## THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| Alton Waggoner ) | |
| Lafayette "Teri" Heishman ) | |
| Hannah Lebovits ) | |
| Kawana Scott ) | Case No. _____ |
| ) | Jury Trial Demanded |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| The City of Dallas, Texas, ) | |
| Edgardo Garcia, in his official capacity, ) | |
| David Pughes, in his official capacity, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I.    INTRODUCTION

1.    This is a First Amendment lawsuit challenging an ordinance recently enacted by the City of Dallas, codified as § 28-61.1 of the Dallas City Code ("the Ordinance"), facially and as applied. The City Council passed the Ordinance to prevent poor people from asking for money on medians and other areas alongside Dallas's roadways. This not only violates the First Amendment rights of some of the City's most vulnerable citizens, but also sweeps far beyond its intended reach to encroach upon the rights of any person in Dallas who uses medians and areas adjacent to the street to engage in protected First Amendment activities. A copy of the Ordinance is attached as Exhibit A.

1

2.      The Ordinance is the product of a years-long effort orchestrated by Dallas councilmembers to score political points by attacking people engaged in the unpopular speech of requesting financial help. It rests upon a manufactured, post-hoc public safety justification unsupported by any evidence demonstrating that people engaging in expressive activities on areas affected by the Ordinance pose any threat to pedestrian and roadway safety. The history of the Ordinance's passage, statements by Councilmembers, its myriad exceptions, and plan for enforcement together reveal that the City's actual target is poor people who solicit donations on the streets.

3.      Section 28-61.1 prohibits any person from "stand[ing] or walk[ing] on a median that measures six feet or less . . . or in an area designated as a clear zone." Ex. A at 2. A clear zone, among other areas, includes "the area four feet from the face of the curb" on a curbed street and "10 feet from the edge of the travel lane" on an uncurbed street. On its face, then, the Ordinance criminalizes anyone in Dallas who uses medians and other areas next to the roadway to exercise their First Amendment rights.

4.      Plaintiffs are individuals who, while standing on areas affected by the Ordinance, regularly solicit donations, provide donations and support to poor individuals, and engage in political speech. In adopting § 28-61.1, the City of Dallas is threatening criminal sanctions against Plaintiffs if they engage in core expressive activity in crucial public forums across the city. Such a broad, punitive restriction on speech violates the First Amendment.

5.      The Ordinance is a targeted attack on poor people who solicit donations, so-called "panhandlers," and those who try to assist them. For over a year and half, the Dallas City Council engaged in a coordinated campaign to erase panhandlers from the streets of Dallas.

6.     Recognizing that such a targeted attack would violate the First Amendment's prohibition on content discrimination, the City manufactured an unjustified "public safety" rationale for § 28-61.1, and attempted to disguise the Ordinance's real purpose by criminalizing a broad array of speech. Similar attacks on homeless people have been struck down across the country in recent years. *See, e.g.*, *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1221 (10th Cir. 2021); *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1068–69 (10th Cir. 2020), cert. denied sub nom. *City of Oklahoma City, Oklahoma v. McCraw*, 141 S. Ct. 1738 (2021); *Cutting v. City of Portland, Maine*, 802 F.3d 79, 88–89 (1st Cir. 2015).

7.     The City passed § 28-61.1 despite being confronted with contradictory evidence from City Attorney Christopher Caso showing the Ordinance would likely exacerbate the harms associated with homelessness. As the City Attorney explained, "[C]riminalization of panhandling often results in unpaid citations and outstanding warrants—limiting an individual's ability to obtain a driver's license, housing, or employment, and indirectly increasing or impacting homelessness." Ex. C (Feb. 3, 2021, City Council Presentation) at 13

8.     Plaintiffs seek a judgment against the City under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 enjoining the City from enforcing the Ordinance and a declaration that the Ordinance violates Plaintiffs' First Amendment rights.

## II.     JURISDICTION AND VENUE

9.     This is a civil rights action arising under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, federal question jurisdiction.

10.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claim occurred in this district.

### III.    PARTIES

11.    Plaintiff Alton Waggoner is a 68-year-old veteran who has been homeless for approximately two years and currently resides in Dallas. He solicits donations from pedestrians and drivers to afford the basic necessities of life. He has previously been fined $450, an amount he still cannot afford, for simply soliciting donations to survive.

12.    Plaintiff Lafayette "Teri" Heishman is a 67-year-old veteran with disabilities who has been in and out of homelessness for several years. Ms. Heishman currently resides in housing subsidized by the Veterans Administration in Dallas, but still struggles to meet the necessities of life. She solicits donations to survive but has been cited by the Dallas Police Department six times for behaviors associated with homelessness.

13.    Plaintiff Hannah Lebovits is a 30-year-old professor at the University of Texas, Arlington and resides in Dallas, Texas. Dr. Lebovits uses areas affected by the Ordinance as part of her research and her personal commitment to helping individuals experiencing homelessness.

14.    Plaintiff Kawana Scott is a 30-year-old political activist who currently resides in the Dallas metropolitan area. She frequently uses areas affected by the Ordinance to advocate for issues she cares about. The Ordinance criminalizes these foundational First Amendment freedoms.

15.    Defendant City of Dallas ("Dallas" or "the City") is a municipal corporation chartered under the laws of the State of Texas. Plaintiffs challenge an Ordinance enacted by the City of Dallas.

16.    Defendant Edgardo Garcia is the Chief of the Dallas Police Department and is sued in his official capacity. Chief Garcia is an enforcement actor authorized by §§ 28-18 and 28-153 of the Dallas City Code to enforce the challenged ordinance.

17.    Defendant David Pughes is the Interim City Marshal of the Dallas City Marshal's office and is sued in his official capacity as acting director of that office. Interim Marshal Pughes is an enforcement actor authorized by § 13-10 of the Dallas City Code to enforce the challenged ordinance.

## IV.    FACTUAL ALLEGATIONS

18.    On October 26, 2022, the City of Dallas enacted a new ordinance, codified as § 28-61.1 in the Dallas City Code ("§ 28-61.1" or "the Ordinance"), that makes it a criminal offense, punishable by a fine of up to $500, if a person:

> [S]tands or walks on a median that measures six feet or less, in areas where no median exists for roadways designated as divided roadways, or in an area designated as a clear zone.

Ex. A at 2. The Ordinance defines a clear zone as the:

> unobstructed, traversable area provided beyond the edge of the through travelled way for the recovery of errant vehicles. On a curbed street, the clear zone is the area four feet from the face of the curb. On an uncurbed street, the clear zone is 10 feet from the edge of the travel lane. A clear zone includes shoulders, bicycle lanes, and auxiliary lanes, except auxiliary lanes that function like through lanes. However, a clear zone does not include areas adjacent to the back of the curb where a paved sidewalk exists.

*Id.*

19.    The Ordinance contains a variety of exceptions, including for people crossing the street in the most direct route possible, responding to emergency situations, performing certain approved road work, or those who have prior authorization from the city. *Id.* at 3. It also allows individuals to be within a clear zone if they are on a paved sidewalk adjacent to the curb. *Id.*

20.    While the precise scope of areas affected is unclear, the Ordinance clearly criminalizes First Amendment activities on medians, some street corners, and all unpaved areas adjacent to the street. But, without justifying why these areas are any safer than raised medians, it permits standing on paved sidewalks even if this means standing right next to a traffic lane.

21.    In conjunction with § 28-61.1, the City Council approved a separate ordinance amending § 13-10 of the City Code to give the Dallas City Marshals authority to enforce § 28-61.1. A copy of this ordinance is attached as Exhibit B. Dallas City Marshals are sworn law enforcement officers, but largely perform duties related to the operation of the Dallas Municipal Court and city jail. In recent years, and as explained below, the Marshals have taken a proactive role in criminally punishing homeless people in conjunction with Dallas's Office of Homeless Solutions.

22.    On its face, § 28-61.1 prohibits Plaintiffs and numerous others from using areas surrounding Dallas's streets that are critical to Plaintiffs' expressive activity. In crafting such a broad and sweeping Ordinance, Dallas has not only undermined the rights of poor people who panhandle, but also prohibited a vast array of protected First Amendment activities in traditional public forums.

## A.    The Dallas City Council and City Attorney Designed Section 28-61.1 to Target Panhandling

23.    For years, the City of Dallas has been regarded as a notoriously harsh enforcer of criminal laws prohibiting activities associated with panhandling and homelessness. For example, in 2016, Dallas was included in the National Law Center on Homelessness & Poverty's "Hall of Shame" because the city had "issued over 11,000 citations for sleeping in public" from January 2012 to November 2015 and "2,000 citations for panhandling in 2015 alone."[1] This was nothing new: as early as 2006, two nonprofits that work extensively with homeless populations labeled

---

[1] NATIONAL LAW CENTER ON HOMELESSNESS & POVERTY, HOUSING NOT HANDCUFFS: ENDING THE CRIMINALIZATION OF HOMELESSNESS IN U.S. CITIES 29 (2016).

Dallas the sixth "meanest" city in the country because of the large number of ordinances on its books that punish behaviors associated with homelessness and feeding the homeless.[2]

24.    Finding its existing anti-panhandling laws both ineffective and unenforceable, the City of Dallas launched a coordinated effort to rid its streets of panhandlers. The culmination of this effort was an ordinance that was designed and enacted to target panhandlers without constitutionally adequate justification.

> *i.    The February 3, 2021, meeting demonstrated City Council's open opposition to panhandling*

25.    Frustrated with the fact that its prior efforts to criminally punish panhandling were not yielding the results it wanted, City Council held a briefing on February 3, 2021, to address "panhandling, solicitation, and available strategies." Ex. C (Feb. 3, 2021, City Council Presentation).

26.    City Attorney Christopher Caso spoke about the City's past approaches to panhandling and potential changes to the City's laws and policies that could address an array of complaints from councilmembers. Caso recognized the harmful impact that such ordinances have on Dallas's homeless population, *id.* at 13, and made clear, "[e]nforcement which specifically targets panhandling likely violates the First Amendment," *id.* at 8.

27.    Attorney Caso offered potential alternatives to a new ordinance prohibiting solicitation such as "Same-Day Pay Programs," physically modifying medians to deter solicitations, increasing available supportive strategies, and providing vouchers for necessities like food and shelter. *Id.* at 13–18.

---

[2] THE NATIONAL COALITION FOR THE HOMELESS & THE NATIONAL LAW CENTER ON HOMELESSNESS & POVERTY, A DREAM DENIED: THE CRIMINALIZATION OF HOMELESSNESS IN U.S. CITIES 31–32 (2006).

28.     Despite the warning that any law targeting panhandling would likely face a constitutional challenge, councilmembers repeatedly expressed their desire for an ordinance punishing panhandling and made statements expressing significant animus toward those panhandling to survive. As then-Councilmember Lee Kleinman saw it, panhandling was "a criminal activity that we're doing virtually no enforcement on."[3] He explained, "We've gotta get some enforcement because the compassionate side just isn't working . . . . [I]n our neighborhoods we see them just destroyed by folks that are taking advantage . . . [I]t's gotta be stronger than this . . . . And we need to get some heavy-handed ordinances in here so we can have some enforcement."[4]

29.     Councilmembers were aware of the constitutional limits on panhandling bans but wanted to criminalize the activity anyway. Councilmember Kleinman put this intention plainly:

> [T]he courts have struck down many ordinances with regards to free speech and the ability to solicit, but . . . most of those courts are on the west coast . . . , in the Ninth Circuit, and in the Fifth Circuit, those cases have not come forward, so my attitude is that until our courts, the courts that oversee our jurisdictions, come forward to destroy that argument, we should just continue to enforce them. I'm sorry—the compassion of people of North Dallas just has a limit.[5]

Not only did his statement reflect a disregard for the First Amendment rights of poor people trying to survive, but it was also misleading on the law. *See, e.g.*, *Gbalazeh v. City of Dallas, Tex.*, 394 F. Supp. 3d 666, 673 (N.D. Tex. 2019); *Blitch v. City of Slidell*, 260 F. Supp. 3d 656, 669–70 (E.D. La. 2017); *Jornaleros de Las Palmas v. City of League City*, 945 F. Supp. 2d 779, 798 (S.D. Tex. 2013).

---

[3] Dallas City Council, *21-17 Panhandling and Solicitation, Overview and Available Strategies*, DALLAS CITY NEWS NETWORK at 36:56 (Feb. 3, 2021), https://dallastx.swagit.com/play/02032021-715.
[4] *Id.* at 39:32–4:00.
[5] *Id.* at 38:30–39:14.

30.    Running through the councilmembers' comments was a series of false, harmful, and misleading statements about people who panhandle. As part of the February 3 presentation, the Office of Homeless Solutions ("OHS") reported that, based on city data and studies from around the country, the majority of people who panhandle are poor, struggle to fulfill "basic needs, such as food or shelter," are largely considered homeless or housing insecure, and earn "anywhere from $20–$300 daily" while panhandling. Ex. C at 6 (Feb. 3, 2021, City Council Presentation).

31.    Relying only on their own experiences, second-hand anecdotes, and outright fabrications, councilmembers expressed their disagreement with OHS's findings. For example, some accused panhandlers of being part of an organized for-profit operation taking advantage of residents. Councilmember Casey Thomas stated, "This is a huge problem, I'm not gonna minimize it. . . , it is a very big problem. . . . that we all deal with. . . . [S]ocial services is not gonna be effective when you got a organized racket of individuals . . . who are not in need of help, but they're doing this as a profession."[6] Councilmember Kleinman went so far as to suggest bringing RICO cases against individuals suspected of being part of these fictional organizations.[7]

32.    Councilmembers also claimed that homeless individuals did not seek social services because panhandling was just too profitable. Councilmember Kleinman speculated, "[W]hen our Office of Homeless Solutions goes into these intersections and meets with people and does cleanups and offers services, they are not accepted. . . . Why would someone go into . . . a shelter, or a supportive housing situation, when they can make $300 a day on the street?"[8] Similarly, Councilmember McGough stated, "My recollection is that . . . really it was just too profitable to panhandle."[9] Councilmember Arnold agreed, "It is frustrating when you try to help

---

[6] *Id.* at 1:29:59–30:34.
[7] *Id.* at 37:50–38:10.
[8] *Id.* at 36:22–36:44.
[9] *Id.* at 1:04:30–38.

and, and the folks tell you they don't want the help. I've had that experience. . . . And so, we want to help, we want to be humane about it, but it has to be a balancing act, you know."[10]

33.    Councilmember Mendelsohn shared these same sentiments even more pointedly: "Here we're talking about people who are resistant to the social services, they're never going there to redeem them, this is not a viable option."[11] She elaborated, "Some of [this] is just fantasyland. . . .[W]here you say people are there for basic needs, food and water, that is not what's happening in our district. Residents will offer food and water and it will be rejected. They only want money."[12] Councilmember Mendelsohn later suggested that panhandling is more lucrative than being a city councilmember and that if people stopped giving money, "they would go away. They would, they would get a job, they would find some other way to subsist."[13]

34.    In a moment of candor, Councilmember Mendelsohn stated, "[T]he notion that these are only people that deserve compassion is incorrect."[14]

35.    Over the course of the lengthy discussion of panhandling, no person provided statistics, evidence, or data on traffic safety problems associated with panhandling. Nor is there any empirical evidence of traffic accidents, pedestrian injuries, or other problems associated with people standing on medians or other affected areas adjacent to the street.

36.    At the conclusion of the meeting, Councilmember Kleinman requested that the City Attorney and his office "prepare the amendments with regards to banning all solicitation" as well as expanding enforcement power to the Marshal's Office.[15]

---

[10] *Id.* at 1:32:38–33:06.
[11] *Id.* at 1:38:30–40.
[12] *Id.* at 55:43–56:23.
[13] *Id.* at 1:41:20–42:08.
[14] *Id.* at 1:40:54–41:20.
[15] *Id.* at 1:45:40–46:00.

37.     The councilmembers' statements reflect both a resentment towards those who panhandle and a misleading view of the reality many housing insecure people face in Dallas. Many poor individuals, including Plaintiffs, do not utilize shelters or social services for a variety of legitimate reasons that criminal punishment will only exacerbate. Ex. F (Decl. of Alton Waggoner) at ¶¶ 7, 10–11. For example, as OHS's findings support, many homeless individuals struggle with mental health in ways that make confined living spaces impossible for them to manage. *Id.* at ¶ 10; Ex. C at 6 (Feb. 3, 2021, City Council Presentation). Others, like Plaintiff Waggoner, are unable to access shelters that require identification because of suspended licenses tracing back to the very same enforcement threatened here. Ex. F (Waggoner Decl.) at ¶¶ 7, 10; *see also* Ex. C at 13 ("Criminalization of panhandling often . . . limit[s] an individual's ability to obtain a driver's license."). Many individuals who panhandle have tried, or are actively trying, to obtain services and support, but are unable to do so. Ex. F (Waggoner Decl.) at ¶¶ 7, 10–11; Ex. H (Decl. of Hannah Lebovits) at ¶¶ 12–13. As the City Attorney acknowledged, criminal punishment only pushes housing insecure individuals further to the margins, making panhandling more necessary and social services less accessible. *See also id.* at ¶ 20.

ii.     *The October 25, 2021, meeting solidified plans to outlaw panhandling through section 28-61.1*

38.     Eight months later, on October 25, 2021, City Council again addressed the issue of panhandling. At a meeting of the Government Performance & Financial Management Committee ("GPFM Committee"), councilmembers heard a presentation from several City departments on the "panhandling deflection program," a multi-disciplinary approach that included social services, public education, and law enforcement.[16] "Creat[ing] an offense for standing in a median" was

---

[16] Dallas City Council, *Government Performance & Financial Management Committee*, DALLAS CITY NEWS NETWORK (Oct. 25, 2021), https://dallastx.swagit.com/play/10262021-529.

included as part of OHS's presentation to the GPFM Committee. Ex. D at 3 (Oct. 25, 2021, GPFM Presentation).

39.     Councilmember Gay Donnell Willis asked specifically about how ordinances would fit into the program: "I wanted to ask the City Attorney about the . . . proposed ordinances and creating the offense for standing in a median, and then also about the prohibition of solicitation of occupants in vehicles, and so even though this would be a pilot, . . . is that something we would go on and do?"[17] A member of the City Attorney's Office explained that the City needed to take additional steps to protect a future ordinance against anticipated constitutional challenge:

> The standing in the median, it's six feet or less [and] to survive constitutional challenges, we would need to do some study to—to show evidence that we do need that as . . . a public safety reason. So I think we would need work on that before we can add that to the books but we have other ordinances that we can enforce at this time.[18]

40.     This comment laid bare the City's plan: at the time, the City had no evidence of any traffic safety problem that would provide a constitutionally sufficient basis for § 28-61.1. Instead, the City sought to craft an ordinance that would prohibit panhandling and then, after the fact, conjure a purported justification that it hoped could withstand constitutional scrutiny.

41.     However, the data the City presented at later meetings undermined, rather than supported, § 28-61.1's supposed safety justification. The discussion around the Ordinance that followed the October 25, 2021, meeting only relied on generic statistics about pedestrian safety without demonstrating the Ordinance at issue would help keep Dallas's pedestrians or drivers safe.

> iii.    *Subsequent meetings failed to support the Ordinance's "traffic safety" justification.*

---

[17] *Id.* at 3:11:20–11:48.
[18] *Id.* at 3:12:00–12:31.

42.    To manufacture a justification for the Ordinance, the Transportation and Infrastructure ("TI") Committee held a briefing the following April.[19] Councilmembers on that committee quickly understood that this ordinance was the City's attempt to punish panhandling.

43.    For example, Councilmember Mendelsohn began the committee's discussion by clarifying that this was the same ordinance the GPFM Committee had discussed as part of its panhandling deflection program. Councilmember Mendelsohn, without any evidence, commented on the dangerousness of panhandling, but also echoed the concerns raised in earlier sessions, asking, "How does this affect the solicitations that happen like Fill the Boot for the firefighters or any of the religious organizations that are soliciting at the streets?"[20] Seeking to assure her that the ordinance would not prohibit her favored categories of speech, a representative from the City Attorney's office replied, "[The Ordinance] would not apply if someone had permission from the city to be there, so presumably they could ask for permission and still continue to do that."[21]

44.    Similarly, Councilmember Tennell Atkins referred to the proposed ordinance as "the one about the panhandling" and expressed concerns about youth sports teams collecting money for their team fundraisers.[22] The TI Committee Chair, Councilmember Omar Narvaez, also expressed concern that "a regular pedestrian" might be subject to a $500 fine for being in a "pedestrian island" of less than six feet.[23]

---

[19] Dallas City Council, *April 18, 2022, Transportation & Infrastructure*, DALLAS CITY NEWS NETWORK at 2:40:30 (Apr. 18, 2022), https://dallastx.swagit.com/play/04182022-541.
[20] *Id.* at 2:19:11–2:19:43.
[21] *Id.* at 2:19:45–2:19:57. The Assistant City Attorney description of the permit mechanism in the Ordinance is further evidence that the City's main objective is picking and choosing which speakers have a voice. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988) ("[E]ven if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion.").
[22] Dallas City Council, *April 18, 2022, Transportation & Infrastructure*, DALLAS CITY NEWS NETWORK at 2:20:26–36 (Apr. 18, 2022), https://dallastx.swagit.com/play/04182022-541.
[23] *Id.* at 2:27:15–40.

45.     Towards the end of the meeting, Councilmember Mendelsohn once again made explicit what other councilmembers implied. She stated, "Just reading [the ordinance], it doesn't say the fullness of what I think the discussion has been. . . . This was actually the intent of the panhandling work we did over two-plus years."[24]

46.     Councilmember Narvaez recognized the legal problem such statements could pose. He observed that the City Attorneys looked uncomfortable at the mention of panhandling and clarified that their discomfort was "because we don't have a panhandling ordinance because the Supreme Court said that you can't ban panhandling and so that's why we are looking at this more as a safety concern."[25]

47.     The Department of Transportation ("DOT") Director also attended the meeting. Councilmembers asked the DOT Director questions about the studies, data, and methodologies relied upon to formulate the Ordinance's public safety justification. Councilmembers did not receive answers to these straightforward questions until five months later, on September 15, 2022, in a memorandum from DOT. Even with several months to acquire the data, DOT only provided references to general road design guidance suggesting medians should be greater than six feet in width to provide adequate pedestrian refuge. However, DOT provided no evidence that narrower medians pose a safety risk, that instances of pedestrian or driver injuries near shorter medians occur with any regularity, if at all, or whether a safety problem exists in these areas in the first place.

48.     The September 15, 2022, memorandum similarly provided no justification for the Ordinance's many exceptions. Presumably, though, if medians less than six feet and other "clear zones" are not safe for Plaintiffs, they would also be unsafe for people using these spaces under

---

[24] *Id.* at 2:30:41–2:33:16.
[25] *Id.* at 2:33:18–44

the Ordinance's exceptions. For example, the memorandum assured committee members that the Ordinance would not make it illegal to cross the road using a median, even though the City's data revealed that crossing at unmarked intersections posed the most significant risk to pedestrian safety. Similarly, the memorandum clarified that the people with prior authorization could use medians and other regulated areas for city-approved activities. But there was no justification for why city-approved speech is somehow safer than the expressive activities of Plaintiffs and others without city approval.

49.    A week after the TI Committee meeting, on April 25, 2022, the GPFM Committee once again considered the Ordinance as part of the "Panhandling Diversion Program"[26] launched in October 2021.[27] Prior to the meeting, OHS submitted a memo titled "Update—Office of Homeless Solutions Panhandling Diversion." The Ordinance was included as an example of "progress made on this [the panhandling] initiative," and was referenced in one of OHS's PowerPoint slides as an upcoming step OHS would be taking to combat panhandling.

50.    OHS provided similar briefings and presentations on May 23,[28] June 27,[29] and October 24 of this year.[30] In each briefing, the Ordinance was presented as more than merely a

---

[26] Councilmembers and City staff use "panhandling diversion" and "panhandling deflection" interchangeably. *Compare infra* note 27 *with infra* note 16 (referring to same program as both diversion and deflection).

[27] Memorandum from Christine Crossley, Director of Office of Homeless Solutions, to Government Performance & Finance Committee, on Update – Office of Homeless Solutions Panhandling Diversion at 1 (Apr. 25, 2022) available at: https://dallascityhall.com/government/Council%20Meeting%20Documents/Panhandling-Diversion-Update_GPFM_Briefing_042522.pdf

[28] Memorandum from Christine Crossley, Director of Office of Homeless Solutions, to Government Performance & Finance Committee, on Update – Office of Homeless Solutions Panhandling Diversion at 1 (May 20, 2022), accessible at https://dallastx.swagit.com/play/05232022-583

[29] Christine Crossley et al., *Panhandling Deflection Program Update*, DALLAS CITY NEWS NETWORK at 7, (June 27, 2022), https://dallastx.swagit.com/play/06272022-529

[30] Memorandum from Christine Crossley, Director of Office of Homeless Solutions, to Government Performance & Finance Committee, on Update – Office of Homeless Solutions

pedestrian safety measure. Rather, it was part of a coordinated campaign to target, track, and cite people who panhandle on street curbs and medians.

51.    At no point during any of the four times the Ordinance was before the GPFM Committee between April 25 and October 24, 2022, did any person from DOT provide data, studies, or other evidence supporting the public safety justification for the ordinance. The Ordinance was only ever "briefed by memorandum" for the whole Committee, meaning it was only discussed if a councilmember asked a specific question. The Committee heard no presentation or other review of any data or studies underlying the barebones safety justification.

52.    Ten days before the Ordinance's passage, the City Manager provided a briefing to a third committee, Public Safety, about the Ordinance. The briefing did not shed light on any concrete safety concerns. Instead, it focused on an ordinance passed in conjunction with § 28-61.1. This complimentary ordinance, codified as § 13-10 of the Dallas City Code, gave the City Marshal authority to "enforce Sections 28-61.1 and 28.63.3 of the Dallas City Code," Dallas's anti-panhandling ordinances. The City proposed this amendment to the Marshal's authority "as part of the city's comprehensive strategic plan to address the needs of the unsheltered population and address illegal solicitation[.]" Ex. E at 1(Oct. 7, 2022, Public Safety Briefing Memorandum).

## B. The Full City Council's Consideration of the Ordinance Demonstrated Section 28-61.1's Anti-Panhandling Intent

53.    City Council formally discussed and voted on the Ordinance on October 26, 2022, passing it by a vote of 14-1. In addition to § 28-61.1, the City Council passed the amendment to § 13-10 without a record vote.

---

Panhandling Deflection at 2 (Oct. 21, 2022),
https://dallascityhall.com/government/Council%20Meeting%20Documents/Panhandling-Diversion-Program-Update_GPFM_102422.pdf

16

> *i.   Panhandling remained the focus of the discussions surrounding the Ordinance*

54.     As the City Council deliberated, Councilmembers repeatedly acknowledged the Ordinance began as a panhandling measure. Councilmember Adam Bazaldua called the Ordinance's newfound "traffic safety" justification "disingenuous." [31] He went on to identify the Ordinance as an "effort to criminalize poverty, an effort to criminalize panhandling, something we know we can't do."[32] Importantly, he observed what the plain language of the Ordinance makes clear: "We have many carve outs in the ordinance that is being proposed that has made it very clear we are not going to be enforcing this on average residents."[33]

55.     Councilmember Mendelsohn addressed Councilmember Bazaldua's concerns, recognizing the Ordinance "was included in the panhandling conversation" but explaining that "what happened is [the Ordinance] evolved. That is why it went to Transportation and that is why it went to Public Safety."[34] For all her demurring, however, Councilmember Mendelsohn had boasted just a few months before, "This [Ordinance] was actually the intent of the panhandling work we did over two-plus years."[35]

56.     Councilmember Narvaez agreed that the Ordinance was initially written in response to the question, "how do we target and do anti-panhandling." Later in the meeting, Councilmember Narvaez worried about "the spirit of where [the Ordinance] started,"—a targeted attack on people who panhandle—but concluded that, "in the spirit of trying something different," he would vote in favor of the Ordinance. He claimed he would reevaluate his position as data became available

---

[31] Dallas City Council, *October 26, 2022, City Council Agenda Meetings*, Item 16 (Part 2 of 2), DALLAS CITY NEWS NETWORK at 16:32–17:35 (Oct. 26, 2022), https://dallastx.swagit.com/play/10262022-855
[32] *Id.* at 19:44–19:55.
[33] *Id.* at 20:00–20:25.
[34] *Id.* at 30:00–31:01.
[35] April 18, 2022, Transportation and Infrastructure, *supra* note 24

on who was targeted for enforcement under the Ordinance.[36] He expressed hope that his colleagues would scrutinize the Ordinance to ensure it was not "just a political move, which is where it started and why it happened."[37]

57.    Those tasked with enforcing the new Ordinance, the Dallas City Marshal's Office, similarly recognized the Ordinance as a panhandling measure. When asked about how his Office would enforce the Ordinance, the Interim City Marshal immediately described enforcement in terms of poor people panhandling. He explained the City would send out marshals as part of their daily responsibilities, but that marshals would respond with "OHS and Crisis Intervention, just like we do on encampment situations now."[38] He further described the Ordinance as an "opportunity" for his office to offer "services" when issuing citations referring people to Dallas's Community Courts.[39] In short, the Marshal made clear his understanding that this was an anti-panhandling ordinance to be enforced against people panhandling.

58.    Councilmember Paula Blackmon recognized the focus on punishing panhandling in the Marshal's description. She responded, "[N]ow I'm confused because I thought we were trying to prevent pedestrian fatalities, but now you've kind of brought in a wholistic approach to something."[40] Councilmember Blackmon neither asked for nor received clarification from the Marshal on her confusion about the relevance of panhandling to a supposed public safety ordinance. But the Marshal's enforcement plan was consistent with previous meetings, where councilmembers sought to expand the enforcement authority of the Marshal's Office to assist OHS

---

[36] Dallas City Council, *October 26, 2022, City Council Agenda Meetings*, Item 16 (Part 2 of 2), DALLAS CITY NEWS NETWORK at 1:00:15–24 (Oct. 26, 2022)
[37] *Id.* at 1:00:41–1:01:02.
[38] *Id.* at 26:00–26:53.
[39] *Id.* at 27:03–27:27.
[40] *Id.* at 28:10–32.

in telling people panhandling violates the law. *See* Ex. E at 1 (Oct. 7, 2022, Public Safety Briefing Memo).

59.     Beyond explicit statements regarding panhandling and homelessness, many councilmembers also made sweeping generalizations about people struggling with mental illness and addiction who were unwelcome in their communities. For example, Councilmember Willis said the Ordinance would help deal with "individuals who are clearly high, hallucinating, having issues, they don't really know where they are."[41] Towards the end of the meeting, she reiterated that the focus of the Ordinance would be to handle those individuals who "could be mentally ill, drug addicted, [and] hallucinating."[42] Councilmember Mendelsohn echoed these sentiments, saying the Ordinance would help manage people who are on medians "daily who this has become a place that they are experiencing life."[43]

> ii.     *The purported public safety justification lacks specificity, support, and credibility*

60.     The City Council's consideration of the public safety justifications underpinning the Ordinance also revealed another of the Ordinance's fatal flaws from a First Amendment perspective.  Both DOT and Dallas police officials presented generic statistics to City Council regarding pedestrian safety. These data only demonstrate that the real pedestrian safety risks in Dallas come from pedestrians crossing the street at unsafe locations or cars failing to yield to pedestrians. The Ordinance addresses neither of these actually urgent public safety concerns.

61.     For example, when asked to provide data on the public safety rationale for the ordinance, the DOT Director stated, "We had 68 pedestrian fatalities in 2021 and year to date in

---

[41] *Id.* at 39:23–30.
[42] *Id.* at 58:02–05.
[43] *Id.* at 54:47–55:01.

2022, 53 fatalities and when we compare it to last year, we are higher by two fatalities for the same period last year. . . and this ordinance will help us in that effort to try and reverse that."[44]

62.    When pressed further on whether these fatalities occurred on medians or in clear zones, the areas the Ordinance targets, the Director stated he would need to get data from the Dallas Police Department ("DPD") or "further review of the reports, but I am aware of at least two of them related to being in the sidewalk or on the median." [45] He went on to state that he did not have any data on pedestrian injuries caused by being on the median.[46] Importantly, the little data he did provide failed to clarify whether the two pedestrian deaths occurred while the person was walking on the sidewalk or using the median to cross the street, both of which are permitted under the Ordinance's exceptions.

63.    When asked about the Ordinance's effect on driver safety, a DPD representative described reports finding that 45 pedestrians had been killed so far in 2022, but only one was attributable to a pedestrian stepping off a median, but again, not standing on the median.[47]

64.    Regarding the possibility of people on medians distracting drivers, the DPD representative said the police department did not have "supporting information nor is it documented that any driver inattention or distraction was caused by subjects on the median."[48]

65.    The text accompanying the Ordinance similarly fails to provide a foundation for the traffic safety claims. In the preamble to the Ordinance, the drafters referenced "a study of pedestrian fatalities in the City of Dallas [which] found that the vast majority of pedestrian fatalities occur when the pedestrian enters the roadway at a point that is not designated for crossing

---

[44] *Id.* at 2:07–2:44.
[45] *Id.* at 3:02–3:15.
[46] *Id.* at 3:15–3:27.
[47] *Id.* at 37:00–37:42.
[48] *Id.* at 37:39–38:00

or standing." Ex. A at 1. While it is not clear what "study" the drafters were referring to, the most likely source is the "Crash Data Analysis 2015–2019" the City conducted as part of its "Vision Zero Action Plan."

66.     Both the crash data and broader action plan, however, demonstrate the Ordinance's ineffectiveness at addressing public safety. The crash data only underscores what DPD and DOT made clear to the City Council—the overwhelming majority of traffic accidents occur because of factors completely unrelated to pedestrians occupying medians or sidewalks.[49] The top six causes listed in the City's analysis are speeding, driving under the influence, failure to drive in a single lane, pedestrians failing to yield to a vehicle, failure to yield when turning left, and running a red light.[50] Across the 25 leading contributors to severe roadway crashes, *none* of the categories plausibly involve injuries due to pedestrians occupying medians.[51]

67.     In fact, the Ordinance's approach to traffic safety—through criminally punishing pedestrians occupying public spaces—contradicts the roadway safety approach the City endorsed in its Vision Zero Action plan. The City developed this action plan based on "wide-ranging analysis of data as well as public input" and "derived [the plan] from verified best practices" from a variety of sources.[52] In the plan, the City recognizes that "the transportation system must be designed to accommodate human vulnerability" and so "plac[es] more responsibility on the system designers than on individual road users."[53] The plan recommends a variety of infrastructure

---

[49] *Dallas Vision Zero Action Plan: Crash & Survey Data Analysis* at 22 (2022), https://dallascityhall.com/departments/transportation/Documents/VisionZeroDataAnalysis_080822_FINAL.pdf
[50] *Id.*
[51] *Id.*
[52] City of Dallas, *Vision Zero Action Plan* at 5 (2022), https://dallascityhall.com/departments/transportation/Documents/FINAL-Vision%20Zero%20Action%20Plan%20%28high%20res%29.pdf
[53] *Id.* at 6.

improvements to make pedestrian crossings safer, reduce traffic speeds, and improve city street infrastructure.[54] The 36-page report does not describe any public safety concerns with individuals occupying medians or unpaved areas behind curbs for extended periods of time.

68.     The closest thing the City has to a justification for the Ordinance is its reliance on general street design guidance suggesting medians should be six-feet wide or greater if intended to be used as a pedestrian refuge. *See* Ex. A at 1. But the First Amendment requires more before a City may restrict speech in public forums, and generic guidance cannot justify a broad restriction on speech on medians and alongside roads across the City. This is particularly true when all of the evidence available to the City suggests the Ordinance would have no effect on public safety, while undermining the commitments made in the City's Vision Zero Action Plan.

**C.  The Ordinance Restricts Plaintiffs' Protected Speech in Crucial Public Forums**

69.     Plaintiffs are all individuals who use Dallas medians and areas adjacent to roadways to engage in protected First Amendment activities, which the Ordinance now criminalizes.

70.     Plaintiff Alton Waggoner is a homeless veteran who solicits donations in public spaces in Dallas for his basic survival. Ex. F (Waggoner Decl.) at ¶¶ 2–3. Mr. Waggoner holds a sign to solicit donations that says, "Disabled Vet anything helps GOD Bless." If he were unable to solicit donations, Mr. Waggoner would have no way to afford the necessities of life including food, shelter, and water. *Id.* at ¶ 3.

71.     He also understands far too well the harmful impact that § 28-61.1 will have on him and other poor people in Dallas. In March of 2020, Mr. Waggoner received a citation for $459.80 for "Solicitation of Occupants of Vehicles." *Id.* at ¶ 7. Because he was, and remains, too poor to

---

[54] *Id.* at 21–25.

afford the ticket, Mr. Waggoner had his driver's license suspended and currently lacks any form of government identification. *Id.* at ¶¶ 7, 10.

72.    Mr. Waggoner cannot access a shelter because of his suspended license. *Id.* at ¶ 10. Unable to find anywhere else to go, Mr. Waggoner even attempted to turn himself into jail to pay off his fine and have a place to sleep. *Id.* at ¶ 7. He was told the jail was too crowded for him. *Id.*

73.    He lives in fear that, because of this new ordinance, he will be further criminalized and targeted just for trying to survive. *Id.* at ¶ 9. The Ordinance punishes Mr. Waggoner for being in the only places where he can make money to survive. *Id.* Despite his attempts to find help with medical problems and addiction treatment, no person from the City has ever reached out to him to offer services. *Id.* at ¶ 11. Instead, several times a week, Mr. Waggoner encounters police officers telling him it is illegal to stand on medians. *Id.* at ¶ 8. When police officers make these statements, Mr. Waggoner complies, but that means he frequently struggles to afford the necessities of life. *Id.*

74.    Plaintiff Lafayette "Teri" Heishman is a veteran with disabilities who can barely afford the basic necessities of life. Ms. Heishman has been in and out of homelessness for the last several years and relies on panhandling to survive. Ex. G (Decl. of Lafayette "Teri" Heishman) at ¶¶ 2–3. To solicit donations, Ms. Heishman holds a sign that says, "Disabled Combat Vet anything helps merry christmas!"

75.    Ms. Heishman frequently uses medians to solicit donations from pedestrians and motorists. *Id.* at 5–6. Without the money gained from soliciting donations, she would not be able to afford food, water, and shelter. *Id.* at ¶ 8.

76.    Dallas police officers have previously cited Ms. Heishman at least six times for behaviors associated with homelessness. *Id.* Ms. Heishman remains too poor to afford those tickets and instead is locked in a cycle of criminal debt and poverty. *Id.* at ¶¶ 9–10.

77.    Ms. Heishman lives in constant fear that the Ordinance will further criminalize constitutionally protected activity she engages in for survival. *Id.* at ¶ 12. Ms. Heishman seeks to continue using areas affected by the Ordinance because when officers tell her it is illegal to be on medians and street corners, she struggles to afford basic life necessities. *Id.* at ¶¶ 13–14.

78.    Similar to Mr. Waggoner, Teri has not been offered supportive services from anyone associated with the City of Dallas. *Id.* at ¶ 15. Instead, the main contact Teri has with the City is through Dallas Police Officers telling her to get off medians and street corners as she tries to survive. *Id.*

79.    Dr. Hannah Lebovits is a Professor of Public Affairs at the University of Texas at Arlington who studies housing and homelessness through the lens of social equity and sustainability. Ex. H (Lebovits Decl.) at ¶ 2. Dr. Lebovits uses areas affected by the Ordinance both for her academic research and carrying out her personal commitments to helping people experiencing economic precarity. *Id.* at ¶ 3.

80.    Medians and other areas affected by the Ordinance are critical to Dr. Lebovits's ability to communicate with and help poor people soliciting donations. These areas help her build trust and maintain the integrity of her research. *Id.* at ¶¶ 6–7, 8. Across the last several years, she has spoken to over 100 people in such areas. *Id.* at ¶ 7. Without access to such areas affected by the Ordinance, Dr. Lebovits will struggle in building long-term lasting relationships, which would undermine both her research and her ability to connect individuals with meaningful services. *Id.* at ¶ 13.

81.    Since the Ordinance's passage, Dr. Lebovits must conduct her research and engagement with people on medians and streets corners under a perpetual threat of enforcement.

*Id.* at ¶¶ 16–18. A citation would harm her research and personal life and deter her from conducting outreach in the street in the future, even in areas unaffected by the ordinance. *Id.* at ¶ 18.

82.    As the City enforces the Ordinance over time, more people who rely on panhandling to survive will leave public spaces for fear of enforcement, further pushing them to the margins. *Id.* at ¶¶ 19–20. This will sever Dr. Lebovits's ties to dozens of people who she has spent years getting to know and prevent future conversations with them. *Id.*

83.    Beyond the Ordinance's effect on poor people who panhandle and those that try to support them, the Ordinance is so broad that it prohibits politically active citizens from speaking out on matters of public concern—speech at the very heart of the First Amendment's protection.

84.    Plaintiff Kawana Scott is a community organizer and works with several advocacy groups across Dallas. Ex. I (Decl. of Kawana Scott) at ¶ 2. She is a dedicated advocate across a number of causes in Dallas, particularly racial and economic justice in Dallas's underserved communities. *Id.* at ¶ 3.

85.    During her 10 years as a community organizer, she has frequently organized, attended, and participated in demonstrations on medians and unpaved areas along roadways. *Id.* at ¶ 4. For her, these public spaces provide her low-cost ways to reach a broad audience. *Id.* at ¶ 5.

86.    As an organizer, Ms. Scott's use of medians is also informed by her understanding of the Civil Rights Movement, where rallies, protests, and demonstrations frequently utilized medians to push for greater civil liberties. *Id.* at ¶ 6. She continues that tradition today by ensuring that the public recognizes racial injustices that occur in our Dallas community. *Id.*

87.    As an organizer of protests and demonstrations, Ms. Scott also recognizes the importance of balancing safety with effective messaging. Medians and areas near curbs give her and her allies a safer place in which to demonstrate because they are typically elevated above the

street and have enough distance from passing cars, while also being close enough to the street to reach a large audience. *Id.* at ¶¶ 7–8.

88.    Across over 100 demonstrations and 10 years as an organizer, Ms. Scott has never seen a person injured while occupying a median. *Id.* at ¶ 11.

89.    Ms. Scott intends to use medians to demonstrate in the future, but the Ordinance as written would prohibit much of Ms. Scott's community organizing and seriously infringes on her First Amendment rights. Because of its breadth, the vast majority of Ms. Scott's demonstrations near public roads are impossible without risking criminal sanctions. *Id.* at ¶ 12.

90.    The diverse speech of Plaintiffs on areas affected by the Ordinance underscores that medians and areas adjacent to the street are critical forums for people to engage with their community and general public. For decades people across Dallas have used medians, sidewalks, and street corners to advocate for causes, preach their respective religions, solicit signatures for petitions, raise money for youth sports teams, and more. The Ordinance is unprecedented in Dallas and closes off critical forums in the marketplace of ideas.

## V.    CLAIMS FOR RELIEF

### Count I: 42 U.S.C. § 1983

### (Free Speech – Invalid Content-Based Restriction)

91.    All prior paragraphs are reincorporated here by reference.

92.    Section 1983 makes Defendants liable "in an action at law, suit in equity, or other proceeding for redress" when persons suffer a "deprivation of any rights, privileges, or immunities secured by the Constitution" due to the City's ordinance. 42 U.S.C. § 1983.

93.    The First Amendment to the United States Constitution, as incorporated against the states through the Fourteenth Amendment, entitles all people to "the freedom of speech" and

prevents governments from abridging that freedom. The Ordinance is a sweeping restriction on expressive activities on medians and areas alongside roadways—places that have long been recognized as "quintessential public forums" where "the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 45 (1983).

94.     The City of Dallas has "no power to restrict expression because of its message, its ideas, its subject matter or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quotation omitted). Content-based laws, meaning those "target[ing] speech based on its communicative content," are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* A restriction on speech may be considered content-based either when its text singles out certain messages or when it is "adopted by the government 'because of disagreement with the message [the speech] conveys." *Id.* at 164 (quotation omitted).

95.     The City of Dallas conducted a multi-year campaign to target and criminally punish panhandling. City Council expressed contempt for people who panhandle, and § 28-61.1 is a manifestation of their disagreement with the expressive activity of panhandling. Even councilmembers who supported the ordinance recognized that it began as an anti-panhandling measure designed to be enforced against panhandlers. Such content-based restrictions on speech are subject to strict scrutiny, which the Ordinance fails.

96.     The City passed the Ordinance for an illegitimate purpose. It has no evidence the Ordinance will keep people safe—let alone that it can survive the "most exacting scrutiny" applied to content-based limitations on speech. *United States v. Alvarez*, 567 U.S. 709, 724 (2012).

97.    Even assuming the post hoc traffic safety justification is legitimate, which Plaintiffs do not concede, the Ordinance still fails strict scrutiny. None of the meager evidence presented to the City Council suggests people sitting or standing on medians pose a safety concern. The generic street design guidance, at most, "lend[s] minimal support to the notion that the Ordinance . . . alleviates non-speculative harms in a direct and material way." *Brewer v. City of Albuquerque*, 18 F. 4th 1205, 1229 (10th Cir. 2021).

98.    Furthermore, the Ordinance is sweeping, applying to the majority of medians across the city and other vaguely defined areas near roadways. Even if the street design guidance supported some restriction on speech, the evidence is insufficient to justify such a broad prohibition on the exercise of First Amendment rights.

99.    The Ordinance therefore violates the First Amendment facially and as applied to Plaintiffs' speech. Because the City has acted and threatened to act under the color of state law to deprive Plaintiffs of rights secured by the First Amendment, Plaintiffs may sue to seek relief under § 1983.

## Count II: 42 U.S.C. § 1983

### (Free Speech – Invalid Time, Place, and Manner Regulation)

100.    All prior paragraphs are reincorporated here by reference.

101.    If the Ordinance is not a content-based limitation on speech, Defendants must still justify it as a content-neutral time, place, and manner restriction under intermediate scrutiny, which the Ordinance fails. Content-neutral regulations must be narrowly tailored to serve a significant government interest and leave open ample alternative avenues for speech. *McCraw*, 973 F.3d at 1071 (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)). This standard requires Defendants to demonstrate a "close fit between ends and means" to prevent "sacrific[ing] speech for

efficiency." *McCullen*, 573 U.S. at 468 (alteration in original) (quotation omitted). The Ordinance fails to meet that standard in all respects.

102.    The Ordinance materially limits Plaintiffs' ability to demonstrate, advocate, solicit, and otherwise express themselves in these areas. Plaintiffs need not wait until they have "experienced an actual arrest, prosecution, or other enforcement action[.]" *Barilla v. City of Houston, Texas*, 13 F.4th 427, 432 (5th Cir. 2021) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). The City's express intention to enforce the Ordinance through DPD and the Marshal's Office creates a credible threat in the face of their continued First Amendment activity.

103.    The Ordinance fails intermediate scrutiny because it does not address public safety concerns and burdens substantially more speech than necessary. The Ordinance bears at most a minimal relationship to the purported interest in protecting the safety of pedestrians and drivers. It leaves untouched the very conduct that the evidence suggests poses the greatest safety risk—pedestrians crossing streets illegally and cars failing to yield to crossing pedestrians.

104.    Moreover, medians and roadsides are a unique, inexpensive place for Plaintiffs to advocate for causes of public concern. No other area in the public square provides as effective and safe a place to reach a broad swath of the public.

105.    The Ordinance represents a broad restriction on a wide variety of First Amendment speech untethered to any actual public safety interest. It therefore fails intermediate scrutiny and violates the First Amendment facially and as applied to Plaintiffs.

106.    Because the City has acted and threatened to act under the color of state law to deprive Plaintiffs of rights secured by the First Amendment, Plaintiffs may sue for relief under § 1983.

## Count III: 28 U.S.C. § 2201

### (Declaratory Judgment)

107.    All prior paragraphs are reincorporated here by reference.

108.    Section 2201(a) provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration[.]"

109.    This case presents an actual controversy between the Plaintiffs and the City of Dallas as to whether Plaintiffs have a First Amendment right to engage in expressive activity on public medians within the City's jurisdiction. As alleged, Plaintiffs claim the Ordinance violates their First Amendment rights.

110.    Plaintiffs seek a declaration that § 28-61.1 violates the Constitution on its face and as applied to Plaintiffs.

## VI.    REQUESTS FOR RELIEF

Plaintiffs respectfully request the following relief:

a)    A judgment declaring the challenged Ordinance violates the United States Constitution under the First Amendment, as incorporated against the states through the Fourteenth Amendment.

b)    A permanent injunction prohibiting the City of Dallas, its police department, and City Marshal from enforcing the challenged Ordinance.

c)    An award to Plaintiffs of costs and attorney's fees; and

d)    Any other and further relief this Court deems just and proper.

Respectfully submitted,

/s/*Travis Fife*
Travis Fife
Texas Bar No. 24126956
travis@texascivilrightsproject.org
*Attorney-in-Charge*
Dustin Rynders
Texas State Bar No. 24048005
dustin@texascivilrightsproject.org
Molly Petchenik (*Pro Hac Vice*)
Illinois Bar No. 6339511
molly@texascivilrightsproject.org
Texas Civil Rights Project
1405 Montopolis
Austin, Texas 78741
Telephone: 512-474-5073

/s/*Caitlyn Silhan*
Caitlyn Silhan
Texas State Bar No. 24072879
csilhan@waterskraus.com
Waters Kraus Paul
3141 Hood Street, Suite 200
Dallas, Texas 75219
Telephone: 214-357-6244
Facsimile:  214-357-7252


Peter B. Steffensen
Texas State Bar No. 24106464
psteffensen@smu.edu
SMU Dedman School of Law
First Amendment Clinic
P.O. Box 750116
Dallas, TX 75275
Telephone: 214-768-4077
Facsimile:  214- 768-1611

**ATTORNEYS FOR PLAINTIFFS**