# Plaintiffs' Appendix

# Exhibit A

6-17-22

ORDINANCE NO.   _____

An ordinance amending Chapter 28, "Motor Vehicles and Traffic," of the Dallas City Code by adding Section 28-61.1; prohibiting standing and walking on medians measuring six feet or less in width, where no medians exist, or in an area designated as a clear zone; providing a penalty not to exceed $500; providing a saving clause; providing a severability clause; and providing an effective date.

WHEREAS, a study of pedestrian fatalities in the City of Dallas found that the vast majority of pedestrian fatalities occur when the pedestrian enters the roadway at a point that is not designated for crossing or standing;

WHEREAS, traffic studies have found that medians under six feet in width, areas with no medians, or areas designated as clear zones are not safe pedestrian refuges;

WHEREAS, the U.S. Department of Transportation, American Association of State Highway Transportation Officials, National Association of City Transportation Officials, and Section 4.3.5 of the City of Dallas 2019 Street Design Manual recommends a minimum median width of six feet for a median to be used as a pedestrian refuge;

WHEREAS, Chapter 2 of the Texas Department of Transportation 2020 Roadway Design Manual recommends an area of four feet from the face of the curb for curbed roadways, or 10 feet from the edge of a travel lane for non-curbed roadways, to be free from obstructions to provide a way for recovery of errant vehicles;

WHEREAS, Section 4.3.5 of the City of Dallas 2019 Street Design Manual recommends the provision of at least three feet of clearance from the outermost edge of structure to back of curb;

WHEREAS, prohibiting pedestrians from standing in a roadway median, on a divided roadway where no median exists, or in a clear zone will protect the health and safety of both pedestrians and motorists; and

WHEREAS, the city council finds that it in the best interest of the public health and safety to prohibit pedestrians from standing in a roadway median, where no median exists, or in a clear zone, subject to certain exceptions; Now, Therefore,

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF DALLAS:

SECTION 1. That Article VIII, "Pedestrians' Rights and Duties," of Chapter 28, "Motor Vehicles and Traffic," of the Dallas City Code is amended by adding a new Section 28.61.1, "Standing and Walking on Medians Prohibited," to read as follows:

**"SEC. 28-61.1.        STANDING AND WALKING IN CERTAIN AREAS PROHIBITED.**

(a)      A person commits an offense if the person stands or walks on a median that measures six feet or less, in areas where no median exists for roadways designated as divided roadways, or in an area designated as a clear zone.

(b)      For purposes of this section,

(1)      CLEAR ZONE means the unobstructed, traversable area provided beyond the edge of the through travelled way for the recovery of errant vehicles. On a curbed street, the clear zone is the area four feet from the face of the curb. On an uncurbed street, the clear zone is 10 feet from the edge of the travel lane. A clear zone includes shoulders, bicycle lanes, and auxiliary lanes, except auxiliary lanes that function like through lanes. However, a clear zone does not include areas adjacent to the back of the curb where a paved sidewalk exists.

(2)      MEDIAN means the intervening space, physical barrier, or clearly indicated dividing section between the two roadways of opposing traffic on a public divided roadway.

(3)     RAISED SPLITTER ISLAND (also known as separator islands) means a median that slows, directs, and separates conflicting traffic and may provide refuge for pedestrians who are crossing a road.

(4)     ROADWAY means streets classified in the city's thoroughfare plan as major/principal or minor arterials, frontage roads or parkways along controlled access freeways and tollways, non-controlled access state roadway facilities and associated intersections with city's major or minor arterials.

(c)     This section does not apply if the person:

(1)     is crossing a divided roadway in the most direct route possible inclusive of roadways that have provisions for dedicated bicycle lane facilities or curb bump outs;

(2)     is the victim of or rendering aid in an emergency situation or in compliance with the directions of a peace officer;

(3)     is performing work in the right-of-way in accordance with a permit issued under Chapter 43 of this code;

(4)     is erecting or dismantling a barricade in the right-of-way in accordance with a permit issued under Chapter 52 of this code;

(5)     has prior authorization from the city or is otherwise in compliance with applicable laws and regulations;

(6)     is standing in a raised splitter island that is not less than four feet in width while attempting to cross a divided roadway in the most direct route possible; or

(7)     is walking or standing on a paved sidewalk if the sidewalk is adjacent to the back of the curb on a curbed roadway which is within a clear zone area.

SECTION 2.  That a person violating a provision of this ordinance, upon conviction, is punishable by a fine not to exceed $500.

SECTION 3.  That Chapter 28 of the Dallas City Code shall remain in full force and effect, save and except as amended by this ordinance.

SECTION 4.  That any act done or right vested or accrued, or any proceeding, suit, or prosecution had or commenced in any action before the amendment or repeal of any ordinance, or part thereof, shall not be affected or impaired by amendment or repeal of any ordinance, or part

thereof, and shall be treated as still remaining in full force and effect for all intents and purposes as if the amended or repealed ordinance, or part thereof, had remained in force.

SECTION 5.  That the terms and provisions of this ordinance are severable and are governed by Section 1-4 of Chapter 1 of the Dallas City Code, as amended.

SECTION 6.  That this ordinance shall take effect immediately from and after its passage and publication in accordance with the provisions of the Charter of the City of Dallas, and it is accordingly so ordained.

APPROVED AS TO FORM:

CHRISTOPHER J. CASO, City Attorney

By_____
   Assistant City Attorney

Passed_____

# Exhibit B

3-31-22

ORDINANCE NO.  _____

An ordinance amending Chapter 13, "Courts, Fines and Imprisonments," of the Dallas City Code, by amending Section 13-10; authorizing the city marshal and his or her deputies to enforce the city's provisions regarding standing or walking on medians contained in Section 28-61.1 of the Dallas City Code and the city's solicitation provisions contained in Section 28-63.3 of the Dallas City Code; providing a saving clause; providing a severability clause; and providing an effective date.

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF DALLAS:

SECTION 1.  That Section 13-10, "Duties of the City Marshal," of Article II, "Municipal Court of Record," of Chapter 13, "Courts, Fines and Imprisonment," of the Dallas City Code, is amended to read as follows:

**"SEC. 13-10.**          **DUTIES OF THE CITY MARSHAL.**

The city marshal and his or her deputies, acting under the direction of the municipal clerk, shall perform the following duties:

(1)     execute warrants of arrest, subpoenas, and other legal process issuing out of the municipal court of record; [and]

(2)     execute other warrants of arrest, subpoenas, and legal process as determined by the municipal clerk; and

(3)     enforce Sections 28-61.1 and 28-63.3 of the Dallas City Code."

SECTION 2.  That Chapter 13 of the Dallas City Code shall remain in full force and effect, save and except as amended by this ordinance.

SECTION 3   That any act done or right vested or accrued, or any proceeding, suit, or prosecution had or commenced in any action before the amendment or repeal of any ordinance, or part thereof, shall not be affected or impaired by amendment or repeal of any ordinance, or part thereof, and shall be treated as still remaining in full force and effect for all intents and purposes as if the amended or repealed ordinance, or part thereof, had remained in force.

SECTION 4.   That the terms and provisions of this ordinance are severable and are governed by Section 1-4 of Chapter 1 of the Dallas City Code, as amended.

SECTION 5.  That this ordinance shall take effect immediately from and after its passage and publication in accordance with the provisions of the Charter of the City of Dallas, and it is accordingly so ordained.


APPROVED AS TO FORM:

CHRISTOPHER J. CASO, City Attorney


By_____
    Assistant City Attorney


Passed_____

# Exhibit C



# Overview of Panhandling, Solicitation, and Available Strategies

## City Council Briefing
## February 3, 2021

Christopher J. Caso,
City Attorney

Jill Haning, Chief of
Community Prosecution

# Overview



- Background
- Constitutional Issues
- Available Tools
- Next Steps





# Background – Departmental Input & Collaboration

- **This is a multifaceted issue. Effectively addressing it requires a multifaceted approach – across many City departments.**
  - City Attorney's Office
  - Office of Homeless Solutions
  - Dallas Police Department
  - Office of Integrated Public Safety Solutions
  - Dallas City Marshal's Office
  - Court & Detention Services
  - Dallas Fire Rescue
  - Office of Community Police Oversight
  - Public Works Department



# Background – City Initiatives



- **Dallas Police Department** – DPD enforces laws to address issues related to panhandling through citation and/or arrest. In 2015, DPD recommended placing "Keep the Change" signs in high traffic areas.

- **Community Court** – Community Courts assist individuals issued quality of life citations associated with panhandling. Along with addressing their criminal offenses, the courts help individuals with mental health, housing, job placement, substance abuse, and other supportive services.

- **Dallas City Marshal's Office** – A program is being developed at the City's Detention Center to refer individuals to community-based support providers to provide them assistance when they are facing quality of life challenges such as homelessness, unemployment, substance abuse, or mental health issues.

- **Office of Community Care** – In 2018, the End Panhandling Now initiative used data to respond to panhandling with social services and referrals delivered by street outreach workers coupled with a social media and outreach campaign designed to educate the community about panhandling and discourage giving directly to panhandlers.

- **Office of Homeless Solutions ("OHS")** – Panhandling outreach has transitioned to OHS as the research showed a high percentage of individuals that panhandle were individuals experiencing homelessness and/or on the continuum (e.g. living day-to-day in motels).



# Background – Panhandling Service Requests 2020









# Background – Local Factors

- Individuals panhandle for a variety of reasons.

- According to the City's street outreach during the End Panhandling Now initiative:

  - *Most individuals are fulfilling basic needs, such as food or shelter.*

  - *Most individuals are considered homeless and/or on the continuum.*

  - *Mental health prevents many from getting and keeping traditional employment and from seeking social services, including shelters.*

  - *Individuals earn anywhere from $20-$300 daily.*

- These findings are consistent with other studies conducted across the country.



# Background - Sites

**Of the 508 service requests in 2020, 32 sites were more heavily trafficked (See Appendix 1) – with 6 of those being the most trafficked.**

- Martin Luther King Jr. Blvd
- Samuell Blvd. & Jim Miller Road
- Galleria
- N. Central Expressway & Royal Lane
- 7950 Forest Lane
- Walnut Hill & N. Central Expressway SB

  



# Constitutional Concerns



- The Supreme Court and lower courts have repeatedly found that asking for help is protected speech under the First Amendment.

- Courts regard the act of asking for money as protected speech and generally prevent cities from criminalizing panhandling or soliciting for money.

- Enforcement which specifically targets panhandling likely violates the First Amendment.
  - *Banning "aggressive panhandling"*
  - *Prohibiting panhandling in specified areas or at specific times*
  - *Requiring panhandlers to obtain solicitation permits*



# Available Tools



Addressing the issues associated with panhandling will require a combination of:

- **Implementing supportive solutions**

- **Modifying existing ordinances and adopting new ordinances**

- **Enforcing existing ordinances and state law**



# Criminal Offenses



- Cities may regulate illegal conduct associated with panhandling.

  - *Littering*
  - *Pedestrian in the Roadway*
  - *Obstructing Highway or Other Passageway*

  - *Impeding Traffic*
  - *Urinating or Defecating in Public*
  - *Criminal Mischief*
  - *Reckless Damage*

  - *Disorderly Conduct*
  - *Assault*
  - *Robbery*





# Municipal Ordinances

- **Broad solicitation ordinances that are content-neutral might survive a constitutional challenge, so long as there is a compelling governmental interest, and they are narrowly tailored.**

  - *Banning all forms of solicitation*
  - *Prohibiting giving to any solicitors*
  - *Requiring all solicitors to obtain solicitation permits*
  - *Prohibiting solicitation at certain times*



# Municipal Ordinances



- **Ordinances that indirectly address panhandling might survive a constitutional challenge.**
  - *Restricting sitting or standing on a sidewalk less than 36 inches*
  - *Require specific land uses that serve individuals who panhandle to develop a "Code of Conduct" that prohibits panhandling by clients; and a plan to manage panhandling in a specified area around the approved land use*

- However, based on the specific language of the ordinance or the specific application of the ordinance, they may face constitutional challenges.





# Supportive Strategies

- **Strategies that address what is believed to be the reason why individuals panhandle are being implemented across the country.**

- Criminalization of panhandling often results in unpaid citations and outstanding warrants - limiting an individual's ability to obtain a driver's license, housing, or employment, and indirectly increasing or impacting homelessness.





# Modifying the Environment

- The physical environment can be modified to discourage panhandling:

  - *Removing benches; unused pay phones; and/or newspaper boxes*

  - *Adding signage re applicable laws and alternative giving options*

  - *Redesigning appropriate landscaping and lighting*

  - *Activating the space to promote activity – mural art, street musicians, businesses, etc.*







# Same-Day Pay Program

The program offers individuals who panhandle an opportunity to earn a daily wage – and create substantive steps towards finding a job, reconnecting with loved ones, or obtaining steady shelter.

| City | Program | Funding | Details |
|---|---|---|---|
| Albuquerque, NM | ***There's A Better Way Initiative*** | City of Albuquerque and Various non-profits | The program pays participants a day's wage to beautify the community during each service day while connecting them with social services. |
| Philadelphia, PA | **Color Me Back: A Same Day Work and Pay Program** | City of Philadelphia, Scattergood Foundation, SEPTA, Sheller Family Foundation, and Mental Health Partnerships | The program offers individuals looking for work to assist with mural painting through a lottery program. They work for half the day and receive a paycheck. Participants can also be connected to city services, such as signing up for a city identification card and connecting to housing and mentorship. |

*Syracuse, NY; Tulsa, OK; Denver, CO; Boston, MA; San Diego, CA; Fort Worth, TX; San Jose, CA; Portland, ME; San Antonio, TX; Atlanta, GA; Memphis, TN*



# Encouraging Alternatives to Giving Curbside



- ***Giving to Non-Profits Serving Individuals Who Panhandlers***
  - This program provides a meaningful way for individuals to give to organizations who serve individuals who panhandle, including text message or websites.
  - OHS is working with San Antonio to develop a program in Dallas.
  - *Philadelphia, PA; Atlanta, GA; Baltimore, MD; Denver, CO; San Antonio, Tx*

- ***Using Technology to Give Directly to Individuals Who Panhandle - Samaritan App*** https://www.youtube.com/watch?v=YZSgQLdGmkg
  - The program provides qualifying individuals with a small "beacon" (a key fob that functions as a smart wallet) which they can obtain through local non-profits.
  - People who download the app get notifications when they cross paths with a qualifying individual and are invited to read their stories and donate money through the app.
  - The "beacon holders" can then use their funds at local partner businesses or ask their counselors to apply the funds to their rent or a different purchase.
  - *Jacksonville, FL; Atlanta, GA; Seattle, WA; Chicago, IL; Oklahoma City, OK; Orange County, CA*



# Voucher Payments



The program allows people to buy vouchers to give to individuals panhandling which are redeemable for food, shelter, transportation, or other necessities.

- a private, nonprofit organization prints and sells the vouchers and serves as the broker between buyers and merchants.

- vouchers are often accompanied with printed information about where they can be redeemed and what social services are available to the needy.

*Los Angeles, CA; Berkeley, CA; Santa Cruz, CA; San Francisco, CA; Nashville, TN; Memphis, TN; New Haven, CT; Portland, OR; Chicago, IL; Seattle, WA; Boulder, CO; and New York, NY.*







# Providing Social Services

- This may include:
    - assistance finding housing that is more affordable;
    - locating community food programs;
    - locating childcare programs;
    - connecting to other activities that decrease social isolation or reconnect with employment, training, education or needed health services; or
    - help navigating available social assistance benefits.



# Proposed Solutions



This multifaceted problem requires a commitment of resources to implement a solution that is a combination of:

- **Implementation of Supportive Solutions**
- **Considering City Code Amendments**
  1) prohibit all forms of solicitation;
  2) prohibit any giving to solicitors; and/or
  3) prohibit sitting or standing on a sidewalk/median less than 36 inches.
- **Enforcement**



# Next Steps



- Consider feedback and direction from City Council.
- Further develop options in coordination with appropriate departments.
- Provide follow up briefings to City Council.
- Draft appropriate ordinances.
- Implement enforcement and supportive strategies.



# QUESTIONS









# City of Dallas

# Overview of Panhandling, Solicitation, and Available Strategies

## City Council Briefing
## February 3, 2021

Christopher J. Caso,
City Attorney

Jill Haning, Chief of
Community Prosecution

# Exhibit D



# Panhandling Deflection Program

## Government Performance and Financial Management
## October 25, 2021

**OHS, CAO, OIPSS, Marshal's Office**

# Project Overview



- Recap of Work Done
- Consequences of Panhandling
- Holistic Approach
- Database
- Pathways to Enforcement
  - OHS Street Outreach
  - City Marshal
  - Mobile Crisis Intervention
  - Community Courts
- Panhandling Deflection Program Flowchart
- Public Education Campaign
- 311 Data Map
- Deterrents
- Pilot Targets
- Next Steps



# Recap of Work Done In The Past 90 Days



2/2021 CAO Presentation to City Council

| **Mobile Crisis Intervention** | • Manager, Supervisors and Caseworkers hired in September and October<br>• Briefed CHC on September 9, 2021 on Mobile Crisis Intervention and RIGHT Care |
| --- | --- |
| **City Marshal's Office** | • Location of panhandling calls; 911/311 calls by time of day and day of the week compiled<br>• Complaint calls mapped and high complaint locations identified |
| **City Attorney's Office** | • To provide additional enforcement options, CAO has drafted proposed ordinances:<br>• Create offense for standing in a median<br>• Expand enforcement authority to allow city marshals to enforce the above prohibition and solicitation of occupants in vehicles |
| **Office of Homeless Services** | • 05/13/2021: Briefed the Citizen Homelessness Commission on draft Public Education Campaign Outreach plan<br>• 08/2021: Public listening sessions by District |



# Consequences of Panhandling







Increased Panhandling          Giving

- Encourages individuals to remain on the street
- Further discourages service-resistant recipients
- Creates a potentially dangerous situation for the donor and recipient of funds



- Hepatitis A
- No guarantee of safe food preparation and handling practices
- Discarded food attracts rodents and stray animals
- Litter is a burden to area property owners and sanitation staff
- Creation of an unsustainable relationship

 Panhandling ≠ Homelessness



# Holistic Approach



- This panhandling diversion project is holistic and attempts to address through an integrated, data-driven approach

- In conjunction with the education and awareness campaign, multiple departments will work together to deter panhandling
  - Environmental deterrents
  - Outreach and services
  - Community courts

- Traditional law enforcement as a last resort











# Office of Homeless Solutions



• 311-based Street Outreach Team engagement
• Service-resistant panhandlers captured in new database





• Engage the faith community, homeless services providers, and street charity event organizers
• Educate the public of the unintended consequences of street charity
• Identify donor and volunteer opportunities
• Match and connect street charity organizers with homeless services providers



# City Marshal



- Partnered with a Crisis Intervention Caseworker
- Identify individuals illegally soliciting
- Conduct initial investigation and check the individual
  - Mental and physical status
  - Warrants
  - Resistant to services



If the individual is cooperative and in need of services, crisis intervention will take over and assess needs

If the individual is uncooperative and resistant to services, a V-citation will be issued



# Mobile Crisis Intervention

- Crisis Intervention caseworkers will ride with a city marshal and conduct an initial assessment on individuals illegally soliciting
- Attempt to deflect the individual away from soliciting and the criminal justice system
- Determine root cause for individual panhandling
- Crisis Intervention caseworkers will be able to refer individuals in need of services
  - **Behavioral Health –** Includes mental health and substance
  - **Physical Health -** Includes primary healthcare services and individuals with disabilities
  - **Social Drivers of Health –** Includes assistance to address factors such as:
    - Access to food security
    - Access to shelter/housing
    - Employment assistance
    - Family reunification





# Community Courts



- The Community Courts will assist individuals cited for violation of Dallas City Code
- Community Courts provide defendants with the opportunity to address the V-citation and connect them to valuable resources that can include:
  - Mental health care
  - Substance abuse care
  - Housing, employment, and transportation needs
  - Basic life skills and financial literacy referrals
- A goal of Community Courts is to eliminate financial hardships:
  - In lieu of court costs, defendants perform supervised community service.
- Pilot Community Courts Street Knowledge Initiative
- Defendants who plead not guilty are referred to Municipal Court



# Panhandling Deflection Program Flowchart



# Public Education Campaign

- Direct residents to call 311 to report issues and ask for better ways to give sustainably
- Educate the public of the unintended consequences of street charity
- Engage the faith community, homeless services providers, and street charity event organizers
- Identify donor and volunteer opportunities
- Match and connect street charity organizers with homeless services providers
- Concepts of signs proposed for campaigns:







# 311 Data Map

Top 9 Locations

- Frankford Rd & Dallas North Tollway, D12
- Forest Ln & 75, D10 & D11
- W Northwest Hwy & Boedeker St, D13
- Shiloh Rd & E Northwest Hwy, D9
- Lovers Ln & 75, D14
- *Communications Dr & N Cockrell Hill Rd, D3 & D6
- *DFW Turnpike & N Cockrell Hill Rd, D3 & D6
- S Polk St & Hwy 67, D4
- Bonnie View Rd & Simpson Stuart Rd, D8



*2 signs only



# Deterrents



- Public works is researching environmental changes to landscape





Page 47 of 229



14



# Deterrents Continued

- **<u>Noise as a deterrent</u>**
    - Use of music
    - Mosquito: Ultra-sonic anti-loitering device





# Pilot Targets



- Goals:
  - Target and identify most active panhandlers and sites reporting panhandling at highest rates
  - Educate public on sustainable giving
  - Decrease giving to panhandlers
- Metrics over 6 months:
  - Reduce number of 911 calls for aggressive panhandling
  - Analyzation of 311 calls – frequency, location
  - Pilot Community Courts Street Knowledge Initiative and report back
  - Increased number of sites hardened
  - Number of V-citations
  - Number of people accessing Sobering Center/CDC
  - Number of people accessing Mobile Crisis services
  - Number of individuals accepting Community Courts services
    - Number of cases warranting adjudication



# Next Steps



- Pilot
  - Beginning of November 2021:
    - Start public education outreach
    - Say No To Panhandling signage goes up
  - November 2021: Database soft-launch
  - End of November/Beginning of December 2021: 6-month pilot
    - Locations based on 311 and 911 data
    - Community Courts partnering with Marshal's Office
  - June 2022: Progress report to GPFM



# Panhandling Deflection Program



**City of Dallas**

## Government Performance and Financial Management
## October 25, 2021

**OHS, CAO, OIPSS, Marshal's Office**

# Exhibit E

# Memorandum



| | |
|---|---|
| DATE | April 25, 2022 |

CITY OF DALLAS

TO    Honorable Chair Mendelsohn and Members of the Government Performance and Finance Committee

SUBJECT    **Update – Office of Homeless Solutions Panhandling Diversion**

The following memorandum is an update on the Office of Homeless Solutions' (OHS) holistic strategy to address homelessness equitably as One Dallas through Panhandling Diversion. The details of progress made on this initiative are outlined below:

- A progress report on areas engaged by the Initiative is attached.
    - o OHS outreach – 23 engagements
    - o Marshals V Citations – 10 citations given
    - o Right care outreach – 7 engagements
    - o Community Courts/Adjudications – No Adjudications in Community Courts needed as of April 18, 2022.
    - o A comparative analysis of 311 and 911 reports for panhandling prior to the Initiative vs the month of March 2022 will be done and sent out prior to the next meeting on May 23, 2022.
- The Transportation Department briefed the Transportation and Infrastructure Committee on April 18, 2022, regarding proposed amendments to Dallas City Code, Chapter 28, to prohibit standing or walking in a median measuring six feet or less, in areas where no median exists for roadways designated as divided roadways, or in an area designated as a clear zone. Attached is a draft of the amendment for your reference.
    - o The Committee had some questions and requested additional information. The Transportation Department will work with the City Attorney's Office to provide the requested information and will be placing the Chapter 28 amendments on the May 11, 2022, City Council agenda.
- The City Attorney's Office is also working with the Marshal's Office on the amendments to Dallas City Code, Chapter 13, to provide the Marshal's Office authority to enforce Section 28-61.1 (standing and walking in certain areas prohibited) and 28-63.3 (solicitations to occupants of vehicles on public roadways prohibited) and will be placing the Chapter 13 amendments on the May 11, 2022, City Council agenda. Attached is a draft of the amendment for your reference.
- Maintenance of the Forest and 75 site continues. OHS is communicating with medical providers in the area to help ameliorate the issue.
- The next two locations are being planned now, with 3 weeks of engagement at each:
    - o South Polk St. and Highway 67
    - o Bonnie View Rd. and Simpson Stuart Rd.
- The cost for signage is $4,000 per 25 signs, which includes fabrication and installation.
- The Office of Homeless Solutions continues to educate and partner with external organizations focused on charitable giving with the larger Continuum of Care (CoC), shelter providers. As a result of OHS' outreach to these organizations, an event is

DATE      April 25, 2022

SUBJECT   **Update – Office of Homeless Solutions Panhandling Diversion**

being planned for early Summer to fully engage all interested, street-based charitable giving organizations with area partners and the local CoC.

Should you have any questions or need additional information, please contact Christine Crossley, Director of the Office of Homeless Solutions.

*Christine Crossley*

Christine Crossley
Director
Office of Homeless Solutions

c:   T.C. Broadnax, City Manager                    Majed A. Al-Ghafry, Assistant City Manager
     Chris Caso, City Attorney                      M. Elizabeth (Liz) Cedillo-Pereira, Assistant City Manager
     Mark Swann, City Auditor                       Robert Perez, Interim Assistant City Manager
     Bilierae Johnson, City Secretary               Carl Simpson, Interim Assistant City Manager
     Preston Robinson, Administrative Judge         M. Elizabeth Reich, Chief Financial Officer
     Kimberly Bizor Tolbert, Deputy City Manager    Genesis D. Gavino, Chief of Staff to the City Manager
     Jon Fortune, Deputy City Manager               Directors and Assistant Directors



# Panhandling Deflection Survey

**Christine Crossley, Office of Homeless Solutions**
**Ayeh Power, City Attorneys Office**
**David Pughes, Office of Integrated Public Safety Solutions**
**Dianne Gibson,  Marshal's Office**
**Brita Andercheck, Data Analytics and Business Intelligence**

# Overview







# Quick Stats



## Out of a Total of 44 Field Reports:

➢ OHS outreach: 23 engagements

➢ Right care outreach: 7 engagements

➢ Marshalls V Citations: 10 citations given

➢ Adjudications: 0

Four entries are tagged as none and are blank.

One entry by OHS cites two individuals.



# Areas with High Density of SR's



Frankford Road and Dallas North Tollway

Lyndon B Johnson and Coit Road









# Areas with High Density of SR's







Forest Lane and North Central Expressway

Lovers Lane and George W Bush Expressway









# Previous, Ongoing, and Next Steps



**Previous**
➢ Data Analytics and Business Intelligence built a secured database for all three teams to use collaboratively.
➢ All teams could enter data and locations of panhandlers through a secure field data collection mobile application.
➢ The team provided 4 training sessions and user guide documentation.

**Ongoing**
➢ Monitoring of SR's and citations of individuals panhandling

**Upcoming**
➢ Proposed amendments to Dallas City Code, Chapter 28
➢ Proposed amendments to Dallas City Code, Chapter 13
➢ A comparative analysis of 311 and 911 reports for panhandling prior to the Initiative vs the month of March 2022 will be done and sent out prior to the next meeting.





# Panhandling Deflection Survey

**Christine Crossley, Office of Homeless Solutions**
**Ayeh Power, City Attorneys Office**
**David Pughes, Office of Integrated Public Safety Solutions**
**Dianne Gibson, Marshal's Office**
**Brita Andercheck, Data Analytics and Business Intelligence**

4-8-22

ORDINANCE NO. _____

An ordinance amending Chapter 28, "Motor Vehicles and Traffic," of the Dallas City Code by adding Section 28-61.1; prohibiting standing and walking on medians measuring six feet or less in width, where no medians exist, or in an area designated as a clear zone; providing a penalty not to exceed $500; providing a saving clause; providing a severability clause; and providing an effective date.

WHEREAS, a study of pedestrian fatalities in the City of Dallas found that the vast majority of pedestrian fatalities occur when the pedestrian enters the roadway at a point that is not designated for crossing or standing;

WHEREAS, traffic studies have found that medians under six feet in width, areas with no medians, or areas designated as clear zones are not safe pedestrian refuges;

WHEREAS, the U.S. Department of Transportation, American Association of State Highway Transportation Officials, National Association of City Transportation Officials, and Section 4.3.5 of the City of Dallas Street Design Manual recommend a minimum median width of six feet for a median to be used as a pedestrian refuge;

WHEREAS, the Texas Department of Transportation recommends an area of four feet from the face of the curb for curbed roadways, or 10 feet from the edge of a travel lane for non-curbed roadways, to be free from obstructions to provide a way for recovery of errant vehicles;

WHEREAS, prohibiting pedestrians from standing in a roadway median, on a divided roadway where no median exists, or in a clear zone will protect the health and safety of both pedestrians and motorists; and

Chapter 28 (standing and walking on medians) - Page 1

WHEREAS, the city council finds that it in the best interest of the public health and safety to prohibit pedestrians from standing in a roadway median, where no median exists, or in a clear zone, subject to certain exceptions; Now, Therefore,

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF DALLAS:

SECTION 1.  That Article VIII, "Pedestrians' Rights and Duties," of Chapter 28, "Motor Vehicles and Traffic," of the Dallas City Code is amended by adding a new Section 28.61.1, "Standing and Walking on Medians Prohibited," to read as follows:

"**SEC. 28-61.1.        STANDING   AND   WALKING   IN   CERTAIN   AREAS PROHIBITED.**

(a)     A person commits an offense if the person stands or walks on a median that measures six feet or less, in areas where no median exists for roadways designated as divided roadways, or in an area designated as a clear zone.

(b)     For purposes of this section,

(1)     CLEAR ZONE means the unobstructed, traversable area provided beyond the edge of the through travelled way for the recovery of errant vehicles. On a curbed street, the clear zone is the area four feet from the face of the curb. On an uncurbed street, the clear zone is 10 feet from the edge of the travel lane. A clear zone includes shoulders, bicycle lanes, and auxiliary lanes, except auxiliary lanes that function like through lanes.

(2)     MEDIAN means the intervening space, physical barrier, or clearly indicated dividing section between the two roadways of opposing traffic on a public divided roadway.

(c)     This section does not apply if the person:

(1)     is crossing a divided roadway in the most direct route possible;

(2)     is the victim of or rendering aid in an emergency situation;

(3)     is performing work in the right-of-way in accordance with a permit issued under Chapter 43 of this code;

(4)     is erecting or dismantling a barricade in the right-of-way in accordance with a permit issued under Chapter 52 of this code; or

(5)     has prior authorization from the city."

SECTION 2.  That a person violating a provision of this ordinance, upon conviction, is punishable by a fine not to exceed $500.

SECTION 3.  That Chapter 28 of the Dallas City Code shall remain in full force and effect, save and except as amended by this ordinance.

SECTION 4.  That any act done or right vested or accrued, or any proceeding, suit, or prosecution had or commenced in any action before the amendment or repeal of any ordinance, or part thereof, shall not be affected or impaired by amendment or repeal of any ordinance, or part thereof, and shall be treated as still remaining in full force and effect for all intents and purposes as if the amended or repealed ordinance, or part thereof, had remained in force.

SECTION 5.  That the terms and provisions of this ordinance are severable and are governed by Section 1-4 of Chapter 1 of the Dallas City Code, as amended.

SECTION 6.  That this ordinance shall take effect immediately from and after its passage and publication in accordance with the provisions of the Charter of the City of Dallas, and it is accordingly so ordained.

APPROVED AS TO FORM:

CHRISTOPHER J. CASO, City Attorney

By_____
    Assistant City Attorney

Passed_____

3-31-22

ORDINANCE NO. _____

An ordinance amending Chapter 13, "Courts, Fines and Imprisonments," of the Dallas City Code, by amending Section 13-10; authorizing the city marshal and his or her deputies to enforce the city's provisions regarding standing or walking on medians contained in Section 28-61.1 of the Dallas City Code and the city's solicitation provisions contained in Section 28-63.3 of the Dallas City Code; providing a saving clause; providing a severability clause; and providing an effective date.

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF DALLAS:

SECTION 1.  That Section 13-10, "Duties of the City Marshal," of Article II, "Municipal Court of Record," of Chapter 13, "Courts, Fines and Imprisonment," of the Dallas City Code, is amended to read as follows:

"**SEC. 13-10.          DUTIES OF THE CITY MARSHAL.**

The city marshal and his or her deputies, acting under the direction of the municipal clerk, shall perform the following duties:

(1)     execute warrants of arrest, subpoenas, and other legal process issuing out of the municipal court of record; [and]

(2)     execute other warrants of arrest, subpoenas, and legal process as determined by the municipal clerk; and

(3)     enforce Sections 28-61.1 and 28-63.3 of the Dallas City Code."

SECTION 2.  That Chapter 13 of the Dallas City Code shall remain in full force and effect, save and except as amended by this ordinance.

SECTION 3   That any act done or right vested or accrued, or any proceeding, suit, or prosecution had or commenced in any action before the amendment or repeal of any ordinance, or part thereof, shall not be affected or impaired by amendment or repeal of any ordinance, or part thereof, and shall be treated as still remaining in full force and effect for all intents and purposes as if the amended or repealed ordinance, or part thereof, had remained in force.

SECTION 4.   That the terms and provisions of this ordinance are severable and are governed by Section 1-4 of Chapter 1 of the Dallas City Code, as amended.

SECTION 5.  That this ordinance shall take effect immediately from and after its passage and publication in accordance with the provisions of the Charter of the City of Dallas, and it is accordingly so ordained.


APPROVED AS TO FORM:

CHRISTOPHER J. CASO, City Attorney


By_____
    Assistant City Attorney


Passed_____

# Exhibit F

# Memorandum



DATE May 20, 2022

CITY OF DALLAS

TO Honorable Members of the Government Performance and Financial Management Committee: Cara Mendelsohn (Chair), Gay Donnell Willis (Vice Chair), Tennell Atkins, Adam Bazaldua, Adam McGough, Paul Ridley, Chad West

SUBJECT **Update – Office of Homeless Solutions Panhandling Diversion**

The following memorandum is an update on the Office of Homeless Solutions' (OHS) holistic strategy to address homelessness equitably as One Dallas through the Panhandling Diversion Initiative. The details of progress made on this initiative are outlined below:

- A progress report on areas engaged by the Initiative is attached.
  - OHS outreach done – 34 engagements
  - Marshals V Citations given – 10 citations given
  - Crisis Intervention Team outreach done – 7 engagements
  - Community Courts/Adjudications – No Adjudications in Community Courts needed as of May 19, 2022.
  - A comparative analysis of 311 and 911 reports for panhandling prior to the Initiative vs the months of March, April, and May 2022 was completed and is attached.
- The City Attorney's Office is working with the Transportation Department and the Marshal's Office on the amendments to Dallas City Code, Chapter 13, and Chapter 28. We anticipate placing the amendments on the June 22, 2022, City Council agenda.
- Maintenance of the Forest Lane and I-75 site is twice monthly with planned DRTRR activity at the nearby encampments contributing to this hotspot.
- The next three locations are being planned now, with 3 weeks of engagement at each:
  - Martin Luther King Boulevard and SM Wright Freeway
  - Lovers Lane and I-75
  - Polk Street and Highway 67
- The cost for signage is $4000 per 25 signs, which includes fabrication and installation.
- The Office of Homeless Solutions continues to educate and partner external organizations focused on charitable giving with the larger Continuum of Care (CoC), shelter providers. As a result of OHS' outreach to these organizations, an event is being planned for early Summer to fully engage all interested, street-based charitable giving organizations with area partners and the local CoC.

DATE      May 20, 2022

SUBJECT   **Update – Office of Homeless Solutions Panhandling Diversion**

Should you have any questions or need additional information, please contact me at 214.670.4276 or via email at Christine.crossley@dallascityhall.com.

*Christine Crossley*

Christine Crossley
Director
Office of Homeless Solutions

[Attachment]

c:     Honorable Mayor and Members of City Council          Majed A. Al-Ghafry, Assistant City Manager
       T.C. Broadnax, City Manager                         M. Elizabeth (Liz) Cedillo-Pereira, Assistant City Manager
       Chris Caso, City Attorney                           Robert Perez, Assistant City Manager
       Mark Swann, City Auditor                            Carl Simpson, Assistant City Manager
       Bilierae Johnson, City Secretary                    M. Elizabeth Reich, Chief Financial Officer
       Preston Robinson, Administrative Judge              Genesis D. Gavino, Chief of Staff to the City Manager
       Kimberly Bizor Tolbert, Deputy City Manager         Directors and Assistant Directors
       Jon Fortune, Deputy City Manager



# Panhandling Deflection Report

**Christine Crossley, Office of Homeless Solutions**
**Ayeh Power, City Attorneys Office**
**Kevin Oden, Office of Integrated Public Safety Solutions**
**David Pughes,  Marshal's Office**
**Brita Andercheck, Data Analytics and Business Intelligence**





# Quick Stats



## Out of a Total of 56 Field Reports:

➢ OHS outreach: 34 engagements

➢ Crisis Intervention Team: 7 engagements

➢ Marshalls V Citations: 10 citations given

➢ Adjudications: 0

Six entries by OHS cite multiple individuals at singular locations.



# April 2022 to May 2022 SR Comparison

## April

## May









# Areas with High Density of SR's

Lovers Lane and North Central Expressway

Northwest Highway and Skillman Road







# Areas with High Density of SR's

## Forest Lane and North Central Expressway



## Frankford Road and Dallas North Tollway







# Emergency 911 calls vs Non-Emergency 311 calls









# Previous, Ongoing, and Next Steps

**Previous**
➢ Data Analytics and Business Intelligence built a secured database for all three teams to use collaboratively.
➢ All teams could enter data and locations of panhandlers through a secure field data collection mobile application.
➢ The team provided 4 training sessions and user guide documentation.

**Ongoing**
➢ Monitoring of SR's and citations of individuals panhandling

**Upcoming**
➢ Proposed amendments to Dallas City Code, Chapter 28
➢ Proposed amendments to Dallas City Code, Chapter 13





# Panhandling Deflection Report

**Christine Crossley, Office of Homeless Solutions**
**Ayeh Power, City Attorneys Office**
**David Pughes, Office of Integrated Public Safety Solutions**
**Dianne Gibson,  Marshal's Office**
**Brita Andercheck, Data Analytics and Business Intelligence**

# Exhibit G

# Memorandum



CITY OF DALLAS

DATE October 7, 2022

TO Honorable Members of the Public Safety Committee
Adam McGough (Chair), Cara Mendelsohn (Vice Chair), Tennell Atkins, Jesse Moreno,
Jaime Resendez, Casey Thomas, Gay Donnell Willis

SUBJECT **October 26, 2022, City Council Draft Agenda Item #L-1; 22-2385 Chapter 13 Code Amendment**

As part of the city's comprehensive strategic plan to address the needs of the unsheltered population and address illegal solicitation, the City Marshal's, Office of Homeless Solutions, Crisis Intervention and Community Courts have proposed an amendment to the Dallas City Code, Chapter 13. This amendment authorizes the City Marshal to enforce illegal solicitation in the roadway as part of this holistic strategy.

The following excerpt of the change is listed below:
An ordinance amending Chapter 13, "Courts, Fines and Imprisonments," of the Dallas City Code, by amending Section 13-10; authorizing the city marshal and his or her deputies to enforce the city's provisions regarding standing or walking on medians contained in Section 28-61.1 of the Dallas City Code.

The proposed ordinance amending chapter 13 has been briefed to GPFM on October 25, 2021, and to the Transportation and Infrastructure committee on August 15, 2022. It is scheduled for City Council consideration at the October 26, 2022, City Council meeting.

The full ordinance amendment is attached. Should you have any questions or concerns please contact me at (214) 670 5299.

Jon Fortune
Deputy City Manager

c:
T.C. Broadnax, City Manager
Chris Caso, City Attorney
Mark Swann, City Auditor
Bilierae Johnson, City Secretary
Preston Robinson, Administrative Judge
Kimberly Bizor Tolbert, Deputy City Manager

Majed A. Al-Ghafry, Assistant City Manager
M. Elizabeth (Liz) Cedillo-Pereira, Assistant City Manager
Dr. Robert Perez, Assistant City Manager
Carl Simpson, Assistant City Manager
Jack Ireland, Chief Financial Officer
Genesis D. Gavino, Chief of Staff to the City Manager
Directors and Assistant Directors

3-31-22

ORDINANCE NO.  _____

An ordinance amending Chapter 13, "Courts, Fines and Imprisonments," of the Dallas City Code, by amending Section 13-10; authorizing the city marshal and his or her deputies to enforce the city's provisions regarding standing or walking on medians contained in Section 28-61.1 of the Dallas City Code and the city's solicitation provisions contained in Section 28-63.3 of the Dallas City Code; providing a saving clause; providing a severability clause; and providing an effective date.

BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF DALLAS:

SECTION 1.  That Section 13-10, "Duties of the City Marshal," of Article II, "Municipal Court of Record," of Chapter 13, "Courts, Fines and Imprisonment," of the Dallas City Code, is amended to read as follows:

**"SEC. 13-10.          DUTIES OF THE CITY MARSHAL.**

The city marshal and his or her deputies, acting under the direction of the municipal clerk, shall perform the following duties:

(1)     execute warrants of arrest, subpoenas, and other legal process issuing out of the municipal court of record; [and]

(2)     execute other warrants of arrest, subpoenas, and legal process as determined by the municipal clerk; and

(3)     enforce Sections 28-61.1 and 28-63.3 of the Dallas City Code."

SECTION 2.  That Chapter 13 of the Dallas City Code shall remain in full force and effect, save and except as amended by this ordinance.

Amending Chapter 13 - Page 1 of 2

SECTION 3   That any act done or right vested or accrued, or any proceeding, suit, or prosecution had or commenced in any action before the amendment or repeal of any ordinance, or part thereof, shall not be affected or impaired by amendment or repeal of any ordinance, or part thereof, and shall be treated as still remaining in full force and effect for all intents and purposes as if the amended or repealed ordinance, or part thereof, had remained in force.

SECTION 4.   That the terms and provisions of this ordinance are severable and are governed by Section 1-4 of Chapter 1 of the Dallas City Code, as amended.

SECTION 5.  That this ordinance shall take effect immediately from and after its passage and publication in accordance with the provisions of the Charter of the City of Dallas, and it is accordingly so ordained.


APPROVED AS TO FORM:

CHRISTOPHER J. CASO, City Attorney


By_____
    Assistant City Attorney


Passed_____

# Exhibit H



# Panhandling Deflection Program Update

Christine Crossley, Office of Homeless Solutions
Ayeh Powers, City Attorney's Office
Kevin Oden, Office of Integrated Public Safety Solutions
David Pughes, **Marshal's Office**
Brita Andercheck, Data Analytics and Business Intelligence

# Program Overview



- Pilot Targets, October 2021
- Panhandling Deflection Program Flowchart
- Achievements, Lessons Learned, and Updates by Department
  - Data
  - Office of Homeless Solutions
  - City Marshal
  - Mobile Crisis Intervention
  - Community Courts
  - Public Works: Site Hardening
- Location Metrics
- Panhandling Reports by SR Type
- Pilot Targets, June 2022
- Next Steps



# Pilot Targets, October 2021



## Goals

Target and identify most active panhandlers and sites reporting panhandling at highest rates

Educate public on sustainable giving

Decrease giving to panhandlers

## Program Metrics

Reduce number of 911 calls for aggressive panhandling

Analyzation of 311 calls – frequency, location

Increased number of sites hardened

Number of people accessing Mobile Crisis services

Number of people accessing Sobering Center/CDC

Number of V-citations

Pilot Community Courts Street Knowledge Initiative

Number of individuals accepting Community Courts services

- Number of cases warranting adjudication



# Panhandling Deflection Program Flowchart











# Office of Homeless Solutions





## OFFICE OF HOMELESS SOLUTIONS
## STREET OUTREACH

City of Dallas

### ABOUT OUR DEPARTMENT

The Office of Homeless Solutions' (OHS) Street Outreach team is considered the department's first responders. They respond to all OHS related requests for assistance submitted to the 311 system and are responsible for connecting our neighbors experiencing homelessness to established partnering agencies.

### NEED ASSISTANCE?

| Homeless Veterans Services of Dallas | The Salvation Army of North Texas | OurCalling |
|---|---|---|
| 214-372-8822 | 214-242-7000 | 214-444-8796 |

| Austin Street Center | Family Gateway | The Bridge Homeless Recovery Center |
|---|---|---|
| 214-428-4242 | 214-823-4500 | 214-670-1507 |

### REPORT A HOMELESS ENCAMPMENT

Call 311 or use the OurDallas Mobile App to Submit a Service Request

### HOMELESS OUTREACH SERVICE LEADERSHIP

To contact OHS Outreach Services please email: ohsinfo@dallascityhall.com



- 311-based Street Outreach Team engagement
- Service-resistant panhandlers captured in new database
- Engage the faith community, homeless services providers, and street charity event organizers
- Educate the public of the unintended consequences of street charity
- Identify donor and volunteer opportunities
- Match and connect street charity organizers with homeless services providers



**PANHANDLING**
SAY NO TO PANHANDLING

CONTRIBUTE TO THE SOLUTION
GIVE TO LOCAL CHARITIES
NEED HELP? - CALL 311



# City Marshal



- Currently Marshal's can enforce the following ordinance:
  - Dallas City Code 28-63-3, Solicitations to Occupants of vehicles on Public Roadways Prohibited
- New Ordinance has been drafted amending Chapter 13 of the Dallas City Code, authorizing the city marshal and his or her deputies to enforce the city's provisions regarding standing or walking on medians contained in Section 28-61.1
- Marshal's conduct special initiatives in collaboration with OHS and Crisis Intervention
  - Identify individuals observed illegally soliciting
  - Conduct initial investigation and check the individual
    - Mental and physical status
    - Warrants
  - If the individual is cooperative and in need of services, crisis intervention will take over and assess needs
  - If the individual is uncooperative and resistant to services, a V-citation will be issued





# Mobile Crisis Intervention

- Crisis Intervention caseworkers co-respond with a City Marshal and conduct an initial assessment on individuals illegally soliciting
- CIT attempts to deflect the individual away from soliciting and the criminal justice system
- Determine root cause for individual soliciting
- Crisis Intervention caseworkers can refer individuals in need of social services
  - **Behavioral Health –** Includes mental health and substance
  - **Physical Health –** Includes primary healthcare services and individuals with disabilities
  - **Social Drivers of Health –** Includes assistance to address factors such as:
    - Access to food security
    - Access to shelter/housing
    - Employment assistance
    - Family reunification





# Community Courts



- The Community Courts will assist individuals cited for violation of Dallas City Code
- Community Courts provide defendants with the opportunity to address the V-citation and connect them to valuable resources that can include:
  - Mental health care
  - Substance abuse care
  - Housing, employment, and transportation needs
  - Basic life skills and financial literacy referrals
- A goal of Community Courts is to eliminate financial hardships:
  - In lieu of court costs, defendants perform supervised community service.
- Pilot Community Courts Street Knowledge Initiative
- Defendants who plead not guilty are referred to Municipal Court





# Public Works: Site Hardening

- Public works and OHS are partnering to provide a list of site hardening options to each Councilmember later this summer





Page 93 of 229



9

# Location Metrics



## Total Field Reports
- 80
  - ➢Marshals- 10
  - ➢OHS- 39
  - ➢OIPSS- 24

## Demographics
- Female- 15
- Male- 61





# Panhandling Reports by SR Type and Locale





Forest and I 75



Frankford Rd and DNT





11

# Pilot Targets, June 2022



## Goals

Target and identify most active panhandlers and sites reporting panhandling at highest rates

Educate public on sustainable giving

Decrease giving to panhandlers

## Program Metrics

Reduction in number of 911 calls for aggressive panhandling being sorted now to duplicate data

311 calls increased by **X%**

**Summer 2022:** Site hardening options coming to Councilmembers via Public Works and OHS

**24 people engaged, 2 accepted:** accessed Mobile Crisis services

**X people** accessed Sobering Center/CDC

**10** V-citations

**0** Number of individuals accepting Community Courts services
- Number of cases warranting adjudication





# Next Steps



- June 2022: Progress report to GPFM
- August 2022: Transportation Ordinances to City Council
- Fall 2022: Community Courts Street Knowledge Initiative launches





# Panhandling Deflection Program Update

Christine Crossley, Office of Homeless Solutions
Ayeh Power, City Attorneys Office
Kevin Oden, Office of Integrated Public Safety Solutions
**David Pughes,  Marshal's Office**
Brita Andercheck, Data Analytics and Business Intelligence

# Exhibit I

# Memorandum



DATE   October 21, 2022

CITY OF DALLAS

TO   Honorable Members of the Government Performance and     Financial     Management Committee: Cara Mendelsohn (Chair), Gay Donnell Willis (Vice Chair), Tennell Atkins, Adam Bazaldua, Adam McGough, Paul Ridley, Chad West

SUBJECT   **Office of Homeless Solutions Update: Panhandling Deflection Program**

**Subject:**

The following memorandum is an update on the holistic strategy to address homelessness equitably through the Panhandling Deflection Program and sustainable giving education, done in partnership by the Office of Homeless Solutions' (OHS), the City Attorney's Office (CAO), the Office of Integrated Public Safety (OIPSS), Data Analytics and Business Intelligence (DBI), Code Compliance Services (CCS), Communications, Outreach and Marketing (COM), Transportation (TRN), and the City Marshal's Office. The details of progress made on the program are outlined below:

**New Program Initiatives**

As a part of the larger Panhandling Deflection Program, COM is working with OHS to pilot a multi-channel communications campaign to educate Dallas residents and visitors about the perils of street charity and opportunities to give responsibly. This pilot will run throughout the season of giving: winter holidays and calendar year-end when charitable giving is highest, using lessons learned to inform ongoing communications concerning panhandling. This will augment existing signage posted at key hotspot intersections based on 311 reports with a wider public awareness campaign aimed at community members who continue to give directly to those illegally soliciting.

- As a first step, OHS has successfully engaged more than 100 organizations linked to street feeding. Building on this targeted outreach, COM will expand its multichannel, multimedia marketing messages, educating residents and stakeholders about:
  - Illegal solicitation
  - Street charity, which hinders access to care; and
  - Sustainable giving, supporting professional nonprofit service providers through donations and volunteerism
- COM's pilot program will market OHS' new website offering responsible giving resources for volunteers and donors via multichannel outreach to include:
  - Proactive pitching of media during the Season of Giving
  - Text signup to receive information on responsible giving options
  - Media buys
  - Direct outreach educating property owners to discourage street charity
  - Updated 311 hold messages and knowledge base scripts for staff to share responsible giving resources

**Current Panhandling Challenges**

- Signage pilot at hotspot intersections initially decreased illegal solicitation. However, ongoing effectiveness requires ongoing education and activity

DATE    October 21, 2022

SUBJECT    **Office of Homeless Solutions Update: Panhandling Diversion Initiative**

- An increase in loitering and illegal solicitation in vehicular rights of way endangers pedestrians, threatens our Vision Zero goals, and increases damage to traffic signals, streetlights, and electric signage through the opening of pull boxes, with wiring removed. Rodent activity threatening public safety is also increased by the accumulation of food and debris around panhandlers and encampments, resulting in chewed-through electrical wiring, causing power outages to impacted infrastructure

**Ongoing Progress:**

- Proposed amendments to Dallas City Code Chapter 28 and Chapter 13 are included in the October 26, 2022, City Council agenda
- OHS and CCS will continue educating private property owners and residents on how best to protect their properties and boundaries and how to report violations
- OHS' Street Outreach continues to conduct cleanings at the Forest Lane and U.S.75/North Central Expressway site. This will continue through the coming weeks as a nearby encampment is decommissioned through the Dallas R.E.A.L. Time Rapid Rehousing (DRTRR) initiative and the COM-led communications pilot launches
- The hotspot at Lovers Lane and U.S. 75/North Central Expressway is targeted for bi-weekly cleanings by OHS' Street Outreach. Police surveillance towers have also been erected in the vicinity to deter illegal solicitation
- DBI's internal facing Panhandling ESRI (GIS) Portal server software underwent an upgrade. The system upgrade included adoption of a near real-time notification system via email to all team members. During that time, October 3 – 14, 2022, no new entries were able to be logged. A report taking this into account is attached

Should you have any questions or need additional information, please contact me at Christine.crossley@dallascityhall.com.

*Christine Crossley*

Christine Crossley
Director
Office of Homeless Solutions

c:    T.C. Broadnax, City Manager          Majed A. Al-Ghafry, Assistant City Manager
Chris Caso, City Attorney           M. Elizabeth (Liz) Cedillo-Pereira, Assistant City Manager
Mark Swann, City Auditor           Robert Perez, Assistant City Manager
Bilierae Johnson, City Secretary      Carl Simpson, Assistant City Manager
Preston Robinson, Administrative Judge  Jack Ireland, Chief Financial Officer
Kimberly Bizor Tolbert, Deputy City Manager  Genesis D. Gavino, Chief of Staff to the City Manager
Jon Fortune, Deputy City Manager     Directors and Assistant Directors



# Panhandling Deflection Program Update

## Government Performance and Financial Management
## October 24, 2022

Christine Crossley, Office of Homeless Solutions
Ayeh Powers, City Attorney's Office
Kevin Oden, Office of Integrated Public Safety Solutions
David Pughes,  Marshal's Office
Brita Andercheck, Data Analytics and Business Intelligence
Dianne Gibson, Community Courts
City of Dallas

# Presentation Overview



- Data Collection and Integration Workflow via Enhanced Notification

- Location Metrics

- Panhandling SR's by Month



# Data Collection and Integration Workflow via Enhanced Notification

Notifications are now live.



# Location Metrics



Total Field Reports- 90

➢Marshals- 10

➢OHS- 54

➢OIPSS- 26

Demographics

➢Female - 17

➢Male - 69





# Panhandling SR's by Month









# Panhandling Deflection Program Update

## Government Performance and Financial Management
## October 24, 2022

Christine Crossley, Office of Homeless Solutions
Ayeh Powers, City Attorney's Office
Kevin Oden, Office of Integrated Public Safety Solutions
David Pughes,  Marshal's Office
Brita Andercheck, Data Analytics and Business Intelligence
Dianne Gibson, Community Courts

City of Dallas

# Exhibit J

DocuSign Envelope ID: 253B1ABC-7443-48D8-B8A5-F105E8CF0B7E

**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| Alton Waggoner et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 3:22-cv-02776-E |
| v. ) | Jury Trial Demanded |
| ) | |
| The City of Dallas, Texas et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## <u>DECLARATION OF YAFEUH BALOGUN</u>

I, YAFEUH BALOGUN, hereby declare and state:

1. I am over eighteen years of age and am of sound mind to make this declaration. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto.

2. I was born and raised in Dallas, Texas, where I continue to live and raise my own son. I grew up in a politically engaged family that used medians and street corners for their protest activities even when I was a child.

3. I have engaged in my own political speech for many years starting at my first protest outside of Home Depot in 2003 in support of a worker's rights. That protest included walking and standing on sidewalks and street corners where we held political signs advocating for fair wages.

4. Since that time, I've used street corners and medians throughout Dallas countless times to share political messages by holding signs, making speeches, leading and joining protest chants, and requesting donations for grassroots organizations and causes.

1

DocuSign Envelope ID: 253B1ABC-7443-48D8-B8A5-F105E8CF0B7E

5.　　I co-founded Guerilla Mainframe in 2008 in Dallas, Texas as a continuation of the work of People's Lunch Counter (PLC) to meet the needs of our community, daily patrolling the perimeter of apartment complexes to help protect our community and the children who lived in the apartments. In those patrols we used street corners repeatedly each day.

6.　　We also helped raise awareness of a variety of issues including inhumane sweeps of homeless encampments. Our work has included standing on corners and medians to spread our message and engage with those being directly impacted by the sweeps.

7.　　I also co-founded the Huey P. Newton Gun Club, which comes together to protect our Second Amendment rights as well as to educate the community on self-preservation, self-defense, and self-sufficiency. Safety, caution, and attention to detail are the core of our way of life. We also engaged in regular protest activities promoting Second Amendment rights. We would conduct press conferences, go to Dallas city hall, but also use street corners and medians to advocate for our rights and a world of peace, justice, and equality for all humanity, and specifically for people of color.

8.　　My first protest with the Huey P. Newton Gun Club was in 2014. That protest itself utilized street corners and medians to raise awareness of Dallas police killings of unarmed people and to educate our community about their right to bear arms.

9.　　In recent years I have also been an active member of the Dallas chapter of Community Movement Builders which engages in youth organizing, and policy advocacy for sustainable development and against police misconduct impacting Black people in Dallas. With this group, we have also used street corners and medians. On December 10, 2022 I used street corners and medians to obtain signatures to request College Park in Highland Hills be renamed to honor Fahim Minkah. I will continue to do this over the next 3-4 months until I obtain the 600

signatures that are required. I believe it is my Constitutionally protected right to engage in this activity and will continue to do so, despite the ordinance, but am concerned I could face unjust criminalization for this activity.

10.     I have also witnessed countless other individuals use medians and street corners to request assistance from their neighbors, distribute religious materials, engage in street corner preaching and request donations for their youth sporting teams.

11.     Street corners and medians, including narrow medians, are important public forums because there are limited public places to select to share your message. Speakers can also reach different audiences they could not reach through press conferences and social media.

12.     I have reviewed the new ordinance and believe it violates my rights and the rights of my neighbors to use traditional public forums to protest, raise awareness and seek support for grassroots causes.

13.     Across decades of using, and seeing others use, medians and other areas near the street, I have never seen someone injured by a car.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ____ day of _____ at Dallas, Texas.
29          December

Yafeuh Balogun

# Exhibit K

DocuSign Envelope ID: CBA71EC9-FA16-446C-8DE5-2FEBA67416A7

### THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| Alton Waggoner et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. _____ |
| v. ) | Jury Trial Demanded |
| ) | |
| The City of Dallas, Texas, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## DECLARATION OF KAWANA SCOTT

I, KAWANA SCOTT,[1] hereby declare and state:

1.      I am over eighteen years of age and am of sound mind to make this declaration. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I reside in the Dallas Fort Worth metropolitan area.

2.      I am currently a local community organizer and the Chair of the Dallas Alliance Against Racist & Political Repression (DAARPR), a local chapter of the National Alliance Against Racist & Political Repression (NAARPR).

3.      I have been organizing and leading political actions such as protests and demonstrations for 10 years. I have participated in and organized over 100 actions within the City of Dallas. These demonstrations include protests, community education, and holding spaces for community members to come together in the public square.

---

[1] Ms. Scott recently married and is in the process of changing her name to Kawana Menchaca.

1

DocuSign Envelope ID: CBA71EC9-FA16-446C-8DE5-2FEBA67416A7

4.      At these events and demonstrations, we frequently stand on medians less than six feet and within clear zones. We use these areas because they are the most effective at displaying our message and they keep our fellow demonstrators safe.

5.      Medians give demonstrators unique access to the public. The streets and intersections with the most travel, and therefore the best access to our audience, are medians less than six feet in width, street corners, and sidewalks. A vast majority of our demonstrations occur in these locations.

6.      My use of medians for First Amendment activities are informed by the history of the Civil Rights Movement where rallies and protests frequently occurred on medians and areas adjacent to the streets and were critical to achieving civil liberties victories. We continue that tradition today by using medians to reach the greatest number of people in areas where people will see our message. Even at our largest events, demonstration leaders will use the median to direct participants safely.

7.      These public spaces are also cost effective. Many other areas in Dallas, for example the streets themselves, require paying for a permit, which community-based organizations largely composed of volunteers cannot typically afford.

8.      Even public property we can use for free, such as parks, are less effective for generating community awareness of our causes because those areas are further removed from passing members of the public.

9.      Medians and areas adjacent to the street also feel safer to me than alternatives. We use these areas because they are raised from the street and allow our members and allies a place to stand, while also communicating our message to passing cars.

2

DocuSign Envelope ID: CBA71EC9-FA16-446C-8DE5-2FEBA67416A7

10.     As organizers, we have a social responsibility to keep attendees safe at our events. I frequently assign leaders within the event to look after attendees to ensure people stay safe and, especially in the summer months, I bring food and water and first aid kits to help keep people at events safe.

11.     Because of these precautions and our use of raised medians, in my 10 years of organizing and over 100 demonstrations attended, I have never seen someone injured from using the median or areas adjacent to the street.

12.     I have read the Ordinance passed by the Dallas City Council on October 26, 2022. I understand it to prohibit anyone from standing or walking on medians less than six feet wide and standing within four feet. This would prohibit a significant amount of our protests and demonstrations, activities which we plan to do in the future.

13.     I am worried that this Ordinance will be used to punish and criminalize protestors with which Dallas city officials disagree. In the past, we have faced police harassment and even had some of DAARPR's members harmed by the police during peaceful protests.

14.     As a protest and demonstration organizer, safety is a serious concern, but this Ordinance will not keep myself or our membership safe. Instead, it will only suppress our ability to advocate on messages critical to our mission.

DocuSign Envelope ID: CBA71EC9-FA16-446C-8DE5-2FEBA67416A7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___6th___ day of ___December___ at Dallas, Texas.

Kawana Scott

# Exhibit L

**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| Alton Waggoner et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 3:22-cv-02776-E |
| | ) Jury Trial Demanded |
| The City of Dallas, Texas, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**<u>DECLARATION OF STEVEN MONACELLI</u>**

I, STEVEN MONACELLI, hereby declare and state:

1.      I am over eighteen years of age and am of sound mind to make this declaration. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto.

2.      I am an investigative journalist at the *Texas Observer* and am based in Dallas, Texas. Prior to joining the *Texas Observer*, I was a freelance reporter for a variety of publications including *Rolling Stone*, *The Daily Beast*, *The Real News*, *Dallas Observer*, *Dallas Weekly*, and others. I have been a reporter in Dallas since the Spring of 2020. My reporting typically focuses on social movements and political extremism in Texas communities.

3.      As part of my reporting, I frequently attend and observe protests, demonstrations, and rallies held by community groups. I have attended demonstrations from across the ideological spectrum. Over the course of two and a half years as a reporter, I have attended dozens of protests.

1

DocuSign Envelope ID: 27F59B01-8389-4C1E-98B7-E7CDEA63F919

4.      I am familiar with § 28-61.1 of the Dallas City Code ("the Ordinance") as passed by the City Council on October 26, 2022 and challenged by Plaintiffs in this case. I understand it to prohibit sitting or standing on medians less than six feet and many areas around the street designated as "clear zones." I understand "clear zones" to cover unpaved areas within four feet of the face of a curb such as grass patches on unpaved portions of sidewalks.

5.      To do my reporting, I regularly take photos and conduct interviews with attendees. Attached to this declaration as Appendix 1 are four photos representative of the various ways demonstrators and reporters make use of areas affected by the Ordinance:

a.  The first photo presented is of myself and two other reporters covering a demonstration in early June of 2020 standing on a median of less than six feet wide. It was taken by Lee Daugherty and published in the *Dallas Voice*.[1] In the photo, occupying the median was critical to safely and accurately covering the demonstration occurring.

b.  The second photo presented is a photo I took on November 28, 2020 of protestors demonstrating against the Chinese Communist Party's COVID-19 policies. The photo is unmodified and unaltered from the file saved on my computer. Demonstrators utilized what the Ordinance calls a "clear zone" to present signs and wave flags.

c.  The third photo presented is a photo I took of supporters of President Donald Trump who believe in "QAnon," a pro-Trump political movement and conspiracy theory. The photo was published in a November 2, 2021, article of *Rolling Stone*

---

[1] Accessible at: https://dallasvoice.com/mass-arrests-of-protesters-made-on-mhh-bridge/

DocuSign Envelope ID: 27F59B01-8389-4C1E-98B7-E7CDEA63F919

that I co-authored.[2] The photo depicts demonstrators gathered around the white "X" where John F. Kennedy was assassinated. The demonstrators waved signs reflecting their beliefs to cars passing by and sang the national anthem. The individuals occupying the "clear zone" in Dealey Plaza near the white "X" was critical because an aspect of their view was that John F. Kennedy Jr., who died in 1999, has been in hiding.

d.   The fourth photo presented is a photo I took on December 14, 2021 of "GAFs Gotta Go" protestors speaking out against pollution in West Dallas caused by a shingles factory. The photo is unmodified and unaltered from the file saved on my computer. They were marching a few blocks from a West Dallas resident's home to the corporate offices of the factory. They used the "clear zone" to accommodate the large number of demonstrators while still remaining safely off the street near the polluting company's offices.

6.   Based on the photos, my personal knowledge of the events of the photos, and my understanding of the Ordinance, I believe the people in each photo, if the Ordinance was in effect at the time, could have been criminally punished for their use of the median.

7.   In addition to the representative photos provided, I have frequently seen other people in Dallas use medians of less than six feet and unpaved areas near roadways during the dozens of demonstrations I have reported on.

8.   I also make regular use of medians less than six feet as part of covering demonstrations. Raised medians help me take better photos of an event, provide safe refuge to

---

[2] Accessible at: https://www.rollingstone.com/culture/culture-news/qanon-kennedy-jfk-jr-dealey-plaza-dallas-1251929/

3

DocuSign Envelope ID: 27F59B01-8389-4C1E-98B7-E7CDEA63F919

passing cars, and allow me to have a better vantage point of the event to report on what occurred. As a journalist, using the narrow medians and unpaved areas near the street also enable me to better cover demonstrations because they allow me to navigate the length of a protest without having to walk through large crowds or in other more dangerous areas in the street.

9.      As a Dallas resident, I have also seen other groups use medians less than six feet to speak about issues they care about. For example, many religious groups distribute handbills about their religions and use medians less than six feet to raise funds.

10.     Across my experiences seeing people speak from medians less than six feet, I have never seen someone injured by a vehicle. Instead, in my experience, the real risk is when people are in the roadway where cars are traveling. Many times, I have seen drivers get impatient and will try to recklessly drive through lines of protesters.

11.     I fear the new Ordinance passed by Dallas will cause me and others people to abandon the safer area of medians and use the street more frequently, posing a greater danger to themselves and other vehicles.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  1  day of  January  at Dallas, Texas.



STEVEN MONACELLI

# Appendix 1



2



3



4



5

# Exhibit M

**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| Alton Waggoner et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. _____ |
| v. ) | Jury Trial Demanded |
| ) | |
| The City of Dallas, Texas et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## <u>DECLARATION OF DR. HANNAH LEBOVITS</u>

I, HANNAH LEBOVITS, hereby declare and state:

1.      I am over eighteen years of age and am of sound mind to make this declaration. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto.

2.      I reside in Dallas, Texas. I am an Assistant Professor of Public Affairs at the University of Texas at Arlington. My research focuses on housing and homelessness, within the context of social equity and sustainability. I have a Ph.D. in Urban Studies and Public Affairs from Cleveland State University, awarded in 2020. I have published several peer reviewed papers and book chapters on topics related to urban governance, urban inequality and justice, as well as democratic behavior and social capital formation.

3.      Through both my research and my personal engagement with people who are experiencing visible social and economic hardships, I spend a significant amount of time standing on the medians of streets across Dallas as well as street corners. In my personal life, I use the medians to engage with homeless individuals and others in poverty who panhandle to

DocuSign Envelope ID: 2154DBFC-5910-4727-9EFA-5C4F4299F52C

survive. I speak with people on medians and on street corners, provide food and water, and offer help connecting them with services in some cases.

4. In my research, I am interested in why people become homeless, why they remain homeless for extended periods of time, and the gaps in the existing social service safety nets. Part of my work includes embedding myself in the communities I study to understand people's experiences. Access to medians and street corners is fundamental to my research. It allows me to maintain relationships and build trust with people where they are at so that I can keep their stories and experiences at the center of my work.

5. It is important to me and to my work to meet people where they are and where they feel comfortable. I never want to inconvenience people because of my work or ask them to travel elsewhere and take time that they would otherwise use to earn money for basic needs by panhandling. Additionally, due to the sensitive nature of research with vulnerable participants, requiring them to leave the site of their economic activities in order to participate in my research effort would be unethical.

6. I am invested in building trust and lasting relationships with people who stand on medians and street corners, which takes time.  Since June 2020, I have spent over 100 hours with people who stand on medians and street corners in Dallas, many of whom do so in order to express themselves and request assistance.

7. I have gotten to know over 100 people who stand on medians and street corners, many of whom are seeking services. My presence gives them the opportunity to express themselves, share information, and access resources.

8. It is crucial to be able to stand in medians and on street corners with the individuals who use them for their means of survival. I cannot do my work without access to

2

DocuSign Envelope ID: 2154DBFC-5910-4727-9EFA-5C4F4299F52C

these spaces. I could not physically find the people I help and who fundamentally shape my research if medians were not available.

9.      In my experience, medians are essential to housing insecure individuals' ability to communicate with people who provide assistance, whether they be existing members of their networks or people who engage in one-off interactions. Medians are a place where I can connect with these individuals and where they can connect with others. Pedestrians and drivers interact with panhandlers on medians as they rarely do in other contexts. Having frequently interacted with people on medians and street corners, it is clear that these interactions must happen in locations that housing insecure people feel comfortable and empowered.

10.     When you communicate with people on a median, they are able to share their needs, ideas, and experiences. This is fundamental to their basic humanity and is an integral form of expression.

11.     In the many hours I have spent interacting with people on the street, I have never seen the Office of Homeless Solutions ("OHS") out offering services to people.

12.     I have heard there is an OHS team that goes out on the street, but I have never met them. I have seen officials from the City Code enforcement office and Parks and Recreation workers who clean public areas. I have never seen these city workers help people or engage in trust-building communication practices. I have observed police officers who just tell people to leave; and nonprofit representatives who offer food but none who assist these individuals in acquiring government-sponsored food assistance, healthcare, immediate housing, cash assistance, employment assistance, SSID/SSI, HIV/AIDS-specific resources, or educational services.

DocuSign Envelope ID: 2154DBFC-5910-4727-9EFA-5C4F4299F52C

13.     In my experience, people on the street are often resistant to speak with an individual who offers to help them, including myself, because they have no reason to trust these individuals and the personal risks are incredibly high.  It can take months or years before people on the street even agree to have a conversation with me. Without putting in the effort to build this trust, it would be incredibly difficult for me to connect anyone with the services they need. You cannot build trust by shaming someone or taking away their rights. You need to meet people where they are and continue to show up. By forcing people off of medians and street corners, the City is exacerbating the existing lack of trust.

14.     I have never seen anyone get injured by a car while panhandling or standing on a median or street corner, nor have I seen anyone injure someone else. People know how to keep themselves safe, and intuitively adopt practices to avoid dangerous situations. They will situate themselves in ways that make it unlikely they will be hurt, such as only walking along the median or the edge of the corner when the light is red and the cars around them are not driving by.

15.     I have seen the police create more traffic and potentially unsafe situations when they park in the street and exit their vehicles to speak to people standing on medians and street corners. Drivers slow down to look at police, which can create difficult traffic situations.

16.     I am personally worried about the police enforcing the Ordinance not only because it is possible that I will be fined but because it is likely that if this ordinance is enforced it will cause people to become less accessible to those who seek to assist them. This work is critical to who I am and what I stand for. If people disappear from public spaces out of fear of enforcement or because of the harm of the tickets/fines, it would negatively impact my job, my career, and my sense of self.

DocuSign Envelope ID: 2154DBFC-5910-4727-9EFA-5C4F4299F52C

17.     After the Ordinance's passage, I now feel I am opening myself up to police aggression by interacting with people on the street. I never know if someone will call the police on me for speaking with housing insecure people on medians or if the person I'm speaking to will be punished. If I were to be fined or otherwise face criminalization for doing this work, it would have a devastating effect on my life. If my license were suspended, I would be unable to work. The power of the police to exert their authority over me leaves me in constant fear and likely dissuades others from offering help as I do.

18.     My fear of enforcement has increased markedly since the new ordinance was passed. The Ordinance is based on where you stand, so just by standing on a median or a street corner, I could be ticketed.

19.     I have heard from people who have experienced aggressive treatment, harassment, and taunting by police. At other times, police drive through a place over and over again to make their presence known. But I have also heard that police sometimes ignore people when they need help.

20.     When we force people off of medians and street corners, they go to even more unsafe places, with less access to food and other basic needs, and less access to lifesaving services. Medians and street corners are irreplaceable in terms of their role in building trust and a strong social network which enable people to continue to survive. If my fear of police intervention increases, then I will avoid these spaces, and the trust I have built will be diminished. Many of these individuals do not have access to other forms of communication, as their phones can get lost or stolen. Their visibility in the medians and on the corners is essential to building trust, maintaining dignity, providing assistance, and empowering them to live as full United States citizens.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  8   day of   December    at Dallas, Texas.

*Hannah Lebovits*

_____
Hannah Lebovits

6

# Exhibit N

**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| Alton Waggoner et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. _____ |
| v. | ) Jury Trial Demanded |
| | ) |
| The City of Dallas, Texas, | ) |
| | ) |
| Defendant. | ) |

**DECLARATION OF ALTON WAGGONER**

I, ALTON WAGGONER, hereby declare and state:

1.      I am over eighteen years of age and am of sound mind to make this declaration. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I reside in Dallas, Texas.

2.      I am currently homeless and struggle to obtain the basic necessities of life. I am a veteran and have been homeless for approximately two years.

3.      The only way I currently make money to purchase food, water, and personal hygiene products is by asking people for donations. I most frequently solicit donations from medians and street corners near traffic lights. These locations are the only ones in Dallas where I feel safe because the cars travel at lower speeds and come to a complete stop as they approach a red light. The stoplights allow me to ask for donations from drivers who are already stopped, as opposed to requesting donations from moving vehicles. It is also where pedestrians most frequently travel by foot. If I could not solicit at these locations, it would be almost impossible to solicit on public property.

1

4.     I have read the ordinance the City of Dallas passed on October 26, 2022. As I understand it, the Ordinance prevents people from standing or sitting on medians of less than six feet and prohibits me from standing within four feet of the street.

5.     To get the funds I need for my basic survival, I frequently stand within four feet of the street and use medians of less than six feet to panhandle. Without the ability to do so, it would be impossible to buy food, water, and other basic necessities.

6.     I live in constant fear of police harassment and enforcement of the newly passed ordinance. I have faced enforcement by police of similar ordinances in the past based on the panhandling activity I must continue to do for survival.

7.     For example, on March 8, 2020, I received a citation for "Solicitation of Occupants of Vehicles." The municipal court found that I owed $459.80. Because I could not afford to pay the fine, my license has been suspended and there is a warrant for my arrest. This outstanding warrant has kept me from obtaining the identification I would need for work. I even tried to go to jail to get time served instead of paying the fine I cannot afford, but I was told the jail was too crowded.

8.     Beyond filing formal criminal charges, Dallas Police Department officers regularly tell me to move from the medians and street corners I find are safest and best allow me to ask for help I need to survive. Several times a week, officers will honk their horns and tell me I am not legally allowed to be on medians and street corners I use to panhandle. I typically move at their requests, but that means I go without food or other necessities until the police move on. I risk the consequences of returning to these locations because it is necessary for my survival.

9.     I am worried this new Ordinance will give police an even greater ability to fine me and tell me to move. It makes it illegal for me to simply sit or stand in public places, but there

2

is nowhere else I can go to ask people for help where people frequently walk or drive by. I also understand the City passed this ordinance because officials were frustrated that they could not enforce the old ordinances as frequently as they wanted to and thought it might be unconstitutional.

10. Because my license is suspended based on a fine for soliciting donations, I cannot access a shelter. Shelters are also challenging for me because I am trying to manage my sobriety, and previous shelters have been triggering for my addiction.

11. I understand City officials have claimed to conduct outreach to panhandlers to ask if they need help accessing social services. Although I panhandle almost every day on Dallas streets, I have never been offered supportive housing, addiction services, or other help I need. I would accept those services if they were offered to me. Instead, the only people from the City I have spoken to while panhandling are police officers, who keep me from asking people for help and cite and harass me for trying to survive.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _18_ day of _November_ at Dallas, Texas.

_Alton Waggoner_
Alton Waggoner

3

# Exhibit O

**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| Alton Waggoner et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. _____ |
| v. | ) | Jury Trial Demanded |
| | ) | |
| The City of Dallas, Texas, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF LAFAYETTE "TERI" HEISHMAN

I, LAFAYETTE "TERI" HEISHMAN, hereby declare and state:

1. I am over eighteen years of age and am of sound mind to make this declaration. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I reside in Dallas, Texas.

2. For many years, I have been in and out of homelessness. Currently, I live in Veterans Administration subsidized housing in Dallas. I only obtained this housing after having a heart attack in which I nearly died and woke up at a VA hospital. For several years before, I had been living in various encampments across Dallas.

3. I am 67 years old. I use a wheelchair to get around and have an ulcer in my leg that makes it difficult to walk. In addition, I have a criminal record that includes numerous incidents of being criminalized by the City of Dallas for being homeless. I do not have a phone or a Texas identification card. All of these circumstances have prevented me from finding work.

4. The only source of income I have is Social Security Income of $750 per month, almost all of which goes to my housing. However, this money does not cover life's necessities.

To buy sufficient food, water, medical supplies, and personal hygiene products, I solicit donations to supplement my social security benefit.

5.       I most frequently solicit donations from medians and street corners near traffic lights. These locations are the only ones I know of in Dallas where I feel safe because the cars travel at lower speeds and come to a complete stop as they approach a red light. The stoplights allow me to ask for donations from drivers who are already stopped, as opposed to requesting donations from moving vehicles. Medians, sidewalks, and street corners also help me talk to pedestrians passing by and ask for donations.

6.       If I could not solicit at these locations, it would be virtually impossible to solicit on public property because cars and pedestrians would have to stop at unsafe locations to give donations. Additionally, private businesses do not typically allow people like me to solicit aid on their property.

7.       I have read the ordinance the City of Dallas passed on October 26, 2022. As I understand it, the ordinance prevents people from sitting on medians of less than six feet and prohibits me from being within four feet of the street.

8.       As part of my basic survival, I often stand within four feet of the street and use medians of less than six feet to panhandle. If I could not do so, it would be impossible to buy food, water, and other basic necessities.

9.       I live in constant fear of police harassment and enforcement of the newly passed ordinance. Police routinely limit my ability to ask people for help on corners or medians.

10.      Even before this new ordinance, I was punished several times by police for being homeless. In 2015, Dallas police cited me for sleeping in public (citation # C21658242-01). Then in 2016, I was cited for soliciting donations from vehicles (citation # C21752973-01). At the

beginning of 2017, I was cited again for soliciting donations from vehicles (citation # C21663235-01). Because I was unable to pay the fines, I was put in jail, but released shortly after because the municipal jail could not meet my medical needs.

11.     After being released from jail, I was still homeless and relied on panhandling for my survival. I was cited three times in a three-month period in 2017 (citation #'s: C21791042-01; C21765649-01; C21753070-01).

12.     The new ordinance poses a serious barrier for my survival because it prevents me from even sitting on the sidewalk or street corner to ask pedestrians for help. This, along with my prior police experiences, make me worried each time I am panhandling that I will be cited again. I also understand that the new Ordinance was passed to give police an additional tool to cite people like me because the City Council found the old ordinances less effective and possibly unconstitutional.

13.     I have no money to pay a citation, but panhandling is currently my only method of survival. I intend to continue panhandling because without it, I have no way of providing for myself.

14.     Beyond formal criminal charges being filed, Dallas Police Department officers frequently tell me to move from the medians and street corners I find are most safe and enable me to obtain money I need to survive. Several times a week, officers will honk their horns and tell me I am not legally allowed to be on medians and street corners I use to panhandle.

15.     I understand City officials have claimed to conduct outreach to panhandlers to ask if they need help accessing social services. Although I panhandle almost every day on Dallas streets, I have never been offered social services. If I had been, I would have considered

accepting it. Instead, the only people from the City I have spoken to while panhandling are police officers citing and harassing me for trying to survive.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _18_ day of _Nov._ at Dallas, Texas.

Lafayette "Teri" Heishman

# Exhibit P

# Dallas Vision Zero Action Plan

# Crash and Survey Data Analysis

FINAL
Spring 2022



# Presentation Outline

- The State of Traffic Safety in Dallas
- Crash Data Analysis Overview
- Severe Crashes in Dallas:
  - Who
  - Where
  - When
  - How
  - Why
- Comparing Police Reports with Hospital Data
- Survey Results
- Focus Areas for Vision Zero Dallas
  - Topic Focus Areas
  - Geographic Focus Areas
  - Systemic Safety Analysis



# The State of Traffic Safety in Dallas

## Dallas has the second highest traffic fatality rate among the 15 most populous cities in the U.S.

(Traffic deaths per 100,000 people; 5-year average rate from 2015-2019)

| | | | | | |
|---|---|---|---|---|---|
| 1. | Jacksonville, FL | 15.79 | 9. | Los Angeles, CA | 6.71 |
| **2.** | **Dallas, TX** | **14.11** | 10. | San Diego, CA | 6.34 |
| 3. | Phoenix, AZ | 13.71 | 11. | Philadelphia, PA | 6.09 |
| 4. | Fort Worth, TX | 10.84 | 12. | San Jose, CA | 6.00 |
| 5. | San Antonio, TX | 10.53 | 13. | Chicago, IL | 4.90 |
| 6. | Houston, TX | 10.07 | 14. | San Francisco, CA | 3.52 |
| 7. | Austin, TX | 9.08 | 15. | New York, NY | 2.56 |
| 8. | Columbus, OH | 7.02 | | National Rate | 11.22 |

*A traffic fatality is 1.27 times more likely to occur in Dallas than in Fort Worth.*



*Memorial at Hampton and Singleton*

Source: National Highway Traffic Safety Administration, Annual Traffic Safety Facts – 2015, 2016, 2017, 2018, 2019.



VISION ZERO

# The State of Traffic Safety in Dallas





**What we are currently doing to make transportation in Dallas safe is not working.**



Source: TxDOT, Crash Records Information System, 2019-2020; National Highway Traffic Safety Administration, Annual Traffic Safety Facts, 2010-2018

# CRASH DATA ANALYSIS OVERVIEW



# Data Analysis is the Vision Zero Foundation

According to Vision Zero Network:

- Vision Zero is a data-driven approach, and gathering, analyzing, utilizing and sharing both formal crash data and community input to understand traffic safety priorities is fundamental.

- The data should answer questions like:
  - Are injury crashes more likely to occur in certain locations? At certain times of day?
  - Are some demographics and road users over-represented in severe crashes? If so, who? Where?
  - What crash factors are prominent? (Examples: high speeds, left turns, or lack of sidewalks and bike lanes)

- The analysis should lead to the development of a High Injury Network that geographically identifies locations where investments in safety are most urgent.



VISION ZERO

# Dallas Vision Zero Action Plan

**Vision Zero Action Plan (VZAP):** a course of action for how the we will meet the Vision Zero goal. Scope of work:

1. **Public and stakeholder engagement:** Task Force, public survey and interactive comment map, public meetings, etc.

**WE ARE HERE**

2. **Crash data analysis** and identification of focus areas (locations and topics).

3. **Review of best practices** related to engineering, enforcement, education, evaluation, equity.

4. **Assessment of existing policies, programs, practices**.

5. **Draft Recommendations:** formulate strategies and policies, and create an implementation plan with department/agency buy-in.

6. **Prepare the Vision Zero Action Plan.**



**VISION ZERO**

# Sources Referenced for Crash Data Analysis

Key sources that were reviewed before and during the completion of the crash data analysis included:

- 2015-2019 American Community Survey (U.S. Census)
- City of Los Angeles. (2016). *Crash Data Analysis Report*.
- City of Seattle. (2016). *Bicycle and Pedestrian Safety Analysis*.
- National Highway Traffic Safety Administration. *Annual Traffic Safety Facts*.
- New York City. (2010). *The New York City Pedestrian Safety Study & Action Plan*.
- New York City's Pedestrian Safety Action Plans for each borough (2015).
- North Central Texas Council of Governments. (2021). *Regional Pedestrian Safety Action Plan*.
- Proulx, F. & Sanders, R. (2018). *High injury networks – Why, when, and how to use them: A case study*.
- Texas Department of Transportation. (2019). *Texas Strategic Highway Safety Plan*.
- Texas Department of Transportation. (2020). *Dallas District Four-Year Safety Plan*.
- Texas A&M Transportation Institute. (2019). *Understanding Dallas District Pedestrian Safety Issues*. Prepared for the Dallas District of the Texas Department of Transportation.
- The Institute for Road Safety Research. *SWOV Fact Sheet: The relation between speed and crashes*.
- U.S. Department of Transportation, Federal Highway Administration. *Systemic Safety Project Selection Tool, and Quick Start Guide Systemic Safety Analysis*.
- U.S. Department of Transportation, Federal Highway Administration. Office of Safety. Retrieved from https://safety.fhwa.dot.gov/.
- Vision Zero Network. (2017). *Vision, Strategies, Action: Guidelines for an Effective Vision Zero Action Plan*.



**VISION ZERO**

# Crash Data Used in the Analysis

- The crash records were retrieved from the Texas Department of Transportation (TxDOT) Crash Records Information System (CRIS). The source of the data is police reports, which all police departments in Texas submit to TxDOT.

- The following filters were applied to extract the crash data used in the analysis:

  1. Crashes located in the City of Dallas.

  2. Crashes that were not on limited-access roadways (e.g., non-interstate roadways).
     - It was decided not to include limited-access roadways in the analysis because there is less of an impact the City of Dallas can have on improving the safety of these facilities.
     - Limited access roadways" are defined by TxDOT as roads that have limited or no access to adjacent property, use of grade-separated interchanges, and prohibit of some modes like pedestrians.

  3. Crashes that occurred from 2015 through 2019.

  4. Crashes in which the "Injury Severity" in the crash report was listed as Killed or Incapacitating. (Throughout this presentation, referred to as Killed or Severe Injury crashes or Severe crashes.)

**VISION ZERO**

# Crash Data Used in the Analysis (cont.)

- Of the 131,997 reported crashes that occurred on non-access-controlled roadways in the City of Dallas between 2015 and 2019, 4,001 (3%) resulted in a fatality or severe injury.

| 2015-2019 Crashes in Dallas | Crashes | People |
|---|---|---|
| Total Crashes | 184,447 | 485,855 |
| Total Crashes - on non-access-controlled roads | 131,997 | 339,245 |
| Fatal Crashes - Total | 890 | 956 |
| Fatal Crashes - on non-access-controlled roads | 569 | 614 |
| Severe Injury Crashes - Total | 4,478 | 5,395 |
| Severe Injury Crashes - on non-access-controlled roads | 3,432 | 4,122 |



Fatal and Severe Injury Crashes on Non-Access-Controlled Roads in Dallas, 2015-2019



# SEVERE CRASHES IN DALLAS: WHO, WHERE, WHEN, HOW, AND WHY



# WHO is Involved in Severe Crashes

- **Pedestrians:** Looking at how people travel in Dallas, pedestrians are significantly overrepresented in fatal and severe injury crashes.





Source: U.S. Census Bureau 2019 ACS 5-Year Estimate; TxDOT Crash Records Information System, 2015-2019 person fatalities for all roads in Dallas.



# **WHO** is Involved in Severe Crashes (cont.)

- **Black and African American People:** Looking at the race/ethnicity of people involved in severe crashes, people identifying as Black or African American are most likely to be involved in severe crashes (37%), despite only accounting for 24% of the City's population (2019 ACS 5-Year Estimates).
  - People identifying as Hispanic/Latino or White are underrepresented in severe crashes compared to their share of the population.





# **WHO** is Involved in Severe Crashes (cont.)

- **Men:** Males accounted for 61% of fatalities and severe injuries.

- **People Aged 30-49:** The people in the 30-49 age group account for the highest percentage cohort of fatal and severe injuries for both genders. However, children and older adults face higher risks when involved in crashes.



# WHEN Do Severe Crashes Occur

- **Just After Sunset:** More severe and fatal injuries occur between sunset and midnight than any other part of the day, with the highest density of severe crashes occurring from 6:00 pm to 9:00 pm.

- There is a spike in crashes in late fall and early spring.



- However, in police reports lighting was not reported to be an issue. 51% of severe crashes occurred when it was light outside.



# **WHERE** Do Severe Crashes Occur

The **High Injury Network (HIN)** identifies streets where a disproportionate number of severe crashes have occurred.

- Segments and intersections in the network were identified by weighting the type and severity of crashes and referencing their location relative to other crashes.

- We looked at different methodologies and thresholds (% streets vs. % severe crashes) to select our recommended threshold for the All-Modes HIN (7% of streets that account for over 60% of severe crashes)

- The HIN is intended to identify locations where investments in safety are most urgent, and to help allocate resources to locations that need it most.



**VISION ZERO**

# WHERE Do Severe Crashes Occur (cont.)



VISION ZERO

# **WHERE** Do Severe Crashes Occur (cont.)

The All-Modes HIN is the combination of three mode-specific HINs.





# **WHERE** Do Severe Crashes Occur (cont.)

The All-Modes HIN is the combination of three mode-specific HINs.





# **WHERE** Do Severe Crashes Occur (cont.)

The All-Modes HIN is the combination of three mode-specific HINs.





# WHERE Do Severe Crashes Occur (cont.)

- **Principal Arterial Roads:** More than half of all severe crashes occurred on principal arterial roads.



- **Intersections and Mid-block:** 51% of severe crashes occurred at mid-block locations (non-intersections), and 49% at intersections.
  - Of the crashes at intersections, 62% were at locations with a traffic signal (30% of total severe crashes)





# HOW Do Severe Crashes Occur

Severe crashes are often caused by multiple contributing factors. The following behaviors were found in the highest percentage of severe crashes.

1. **Speeding Related** (Failed to Control Speed, Speeding Over Limit, or Unsafe Speed): 27%

2. **Driving Under the Influence** (Drugs, Alcohol, or Had Been Drinking): 14%

3. **Failure to drive in a single lane**: 12%

4. **Pedestrian failure to yield the right of way to vehicles**: 11%

5. **Failure to yield when turning left**: 10%

6. **Running a red light**: 10%





# WHY Are Crashes Severe

## Traveling at Higher Speeds

The higher the speed, the more likely a crash will occur and the more severe it will be. Injury severity also increases when there is greater mass difference between the vehicles and when vulnerable road users (pedestrians, bicyclists, motorcyclists) are involved.





*Field of vision at 15 MPH*



*Field of vision at 30 to 40 MPH*
Source: City of Seattle

Source: The Institute for Road Safety Research. SWOV Fact Sheet: The relation between speed and crashes.



# **WHY** Are Crashes Severe (cont.)

## **Not Using Proper Restraints**

- Severity also increases when protection is lacking.

- When people do not wear a seatbelt, they increase their chance of death from less than 1% to over 10%!

- 658 (14%) of the 4,736 people that were killed or severely injured were not wearing a seat belt (or 16% of fatal and severe injury crashes)





# FOCUS AREAS FOR THE VISION ZERO ACTION PLAN



# Focus Areas for Vision Zero Dallas

• Seven factors in which to focus engineering, enforcement, and education efforts on were identified through the crash data analysis and public survey, with additional review and input from the Vision Zero Task Force.

1. **Pedestrian-Involved Crashes** (30% of crashes)

2. **Speeding/Unsafe Travel Speeds** (27% of crashes)

3. **Not Using Proper Restraints** (e.g., Seat Belt, Car Seat) (16% of crashes)

4. **Under the Influence** (14% of crashes)

5. **Left-Turn Crashes** (10% of crashes)

6. **Red Light Running** (10% of crashes)

7. **Distracted Driving** (only 5% in the crash data, but a top priority in the public survey)



**VISION ZERO**

# Exhibit Q

Case 3:22-cv-02776-E   Document 11-1   Filed 01/06/23   Page 171 of 229   PageID 347

# VISION ZERO ACTION PLAN



CITY OF DALLAS

2022

PAGE INTENTIONALLY LEFT BLANK



**MAYOR
ERIC JOHNSON**

Safety is the number one responsibility of every level of government. When it comes to government, there is no higher priority than the protection and safety of the people.

And safety is not only about preventing crime in our neighborhoods. It is also about allowing people to walk, bike, drive, and move around safely throughout Dallas.

Traffic safety has not always been treated as a priority, unfortunately. The data shows that despite the major advances over the years in vehicle safety and technology, the rate of traffic deaths in Dallas has been steadily increasing during the past two decades.

Frankly, this is a tragedy — one that has not received the attention it deserves. Far too many lives and livelihoods have been forever altered by these awful incidents and accidents.

Action is needed now. That is why the Dallas City Council and I have responded to these alarming trends by setting ambitious goals: zero traffic fatalities and a 50% reduction in severe injuries by 2030.

However, this plan, which we call Vision Zero, is much more than just a goal. It is a strategic and collaboratively designed roadmap to a safer, more prosperous Dallas. Our plan includes input from nearly every city department, including the Department of Transportation and the Dallas Police Department. This plan also outlines steps we can take to improve safety for all modes of transportation in Dallas.

Achieving our goals will not be easy. But this work is imperative. Safety must come first in Dallas. We must ensure that our residents are able to safely get to school, go to work, run errands, visit friends and family, and travel to restaurants, events, and entertainment. That is what is at stake: the lives, livelihoods, health, and well-being of our residents.

We understand our challenges and opportunities clearly. And through our Vision Zero plan, we will make Dallas a safer, more livable, and more vibrant city for years to come.

Sincerely,





**CITY MANAGER
T.C. BROADNAX**

I am pleased to present the City's first Vision Zero Action Plan to address and prevent traffic fatalities and severe injuries on Dallas streets. I want to thank the Mayor and City Council for their leadership and guidance in calling for the development of the plan and setting an audacious goal of ZERO traffic fatalities and a 50% reduction in severe injuries by 2030. I also want to thank the Vision Zero Task Force for their tireless efforts to ensure the plan incorporates feedback and input from all Dallas residents.

The ability to travel safely- to work, school, or errands– without worrying about suffering injuries or a fatality, is an important component of a city's quality of life. And despite major advances made to vehicle safety and technology, the traffic death rate in Dallas has steadily increased over the past 20 years. Many people don't think twice about speeding. But speeding by just 5 miles per hour (mph) can have fatal consequences, particularly when there are pedestrians nearby.

It is going to take the combined efforts of the City, our external partners, residents, and visitors to create a culture shift to keep everyone safe on Dallas streets. This is an audacious and ambitious goal, that I believe we can meet and achieve together as One Dallas.

In the Spirit of Excellence,



# ACKNOWLEDGEMENTS

The Dallas Vision Zero Action Plan is a result of a two-year analysis, planning, and engagement process. This document is the product of a collaborative planning effort that involved City staff, Council members, the Vision Zero task force, community leaders, and a public process that involved hundreds of Dallas residents. The following groups contributed significantly to the effort throughout the course of the process:

**DALLAS MAYOR AND CITY COUNCIL**
Eric Johnson, Mayor
Chad West, Mayor Pro Tem, District 1
Jesse Moreno, District 2, Transportation and Infrastructure Committee
Casey Thomas, II, District 3
Carolyn King Arnold, District 4
Jaime Resendez, Deputy Mayor Pro Tem, District 5
Omar Narvaez, District 6, Transportation and Infrastructure Committee Chair
Adam Bazaldua, District 7, Transportation and Infrastructure Committee
Tennell Atkins, District 8, Transportation and Infrastructure Committee Vice Chair
Paula Blackmon, District 9
Adam McGough, District 10
Jaynie Schultz, District 11, Transportation and Infrastructure Committee
Cara Mendelsohn, District 12, Transportation and Infrastructure Committee
Gay Donnell Willis, District 13, Transportation and Infrastructure Committee
Paul E. Ridley, District 14

**PROJECT TEAM**
Ghassan Khankarli, Director, Department of Transportation, City of Dallas
Kathryn Rush, Chief Planner, Department of Transportation, City of Dallas
Wayne Powell, Planner II, Department of Transportation, City of Dallas
Hortencia Rubalcava, Outreach Specialist II, Department of Transportation, City of Dallas
Tim Jeffcoat, Traffic Accident Analyst, Data Analytics & Business Intelligence, City of Dallas

**VISION ZERO TASK FORCE**
Chris Turner Noteware, Public Works (formerly), City of Dallas
Lonzo Anderson, Dallas Police Department
Albert Martinez, Dallas Police Department
Will Slack, Dallas Fire Rescue
Heather Murphy, Data Analytics & Business Intelligence, City of Dallas
Suzanne Zieman, Budget Office, City of Dallas
Raymond Williams, Dallas County Sherriff's Department
Woldu Ameneshoa, Dallas County Health & Human Services
Sonya Landrum, North Central Texas Council of Governments
Jeffrey Bush, Texas Department of Transportation
Bryant Shaw, Dallas Independent School District
Emma Dugas, Mothers Against Drunk Driving
Susan Williams, AARP
Heather McNair, BikeDFW
Courtney Edwards, Parkland Health & Hospital System
Mary McCoy, Parkland Health & Hospital System
Karen Mynar, Baylor University Medical Center
Marisa Abbe, Children's Medical Center Dallas

**OTHER PARTNERS AND SUB-COMMITTEE PARTICIPANTS**
Joseph Marchione, Department of Transportation, City of Dallas
Ali Hatefi, Public Works, City of Dallas
Jonathan Blanchard, Dallas Police Department
Matthew Finley, Dallas Police Department
Kellie Renfro, Dallas Police Department
Preston Robinson, Judiciary, Court & Detention Services, City of Dallas
Cheryl Williams, Judiciary, Court & Detention Services, City of Dallas
Tonya Goffney, Judiciary, Court & Detention Services, City of Dallas
Rodney Patten, Prosecutors, Court & Detention Services, City of Dallas
Catherine Cuellar, Communications, Outreach & Marketing, City of Dallas
Steve Ratke, Federal Highway Administration
Millie Hayes, Federal Highway Administration



# OUR PLEDGE

We pledge that the safety of the people on public roads is a top priority and we will work to eliminate traffic deaths and severe injuries caused by preventable crashes.

Eric Johnson
Mayor

Chad West
Mayor Pro Tem
District 1

Jesse Moreno
District 2

Casey Thomas, II
District 3

Carolyn King Arnold
District 4

Jaime Resendez
Deputy Mayor Pro Tem
District 5

Omar Narvaez
District 6

Adam Bazaldua
District 7

Tennell Atkins
District 8

Paula Blackmon
District 9

Adam McGough
District 10

Jaynie Schultz
District 11

Cara Mendelsohn
District 12

Gay Donnell Willis
District 13

Paul E. Ridley
District 14

PAGE INTENTIONALLY LEFT BLANK

# CONTENTS

Message from Mayor and City Manager.................................... 1
Acknowledgements......................... 2
Pledge......................................... 3
Introduction............................. 5
   About Vision Zero...................... 6
   Safe System Approach.............. 6
   Collision Trends......................... 7
Focus Areas.................................... 9
   Methodology............................. 9
   Public Input.............................. 9
   Task Force................................. 10
   Crash Data Anaylsis.................. 11
Focus Areas.................................... 12
   Factors...................................... 12
   Geographic Locations............... 15
   High Injury Network Map.......... 16
Taking Action............................. 19
   Overall Themes.......................... 20
   Engineering................................ 21
   Enforcement.............................. 23
   Education................................... 24
   Legislation and Coordination... 26
   Evaluation.................................. 26
Conclusion..................................... 28
Appendix....................................... 30



INTRODUCTION

In December 2019, the Dallas City Council committed the City to a goal of ZERO traffic fatalities and a 50% reduction in severe injuries by 2030. The Vision Zero resolution directed the City Manager to convene a Vision Zero Task Force that would collaborate with City departments on the development of a Vision Zero Action Plan, and have City departments participate in Vision Zero Acton Plan development, implementation, and evaluation.

This Action Plan lays out the strategy for how the City will advance this Vision Zero goal over the next five years. The Action Plan and its recommendations are based upon a wide-ranging analysis of data as well as public input. The recommendations are derived from verified best practices from literature, other governmental organizations, the City's own data analysis, and public feedback. The following sections will cover the basics of Vision Zero and its importance, an analysis of Dallas' crash data and Vision Zero focus areas, and a full list of recommendations to make Dallas' streets safer for all users.

# ABOUT VISION ZERO



What is Vision Zero?

**TRADITIONAL APPROACH**

Traffic deaths are INEVITABLE
Expect PERFECT behavior
Prevent COLLISIONS
INDIVIDUAL responsibility
Saving lives is EXPENSIVE

VS

**VISION ZERO**

Traffic deaths are PREVENTABLE
Integrate human FAILURE
Prevent FATAL & SEVERE CRASHES
SYSTEMS approach
Saving lives is NOT EXPENSIVE

Adapted from a graphic created by Vision Zero Network

Incidents resulting in major injuries or fatalities are often viewed as unfortunate but unavoidable side effects of our transportation system, but the Vision Zero approach views serious and fatal incidents/crashes as preventable. The traditional approach to roadway safety is centered around an assumption of perfect and predictable behavior from all roadway users. The Vision Zero approach, however, calls for a system that accommodates and mitigates human error. Vision Zero is not about preventing all crashes, it is about preventing fatal and severe crashes.

# SAFE SYSTEM APPROACH

The Safe System Approach recognizes the interdependence of the safe system components: Safe Roads, Safe Speeds, Safe Road Users and Safe Vehicles, and the actions that can be taken to achieve continuous improvements across these components. The goal of this approach is to prevent all collisions and to assure that if collisions do occur, road users will not be seriously injured. While road users must always try to interact safely, the Safe System Approach emphasizes that the transportation system must be designed to accommodate human vulnerability and error. The idea of the Safe Systems Approach is to accept the fact that mistakes will always be made on the road, placing more responsibility on the system designers than on individual road users. This means that system designers must identify and address the causes of severe crashes through data analysis and innovative design solutions.



Dallas has the second highest traffic fatality rate among the 15 most populous U.S. cities, and the highest among major Texas cities on average from 2015 to 2019. [a]

# COLLISION TRENDS



**614**
The number of people killed in traffic crashes on local, non-access-controlled roads in Dallas from 2015 to 2019[b,c]

The number of deaths on Dallas roads increased

**49%**
from 2010 to 2019[a]

### Traffic Fatality Rates of Top Texas Cities
(2015-2019; deaths per 100k population[a])

- Dallas
- Fort Worth
- San Antonio
- Houston
- Austin

a) Source: National Highway Traffic Safety Administration. Traffic Safety Facts Annual Reports. Washington, DC: U.S. Department of Transportation.
b) Source: Texas Department of Transportation. Crash Records Information System, 2015-2019 data.
c) "Non-Access-Controlled Roads" are roads that provide access to private properties, such as local, collector, and arterial roads, intersections, frontage roads, and state roads that provide access to private properties (e.g., Buckner Blvd., Ledbetter Dr., and Grand/SH78). It does not include the access-controlled main lanes of highways (e.g., US 75, IH-35E, Dallas North Tollway).

*Crash data for 2020 and 2021 was excluded from the analysis conducted for this Action Plan to avoid the potential for skewed data from the impact the COVID-19 pandemic had on travel patterns and volumes. For reference, however, the number of fatalities in 2020 and 2021 were higher than in the preceding five years.

Vision Zero is also imperative to meeting the City's climate action goals and improving general quality of life. While only 2% of Dallasites walk to work, pedestrians account for 30% of traffic deaths. Increasing the safety of our streets will be critical to enticing more people to walk and bicycle for transportation and recreation.



Source: 2019 ACS 5-Year Estimate; 2015-2019 person fatality data for crashes on all roads and highways in Dallas, retrieved from Texas Department of Transportation Crash Records Information System





FOCUS AREAS

# METHODOLOGY

Foundational to Vision Zero is the use of crash data analyses and community input to determine traffic safety priorities. The following sections detail the inputs that were used to determine the focus areas and discusses the focus areas for the Vision Zero Action Plan. The focus areas are those topics and geographic locations that should be targeted and prioritized to have the greatest impact on reaching the Vision Zero goal.

## *PUBLIC INPUT*

Two rounds of public engagement with two community surveys were conducted in the summer and fall of 2021 and were made available in English and Spanish. Notification of the input opportunities was disseminated through mailing lists, public events, media outreach, and through the City of Dallas website.

**VISION ZERO ACTION PLAN 2022**

The surveys asked the public about the general state of traffic safety in Dallas, the greatest causes of severe crashes, what the focus areas should be for the Vision Zero Action Plan, and to identify specific locations of concern on an interactive map. In total, 1,692 responses were received from the first community survey and 923 responses from the second survey.

Findings from the surveys included that the majority of people said they do not feel safe traveling in Dallas, and the top three perceived challenges to safe travel are people driving too fast, distracted drivers, and drivers running red lights or stop signs. There was overwhelming support for lowering speed limits on residential streets. When it comes to Engineering and Enforcement efforts, residents said the City's top priority should be lowering and managing speeds, and for Education efforts it should be increasing Vision Zero awareness. The complete summary of survey responses can be found in the Appendix.



## *TASK FORCE*

A Vision Zero Task Force was convened to inform and guide the development and implementation of the Vision Zero Action Plan. The Task Force includes representatives from departments and agencies with a role or stake in improving traffic safety as well as representatives from outside stakeholder groups. Subcommittees for engineering, enforcement, and education held meetings at key points throughout the development of the Action Plan. Topic-specific meetings were also held to help guide the development of engineering, enforcement, and education recommendations.

# CRASH DATA ANALYSIS

Our data-driven approach starts with crash reports filed by law enforcement agencies operating in Dallas at the scene of a collision. Following national best practices, the crash data analysis for this Action Plan focused on traffic crashes, including crashes involving pedestrians and bicyclists, that occurred in the five years from 2015 to 2019 on non-access-controlled roads in Dallas and that resulted in a fatal or severe injury, hereafter collectively referred to as "severe crashes". Law enforcement agencies submit these crash reports to the Texas Department of Transportation (TxDOT), where the data is cleaned and made available through TxDOT's Crash Records Information System.

Crash data from 2020 and 2021 was excluded from the analysis to avoid the change in travel patterns from the COVID-19 pandemic skewing the data. However, the totals from these years have been provided for reference. Compared to the 2015-2019 five-year average, fatalities on non-access-controlled roads were higher in 2020 and 2021.

As a result of the crash data analysis, we know that most crashes occur on a small number of arterial streets, that certain types of streets have higher crash rates, and we know what factors are most likely to lead to a crash being life-threatening. This data allows us to better target our engineering, enforcement, and education efforts.

## Dallas Severe Crashes by Year

|   |   | 2015 | 2016 | 2017 | 2018 | 2019 | 15-19 Avg | 2020 | 2021 |
|---|---|------|------|------|------|------|-----------|------|------|
| Fatal Crashes | Access-Controlled Highways | 55 | 59 | 65 | 86 | 56 | 64 | 60 | 83 |
|  | Non-Access-Controlled Roads | 102 | 122 | 118 | 109 | 118 | 114 | 148 | 131 |
|  | Total | 157 | 181 | 183 | 195 | 174 | 178 | 208 | 214 |
| Severe Injury Crashes | Access-Controlled Highways | 163 | 245 | 229 | 199 | 210 | 209 | 191 | 295 |
|  | Non-Access-Controlled Roads | 617 | 714 | 704 | 687 | 710 | 686 | 641 | 804 |
|  | Total | 780 | 959 | 933 | 886 | 920 | 896 | 832 | 1099 |
|  | Total Severe Crashes | 937 | 1140 | 1116 | 1081 | 1094 | 1074 | 1040 | 1313 |

# FOCUS AREAS

Focus Areas are those factors and locations that account for the highest percentage of severe crashes in Dallas and should be the focus of traffic safety efforts to have the greatest impact on meeting the Vision Zero goal. They were identified through the crash data analysis and public surveys, with additional input from the Vision Zero Task Force.

## *FACTORS*

Severe crashes are often caused by multiple contributing factors. The following factors were present in the highest percentage of severe crashes or were identified as a priority by the public.



**PEDESTRIANS** – PRESENT IN 30% OF SEVERE CRASH REPORTS



**SPEEDING OR UNSAFE TRAVEL SPEEDS** - PRESENT IN 27% OF SEVERE CRASH REPORTS

Speeding is one of the most important factors in determining the severity of a crash. The higher the speed, the more likely a crash will occur and the more severe it will be. This is especially true for crashes involving pedestrians and cyclists. A pedestrian hit by a vehicle going 30 mph is twice as likely to die as one hit by a vehicle going 25 mph. Injury severity also increases when there is greater mass difference between the vehicles and when vulnerable road users (pedestrians, bicyclists, motorcyclists) are involved.





## NOT USING PROPER RESTRAINTS (SEAT BELT, CAR SEAT) –
### PRESENT IN 16% OF SEVERE CRASH REPORTS

When drivers or passengers fail to wear a seat belt, the likelihood that they will be killed or severely injured if involved in a traffic collision increases from less than 1% to over 10%.



## UNDER THE INFLUENCE OF DRUGS OR ALCOHOL – PRESENT IN 14% OF SEVERE CRASH REPORTS



## LEFT-TURN FAILURE TO YIELD – PRESENT IN 10% OF SEVERE CRASH REPORTS



## RED LIGHT RUNNING – PRESENT IN 10% OF SEVERE CRASH REPORTS



## DISTRACTED DRIVING – PRESENT IN ONLY 5% OF SEVERE CRASH REPORTS, BUT WAS A TOP PRIORITY IN THE SURVEY

Reasons for distracted driving being present in a small number of severe crash reports include that drivers may be reluctant to admit fault and police investigators are not always able to discern the extent to which driver distraction is a contributing factor in a crash. Nevertheless, distracted driving is known to lead to fatal car crashes. A review of national crash data by the National Highway Traffic Safety Administration found that in 2012, distraction was a factor in 10% of all fatal motor vehicle crashes and 18% of all crashes causing injury (NHTSA, April 2014). Drivers who text behind the wheel are eight times as likely to be in a crash or near crash as drivers who are not texting (Drews et. al, 2009). Respondents to the Vision Zero survey felt that distracted driving should be a top priority for reducing severe crashes.

Additionally, it was determined through the crash data analysis that incidents of severe crashes spike in the three hours just after sunset, as well as in the late fall and early spring. The percentage of severe crashes that occur during daylight hours versus at night is nearly evenly split, as is the percentage that occur at intersections versus mid-block. Detailed findings from the crash data analysis can be found in the Dallas Vision Zero Crash Data Analysis presentation (Dallas Department of Transportation, 2022).



# GEOGRAPHIC LOCATIONS

In addition to the general crash type focus areas, the crash data analysis process took into account the physical locations of severe crashes. Identifying geographic focus areas allows for efficient project prioritization by identifying the most dangerous streets and intersections in the city. Additionally, considering location, geography, and demographics is key in insuring equity in the Vision Zero process.

## High Injury Network

The High Injury Network (HIN) is composed of the streets that account for the highest percentage of fatal and severe crashes. It identifies the 7% of roads that account for 62% of severe crashes, and is the composite of the motor vehicle, pedestrian, and bicycle high crash networks.

## Equity Focus Areas

The overall themes for Vision Zero dictate that both traffic crash data and equity data be used to identify and prioritize investment. "Equity Focus Areas" were identified by using the draft Capital Improvement Equity Tool that was developed by the City of Dallas Office of Equity and consists of four equally weighted criteria:



- Race: ≥70% of people are non-white

- Transportation Access: ≥5% use public transportation

- Socio-Economic Status: >24% live in poverty

- Social Vulnerability: High

Those census tracts that meet all four criteria have been identified as Equity Focus Areas for the purpose of this plan.



**VISION ZERO ACTION PLAN 2022**



# Pedestrian High Injury Network

Top 15 roadway segments on which people were most likely to be killed or seriously injured while driving.

Maple – Hudnall to Oak Lawn
MLK Jr – SM Wright to Botham Jean
Great Trinity Forest – Ledbetter to IH-45
Wheatland – Duncanville City Limit to Kirnwood
Ledbetter – Lancaster to Great Trinity Forest
Bruton – Prairie Creek to Masters
Buckner – John West to IH-30
Jupiter – IH-635 to Garland
Cedar Springs – DNT to Turtle Creek
Forest – Audelia to Garland City Limit
Jefferson – Edgefield to Zang
Jefferson – Zang to Fleming
Great Trinity Forest – Jim Miller to US 175
Cedar Spring – Turtle Creek to Field
Northwest Hwy – Harry Hines to Timberline

▬ Number of Fatal and Severe Injury Crashes

— Pedestrian HIN
— Top 15 Segments

The Pedestrian High Injury Network shows the 4% of streets on which 59% of severe pedestrian crashes occurred.



# Vehicle High Injury Network

Top 15 roadway segments on which people were most likely to be killed or seriously injured while driving.

Great Trinity Frst – Jim Miller to US 175
Buckner – Lake June to Great Trinity Frst
Northwest Hwy – Walton Walker to Harry Hines
Buckner – IH-30 to Forney
Great Trinity Frst – S Central Expy to Pemberton Hill
Storey – Irving City Limit to Northwest Hwy
Buckner – Lake June to Bruton
Buckner – Scyene to Forney
Ledbetter – IH-35E to University Hills
Northwest Hwy – Harry Hines to Timberline
Buckner – Bruton to Scyene
Ledbetter – S Lancaster to Great Trinity Forst
2nd – Elsie Faye Heggins to US 175
Corinth – 8th to Stella
Jim Miller – Scyene to Forney

▬ Number of Fatal and Severe Injury Crashes

— Vehicle HIN
— Top 15 Segments

The Vehicle High Injury Network shows the 4% of streets on which 59% of severe crashes occurred that only involved motor vehicles.



# Bicycle High Injury Network

Top 15 roadway segments on which people were most likely to be killed or seriously injured while bicycling.

- W Lawther – White Rock to Goforth
- Lamar – San Jacinto to IH-35E
- Pacific – Akard to IH-45/IH-75
- Main – Malcolm X to Canton
- Great Trinity Forest – Jim Miller to US 175
- Munger – Bryan to IH-30
- Beckley – IH-30 to W Main
- Buckner – Bruton to Scyene
- St Augustine – Scyene to Bruton
- Malcolm X – Metropolitan to Elsie Faye Heggins
- Continental – IH-35E to Houston
- Allen – McKinney to Carlisle
- Carlisle – Allen to Cole
- Knox – Highland Park City Limit to US 75
- Routh – US 75 to Woodall Rodgers

Number of Fatal and Severe Injury Crashes

Bicycle HIN
Top 15 Segments

The Bicycle High Injury Network shows the 1% of streets on which 38% of severe bicycle crashes occurred.



VISION ZERO ACTION PLAN 2022



The recommendations in this plan are based on public input and the crash data analysis. The intent is to provide a solid base of action items that Dallas and its partners can use to improve roadway safety.

While each recommendation and action item might be handled by a different City department, coordination between departments will be critical to ensure that each recommendation is carried out in an effective manner.

This section will outline the recommendations and organize them in terms of which category they fall into and which City department will be responsible for their implementation.

CITY OF DALLAS | 19

# OVERALL THEMES

- **Collaborative:** Work across departments and partnering agencies and take a comprehensive approach to improving safety using Engineering, Enforcement, Education, Evaluation, and Equity.

- **Data-Driven:** Use data to determine priorities.

- **Focus on Speeds:** Manage speeds to safe levels as determined through engineering studies that incorporate local conditions.

- **Comprehensive:** Direct engineering, enforcement, education, and evaluation resources to high injury and fatal crash hotspot locations.

- **Culture Shift:** Create a culture of safety within the city and the public at large.



# ENGINEERING

## DEPARTMENT OF TRANSPORTATION

| | Action Item | Target | Focus Areas |
|---|---|---|---|
| 1 | **Conduct engineering safety evaluations** for streets on the High Injury Network (HIN). | Avg. 5 corridors on the HIN/year | All |
| 2 | **Implement lower-cost, quick-build Vision Zero safety improvements**. | Avg. 5 corridors on the HIN and 15 intersections/year | All |
| 3 | **Establish a pipeline of capital projects and seek funding.** | Ongoing | All |
| 4 | **Increase speed data collection and analysis.** | Ongoing | Speeding |
| 5 | **Conduct a citywide evaluation of speed limits and recommend changes to City Council.** | Complete by end of 2023 | Speeding |
| 6 | **Implement speed humps/cushions or raised cross-walks** on local residential streets, distributed equitably based on need. | 4 locations/year | Speeding, Pedestrians |
| 7 | **Install new or improved pedestrian crossings** at locations identified by data as having pedestrian safety issues. | 3 locations/year | Pedestrians |
| 8 | **Continue to enhance maintenance of street markings.** | Restripe 33%/year | All |
| 9 | **Coordinate with the Texas Department of Transportation** on making safety improvements along state roadways. | Ongoing | All |
| 10 | **Promote safe, active transportation around schools.** | Improvements around 3 schools/ year | Pedestrians |
| 11 | **Adopt new policies, procedures, and standards.**<br>a. Setting Speed Limits: recommend standard method that supplements guidance in the Texas Manual on Uniform Traffic Control Devices (TMUTCD); consider various factors as recommended by the Federal Highway Administration (FHWA).<br>b. Speed Limit Signs: supplement TMUTCD guidance in creating standards for the placement and spacing of signs.<br>c. Mid-block Pedestrian Crossing Criteria: supplement the TMUTCD guidance on when to implement new crossings and what types of improvements to provide based on context.<br>d. Construction Zones: Update the 2011 City of Dallas Traffic Barricade Manual.<br>e. Street Lighting: Update the City's streetlight design guidelines and standards. | Complete by end of 2023 | Speeding, Pedestrians |

# ENGINEERING (CONTINUED)

## DEPARTMENT OF PUBLIC WORKS

| | Action Item | Target | Focus Areas |
|---|---|---|---|
| 1 | **Implement major Vision Zero capital safety projects.** | 10 projects by 2027 | All |
| 2 | **Fund and implement priority sidewalks in the Sidewalk Master Plan.** | In accordance with goals in adopted plan | Pedestrians |
| 3 | **Adopt new policies, procedures, and standards.**<br>a. Revise the Street Design Manual to prioritize mitigating and reducing severe injury crashes throughout the design process.<br>b. Add a toolbox in the Street Design Manual of proven safety treatments that should be considered as part of private and public projects.<br>c. Re-evaluate driveway standards (number and spacing).<br>d. Create standard construction and marking details for pedestrian refuge islands at mid-block and intersection locations, to increase the use of this proven countermeasure. | Complete by end of 2023 | All |

## CITY MANAGER'S OFFICE

| | Action Item | Target | Focus Areas |
|---|---|---|---|
| 1 | **Clarify the duties of the City Engineer and the City Traffic Engineer in the City Code,** when it comes to responsibility for and authority over conducting multi-modal safety evaluations, evaluating and recommending changes to speed limits, approving traffic and speed control measures, approving driveway connections to streets, and making recommendations to City Council on proposals for major changes to street operations. | Complete by end of 2022 | All |

# ENFORCEMENT

## DALLAS POLICE DEPARTMENT

| | Action Item | Target | Focus Areas |
|---|---|---|---|
| 1 | **DPD Traffic Unit and specialized Patrol Units will** elevate the enforcement of the most dangerous driving behaviors including at high injury locations, as determined through Vision Zero analysis. | 2022 | All |
| 2 | **Conduct high-visibility enforcement by DPD Traffic Unit and specialized Patrol Units** along HIN corridors. | 6 HIN corridors per quarter | All |
| 3 | **Evaluate Texas STEP grant funding options to merge with Vision Zero**. | FY 2022-2023 | Speeding |
| 4 | **Provide consistent levels of enforcement** across all DPD Divisions, as feasible. | Ongoing | All |
| 5 | **Conduct education prior to intensified enforcement** (e.g., using variable message signs and speed feedback trailers). | Ongoing | All |
| 6 | **Work with Courts to create graduated penalties for repeat offenders** who engage in dangerous driving behavior. | 2023 | All |
| 7 | **Address challenges to successfully enforcing speed limits.** a. Provide officer training on SEC. 28-43 of the Dallas City Code. b. Continue coordinating with Department of Transportation and the Courts department. | 2023 | Speeding |
| 8 | **Address challenges to enforcing Failure to Yield to Pedestrians violations.** Provide officers with training on new state law SB 1055, "Stop for Pedestrians." | 2022 | Pedestrians |
| 9 | **Increase officer training on immediate and advanced crash investigation.** | Ongoing | All |
| 10 | **Practice what we preach.** Incorporate Vision Zero materials and safe driving behavior training in cadet officer safety training. | 2023 | All |
| 11 | **Expand and make permanent DPD's Driving While Intoxicated squad** as the Department's staffing increases. | 2023 | Under the Influence |
| 12 | **Convene monthly meetings between DPD, City of Dallas Prosecutors, and Chief City Administrative Judge** (and his/ her judges) to discuss fair and equitable enforcement practices. | Ongoing | All |

# EDUCATION

## OFFICE OF COMMUNICATION, OUTREACH & MARKETING

| | Action Item | Target | Focus Areas |
|---|---|---|---|
| 1 | **Align all traffic safety education and outreach efforts in the city under the Vision Zero umbrella.** Create a branded toolkit to ensure consistency across education and outreach efforts. | 2022 | All |
| 2 | **Develop and implement a safety education campaign** aimed at reducing speeding, failure-to-yield, and drunk and distracted driving. | 2023 | All |
| 3 | **Increase awareness about the new state law SB 1055, "Stop for Pedestrians."** | 2022 | Pedestrians |
| 4 | **Increase Vision Zero awareness** using City-owned and controlled channels. | Ongoing | All |
| 5 | **Work with school districts to implement traffic safety education in schools.** | 2026 | All |

Based on an extensive literature review, best practices for Vision Zero and traffic safety education and messaging include:

- Avoid asking for perfect behavior from people walking, such as wearing bright clothing if walking at night, as this will likely not protect them in the situations in which fatal and severe crashes are most likely to occur (i.e. where vehicles are traveling at high speeds).

- Focus messaging on drivers and driver behavior.

- Avoid campaigns that are directive, that say things like 'Slow down,' Instead, connect the action you want someone to take with consequences or data that are meaningful, and they can identify with.

- In a media saturated society where distractions abound, shocking messages and visuals can help cut through the noise.

# EDUCATION (CONTINUED)

- Use data to determine priority education topics, such as the seven topic focus areas in this Vision Zero Action Plan.

- Use data to determine who to target, and how, where, and when to target them. The High Injury Network tells us where severe crashes are most likely to occur. As far as when: severe crashes in Dallas, as in other cities, tend to spike in early spring and late fall. When budgets are limited, boosting traffic safety messaging during this time of year can be most effective, with smaller campaigns to provide continuity throughout the year.









SOURCE: NEW YORK CITY





SOURCE: CITY OF PHILADELPHIA

# LEGISLATION AND COORDINATION

## OFFICE OF GOVERNMENT AFFAIRS

| | Action Item | Target | Focus Areas |
|---|---|---|---|
| 1 | **Work with other cities in Texas to effectuate lowering prima facie speed limits** for residential streets to 25mph. | 2023 | Speeding |

## DEPARTMENT OF TRANSPORTATION

| | Action Item | Target | Focus Areas |
|---|---|---|---|
| 1 | **Convene regular meetings of the Vision Zero Task Force** to guide the initiation and monitor the implementation of the Action Plan through 2025. | 4 meetings/year | All |
| 2 | **Convene regular meetings between the Department of Transportation and Dallas Police Department** to review reports for severe crashes. | 4 meetings/year | All |

# EVALUATION

## OFFICE OF DATA ANALYTICS & BUSINESS INTELLIGENCE

| | Action Item | Target | Focus Areas |
|---|---|---|---|
| 1 | **Publish an annual Vision Zero progress report** and/or create a dashboard to track progress and update at least annually. | 2023, 2024, 2025, 2026 | All |
| 2 | **Continue quarterly fatal and severe crash pattern data evaluation.** | Ongoing | All |
| 3 | **Compare hospital data and police crash reports** to determine if under-counting of low-income or minority populations is occurring in the police report data. | 2026 | All |

# EVALUATION (CONTINUED)

## DEPARTMENT OF TRANSPORTATION

| | Action Item | Target | Focus Areas |
|---|---|---|---|
| 1 | **Develop metrics for evaluating safety projects and conduct before and after studies** to assess their effectiveness. | 2022 and 2023 | All |
| 2 | **Create an online, interactive map of the HIN and safety improvement projects.** | 2022 | All |
| 3 | **Update the High-Injury Network using 2017-2021 crash data.** | 2023 | All |

## CITY MANAGER'S OFFICE

| | Action Item | Target | Focus Areas |
|---|---|---|---|
| 1 | **Add Vision Zero traffic safety performance measures to Dallas 365 and Annual Budget performance measures for the Dallas Police Department and Department of Transportation.** | 2022 | All |

The following are recommended evaluation measures that can be used to track our progress toward Vision Zero:

- The annual number of fatal and severe crashes, on average, over the previous five years (i.e. the five year rolling average).

- The number of annual traffic deaths, severe injuries, fatal crashes, and severe injury crashes on controlled access roads and the travel mode and race/ethnicity of those involved.

- The number of locations on the High-Injury Network that have received Vision Zero safety treatments.

- The number of new miles of sidewalk installed in the city.

- The number and percentage of traffic citations and warnings given for the most dangerous driving behaviors: speeding, failure to yield to pedestrians, running red lights, driving under the influence, distracted driving.

- The level of awareness of Vision Zero among the public.

- The number of schools receiving transportation safety education.



CONCLUSION

In December 2019, Dallas City Council committed the City to a goal of zero traffic fatalities and a 50% reduction in severe injuries by 2030. This action plan lays out the steps that the city and community must take to work toward that goal. By taking a data-driven approach with a focus on equity, Vision Zero programs and improvements can be directed to where they are needed most in order to have the greatest impact.

At the heart of Vision Zero is the principle that traffic deaths and serious injuries are unacceptable and, most importantly, preventable. Cities around the globe have seen success in their respective Vision Zero initiatives, but truly reaching ZERO will require the participation and engagement of the entire Dallas community.

# APPENDIX

# PUBLIC ENGAGEMENT SURVEY RESPONSES

## *SURVEY #1*

The first online survey was open from June 9 through August 16 2021. The purpose was to get input from a wide variety of Dallas residents in order to better understand real and perceived safety issues in the city. In total, 1,692 responses were received to the survey.





### Q6. If you could choose two areas that the City should focus on to improve traffic safety, what would they be?



- Improve enforcement of traffic laws like speeding and red light running
- Slow down cars and trucks to safer speeds
- Reduce distracted driving
- Build street safety improvements like sidewalks and street lights
- Build a culture of traffic safety through education and community engagement



### Q7.1. Do you support lowering speed limits on residential streets?

- 498
- 947
- 247
- Support
- Do not Support
- Neutral or Need More Information

### Q7.2. Do you support red light cameras and automated enforcement?

- 325
- 645
- 722
- Support
- Do not Support
- Neutral or Need More Information

### Q8. Do you live in the City of Dallas?

- No, 295
- Yes, 1397

### Q9. What is your race/ethnicity?



- 52
- 40
- 252
- 269
- 1215

- White
- African American/Black
- Hispanic/Latino
- Asian/Pacific Islander
- American Indian/Alaska Native

### Q10. What is your zip code?



# SURVEY #2

The second online survey was open from November 15 through December 6 2021. The purpose was to solicit feedback on what should be prioritized in the VZAP and review potential recommendations. In total, 921 responses were collected.



**CITY OF DALLAS | 32**

PAGE INTENTIONALLY LEFT BLANK



# VISION ZERO ACTION PLAN 2022

## CITY OF DALLAS

# Exhibit R

DocuSign Envelope ID: B8C3F05F-940B-4DC4-981B-0F54BF86C01A

### THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| Alton Waggoner et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 3:22-cv-02776-E |
| v. | ) Jury Trial Demanded |
| | ) |
| The City of Dallas, Texas et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF DR. DAVID RAGLAND

I, DAVID RAGLAND, hereby declare and state:

1.      I am over eighteen years of age and am of sound mind to make this declaration. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto. I reside in Concord, California.

2.      I am the founder and Co-Director of the Safe Transportation Research and Education Center ("SafeTREC") at the University of California Berkely ("UC Berkeley"). I am also an Adjunct Professor Emeritus of Epidemiology at UC Berkeley. I earned a B.A. in Psychology from the University of Oregon in 1965, a Ph.D. in Psychology from the State University of New York at Buffalo in 1976, and an MPH in Epidemiology/Biostatistics from UC Berkeley in 1981. Details of my professional experience, publications, and past testimony are described in my curriculum vitae, a copy of which is attached to this declaration as Appendix A.

3.      For the past 19 years, I have been the Director or Co-Director of SafeTREC, which I founded in 2000 (then called the UC Berkeley Traffic Safety Center). SafeTREC's mission is reducing traffic-related injury through teaching, outreach, technical assistance, and research.

1

DocuSign Envelope ID: B8C3F05F-940B-4DC4-981B-0F54BF86C01A

SafeTREC is affiliated with the UC Berkeley Institute of Transportation Studies and the UC Berkeley School of Public Health. In my capacity as Director, I have advised state and federal transportation agencies on issues of transportation safety— including collision analysis, data collection, safety for vulnerable populations, pedestrians, and bicyclists. I have authored or co-authored several dozen publications on health and safety, especially in regard to traffic safety and occupational health and safety. I have taught courses on injury prevention and control (in the UC Berkeley School of Public Health) and traffic safety and injury control (in the UC Berkeley Department of Civil and Environmental Engineering), among other courses. My research interests specifically include injury epidemiology (intentional and unintentional); injuries in vulnerable road users (such as pedestrians, bicyclists, and motorcyclists); the interaction of behavioral and environmental factors in injury; and the demographic, social, and cultural factors in injury patterns.

4.      I have been retained by Plaintiffs as an expert in this case at a rate of $250 per hour and reimbursement expenses at $50 per hour for time spent by my staff. This declaration is based on my initial review of publicly available documents provided to me by Plaintiffs' counsel, including:

a.  A copy of § 28-61.1 of the Dallas City Code ("the Ordinance");

b.  Dallas' Vision Zero Action Plan, a report published in 2022, which codified the City's long-term approach to traffic and pedestrian safety.

c.  A presentation given to the City Council summarizing the City's review of data on traffic and pedestrian related crashes from 2015-2019.

DocuSign Envelope ID: B8C3F05F-940B-4DC4-981B-0F54BF86C01A

    d.   A public dashboard of up-to date Fatal and Severe Injury Data from January 1, 2015 to the January 2, 2023.[1]

5.    Based on my review of the materials provided to me, and my extensive experience researching traffic and pedestrian injury prevention, § 28-61.1 will have a minimal effect on public safety even if it is vigorously enforced and pedestrians seek to abide by it. The City's own materials demonstrate that people sitting or standing on medians and areas adjacent to the street do not pose a safety problem. The pedestrian and traffic safety problems that do exist are better redressed through Dallas' existing Ordinances and roadway design improvements. The conclusion that other alternatives better address public safety is confirmed by the City's own data, the principles outlined in Vision Zero, and best practices in the traffic safety literature.

## Background

6.    I understand that Plaintiffs Alton Waggoner, Teri Heishman, Hannah Lebovits, and Kawana Scott are suing the City of Dallas alleging the City's enactment of an ordinance, codified as § 28-61.1 of the City code, violates the First Amendment of the United States Constitution. The Ordinance prohibits anyone in the city from standing or sitting on medians less than six feet wide and in certain "clear zones".[2]

7.    I also understand the Ordinance contains a variety of exceptions, including for individuals crossing the street, walking or standing on a curb, with prior authorization from the

---

[1] Accessible at:
https://dallascitydata.dallascityhall.com/views/VisionZeroDashboard/VisionZero?:showAppBanner=false&:display_count=n&:showVizHome=n&:origin=viz_share_link&:isGuestRedirectFromVizportal=y&:embed=y

[2] CLEAR ZONE means the unobstructed, traversable area provided beyond the edge of the through travelled way for the recovery of errant vehicles. On a curbed street, the clear zone is the area four feet from the face of the curb. On an uncurbed street, the clear zone is 10 feet from the edge of the travel lane. A clear zone includes shoulders, bicycle lanes, and auxiliary lanes, except auxiliary lanes that function like through lanes. However, a clear zone does not include areas adjacent to the back of the curb where a paved sidewalk exists.

3

DocuSign Envelope ID: B8C3F05F-940B-4DC4-981B-0F54BF86C01A

City, performing approved roadwork or erecting a barricade, or rendering aid in emergency situations.

8.      I understand that this declaration will be used as part of Plaintiffs' Motion for a Preliminary Injunction, which asks this Court to prevent the City from enforcing the Ordinance pending the final outcome of the litigation. Because this litigation is at a preliminary stage, I have not been provided with crash reports or other materials that will become available at a later date through discovery. However, the materials I have reviewed appear to be a representative summary of the City's crash data since January 1, 2015, and the City's long-term approach to reducing the number of crashes in Dallas.

**The Ordinance Will Have an Exceptionally Small Effect on Public Safety**

9.      Based on my review of the City's Severe and Fatal Injury Dashboard and its detailed summary of crashes that occurred from 2015-2019, § 28-61.1 will have a minimal or non-existent effect on traffic and pedestrian safety. In neither the Severe and Fatal Injury Dashboard nor in the detailed summary of crashes does data show that people involved in panhandling or related activities are severely or fatally injured. Similarly, there is no data showing people sitting or standing on medians have been severely or fatally injured.

**Alternative Solutions Would be More Effective at Addressing Public Safety**

10.      The City could better address pedestrian and traffic safety through roadway design changes, reducing speed limits, and enforcing existing traffic laws.

11.      An audit conducted by the City of Dallas, published May 23, 2022, concluded that the City has not sufficiently addressed the issue of pedestrian safety.  These efforts have resulted in the identification of streets with multiple pedestrian incidents and efforts to address them. Several examples from the City sponsored Audit of Pedestrian Injury are as follows:

4

- The Dallas DOT does not have performance measures and written procedures directly related to pedestrian safety

- Has a backlog of 1,500 crosswalks where thermoplastic markings have not been refreshed.

- Does not maintain pedestrian countermeasures as frequently as federal and state guidelines recommend.

These and other deficiencies have been described in an Audit of Pedestrian Safety prepared by the City of Dallas (May 2022). A summary of such deficiencies is included here as an Appendix to this Declaration (Appendix B). Addressing these deficiencies would dramatically reduce pedestrian injury in the City of Dallas without prohibiting speech on medians less than six feet and areas adjacent to the street. Some specific examples are supported by the City's own commitments in Vision Zero available to the City (besides the prohibitions in the Ordinance) that would reduce or prevent pedestrian injury and promote the City's stated public-safety aims, such as improving facilities for pedestrian crossings, reducing speed limits, and more consistently enforcing traffic laws.

12.    Energy and resources devoted to implementation and enforcement of the Ordinance may detract from the proven countermeasures outlined by the Vision Zero approach. For example, since many of the pedestrian severe injuries and fatalities appear to take place at intersections, and during lawful street crossings (*e.g.*, at a marked crosswalk, or with the light), one approach would be to begin development of enhanced intersections. Such enhancements might include, for example, (i) raised crosswalks, (ii) raised median refuge islands, (iii) increased pedestrian walking time, and (iv) installing flashing beacons to warn drivers of the presence of pedestrians in these areas. These enhancements could have a significant effect on overall vehicle-pedestrian conflicts reflected in the underlying data. For example, the Federal Highway Administration ("FHWA") indicates that adjusting pedestrian walking time by adding "leading pedestrian intervals" (essentially, a "head start" for pedestrians to begin crossing an intersection before vehicles are given a green light) may reduce

DocuSign Envelope ID: B8C3F05F-940B-4DC4-981B-0F54BF86C01A

vehicle-pedestrian crashes by as much as 60%. Likewise, installing raised medians or pedestrian crossing islands where none currently exist can reduce pedestrian crashes by 46-56%. Safety analyses done by the City of Dallas show a high rate of severe pedestrian injury crashes during the period from sunset to midnight. Installing adequate lighting where pedestrians may be crossing a street during this time interval could also be effective.

13.     The City of Dallas would be better served by implementing proven countermeasures rather than relying on approaches, like the proposed Ordinance, for which there exists no convincing empirical support.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 4th day of January 2023, at Berkeley, California.

_David Ragland_

Dr. David Ragland

# Appendix A

## Curriculum Vitae: David Ragland

**Education**

University of Oregon, Eugene, Psychology, BA, 1965

State University of New York at Buffalo, Psychology, Ph.D., 1976

University of California at Berkeley, Epidemiology/Biostatistics, MPH, 1981

**Appointments**

- Co-Director, University of California SafeTREC, Safe Transportation Research & Education Center, School of Public Health, Institute of Transportation Studies, 2016- present
- Director, University of California SafeTREC, Safe Transportation Research & Education Center, School of Public Health, Institute of Transportation Studies, 2000-2016
- Adjunct Professor of Epidemiology, School of Public Health, University of California, Berkeley, 1999-present
- Epidemiologist, Department of Epidemiology and Biostatistics, School of Public Health, University of California at Berkeley, 1983-1999
- Postdoctoral Fellow, Behavioral Factors in Cardiovascular Disease, Department of Epidemiology and Biostatistics School of Public Health, University of California at Berkeley, 1978-81
- Psychologist, Behavioral Medicine Branch, National Heart, Lung, and Blood Institute, NIH, Bethesda, Maryland, 1976-78

**Awards**

- One of 75 most influential alumni of the School of Public Health (for 75th Year Celebration of the School of Public Health)
- 2018 recipient of the Zak Sabry Mentorship Award (established in School of Public Health to recognize faculty with distinguished records of mentorship)

**Synergistic Activities**

- As PI or Co-PI on about $20 million in research grants/contracts from 2010 to the present
- Teach two graduate level courses at UC Berkeley: Traffic Safety and Injury Control (Civil Engineering), Injury Prevention and Control (School of Public Health)
- Technical Advisory Committee, UrbanFootprint Public Health Module, Governor's Office of Planning and Research
- Advisory Panel, Urban Design for Health (UD4H)
- Advisory Committee, Crash Medical Outcomes Data (CMOD), California Department of Public Health
- Executive Committee, Institute of Transportation Studies, UC Berkeley
- Executive Committee, Traffic Records Coordinating Committee (TRCC), California

**Prior Expert Testimony**

I have provided expert testimony in the following years:

8

**Two related cases in Michigan state court:**

- Therese Hetrick, et al. v. Stephen Fisher, et al., Oakland County Circuit Court Case No. 2013-137159-NI
- Wayne Brouillet, et. al. v. Stephen Fischer, et al., Oakland County Circuit Court Case No. 2013-137379-NI
  **Case involving attempted prohibition of panhandling near vehicle right of way.**
- City of Albuquerque vs Martin Relevant information for this case by searching for No. 19-2140 (https://www.ca10.uscourts.gov/opinion/19-2140 )
  **Case supporting California's effort to maintain mandate for fuel efficient vehicles.**
- https://ww2.arb.ca.gov/sites/default/files/2020-04/10_23_2018_ragland_safe_trec_traffic_safety_strategies_ac_0.pdf


**Publications/Products**

Publications and reports for David Ragland can be found on the following Internet sites:

- Researchgate: https://www.researchgate.net/profile/David-Ragland-2/research
- GoogleScholar: https://scholar.google.com/citations?hl=en&user=DesqMVwAAAAJ
- SafeTREC: https://safetrec.berkeley.edu/publications

Publications from 2009 to Present:

1. K MacLeod, T zMcMillan, D Ragland. A Multidimensional Understanding of Older Adult
   Mobility Needs: A Survey to Improve Mobility, Health, and Social Inclusion among Older Adults in California. Journal of Transport & Health 9, 2018, S58-S59

2. K Chung, D Ragland. Discussion of theoretical and practical challenges in developing high collision concentration location detection procedures. International Journal of Urban Sciences, 2018, 1-15

3. KE MacLeod, RL Sanders, A Griffin, JF Cooper, DR Ragland. Latent analysis of Complete Streets and traffic safety along an urban corridor. Journal of Transport & Health 8, 2018, 15-29

4. AM Amiri, N Nadimi, DR Ragland, R Imaninasab. Predicting Crash Severity Based on Its Related Collision Type Using Five Data Mining Techniques. Transportation Research Board 97th Annual Meeting Transportation Research Board, 2018

5. MacLeod, Kara E; Sanders, Rebecca L; Griffin, Ashleigh; Cooper, Jill F; Ragland, David R. Latent Analysis of Complete Streets and Traffic Safety Along an Urban Corridor. Journal of Transport & Health, Volume 8, 2018, pp 15-29 https://trid.trb.org/view/1507951

6. Amiri, Amir Mohammadian; Nadimi, Navid; Ragland, David R; Imaninasab, Reza. Predicting Crash Severity Based on Its Related Collision Type Using Five Data Mining Techniques. Transportation Research Board 97th Annual Meeting, Transportation Research Board, 2018, 15p https://trid.trb.org/view/1495170

7. MacLeod, Kara E; Karriker-Jaffe, Katherine J; Satariano, William A; Kelley-Baker, Tara; Lacey, John H; Ragland, David R. Drinking and Driving and Perceptions of Arrest Risk among California Drivers: Relationships with DUI Arrests in Their City of

Residence.Traffic Injury Prevention, Volume 18, Issue 6, 2017, pp 566-572
https://trid.trb.org/view/1473873

8. Cooper, Douglas; Duffy, Sarah; Orrick, Phyllis; Ragland, David. Methods to Reduce or Prevent Backing Crashes. Accident Reconstruction Journal, Volume 26, Issue 5, 2016, pp 43-52 https://trid.trb.org/view/1429462

9. Fang, Shou'en; Xie, Wenjing; Wang, Junhua; Ragland, David R. Utilizing the eigenvectors of freeway loop data spatiotemporal schematic for real time crash prediction. Accident Analysis & Prevention, Volume 94, 2016, pp 59-64 https://trid.trb.org/view/1416632

10. Wang, Junhua; Xie, Wenjing; Liu, Boya; Fang, Shou'en; Ragland, David R. Identification of Freeway Secondary Accidents with Traffic Shock Wave Detected by Loop Detectors. Safety Science, Volume 87, 2016, pp 195-201 https://trid.trb.org/view/1405554

11. Junhua, Wang; Boya, Liu; Lanfang, Zhang; Ragland, David R. Modeling secondary accidents identified by traffic shock waves. Accident Analysis & Prevention, Volume 87, 2016, pp 141-147 https://trid.trb.org/view/1385864

12. MacLeod, Kara E; Karriker-Jaffe, Katherine J; Ragland, David R; Satariano, William A; Kelley-Baker, Tara; Lacey, John H. Acceptance of drinking and driving and alcohol-involved driving crashes in California. Accident Analysis & Prevention, Volume 81, Issue 0, 2015, pp 134-142

13. Zhang, Yuanyuan; Bigham, John; Ragland, David; Chen, Xiaohong. Investigating the associations between road network structure and non-motorist accidents. Journal of Transport Geography, Volume 42, Issue 0, 2015, pp 34-47

14. Ragland, David R; Bigham, John; Oum, Sang Hyouk; Chen, Katherine; Felschundneff, Grace. Traffic Injury on Tribal Lands in California. Transportation Research Board 94th Annual Meeting, Transportation Research Board, 2015, 10p

15. MacLeod, Kara E; Satariano, William A; Ragland, David R. The impact of health problems on driving status among older adults. Journal of Transport & Health, Volume 1, Issue 2, 2014, pp 86-94

16. Izano M., Satariano, W.A., Tammemagi, M.C., Ragland, D., Moore, D.H., Allen E, et al. Long-Term Outcomes Among African-American and White Women With Breast Cancer: What is the Impact of Comorbidity? *J Geriatr Oncol.* 2014 Mar 5

17. Li, Z., Ahn, S., Chung, K., Ragland, D.R., Wang, W., Yu, J.W. Surrogate Safety Measure for Evaluating Rear-End Collision Risk Related to Kinematic Waves Near Freeway Recurrent Bottlenecks. *Accid Anal Prev.* 2014 Mar; 64: 52-61

18. Macleod, K.E., Ragland, D.R., Prohaska, T.R., Smith, M.L., Irmiter, C., Satariano, W.A. Missed or Delayed Medical Care Appointments by Older Users of Nonemergency Medical Transportation. *Gerontologist.* 2014 Feb 20

19. Ragland, D.R., Pande, S., Bigham, J., Cooper, J.F. *Ten Years Later: Examining Long-Term Impact of California Safe Routes to School Program.* Transportation Research Board Annual Meeting 2014. 15p

10

20. Arnold, L.S., Flannery, A., Ledbetter, L., Bills, T., Jones, M.G., Ragland, D., et al. Identifying Factors That Determine Bicyclist and Pedestrian-Involved Collision Rates

11

and Bicyclist and Pedestrian Demand at Multi-Lane Roundabouts. UC Berkeley Safe Transportation Research and Education Center. 2013. 81p

21. Cooper, D.L., Ragland, D.R., Felschundneff, G. *Low Cost Upgrades to At-Grade Crossing Safety Devices.* Transportation Research Board Annual Meeting 2013 Paper #13-4164. 2013. 11p

22. Cooper, J.F., Ragland, D.R., Ewald, K., Wasserman, L., Murphy C.J. Observational Study of Use of Cell Phone and Texting Among Drivers in California: Comparison of Data From 2011 and 2012. *Transp Res Rec.* 2013 (2365): 66-72

23. Do, M.T., Grembek, O., Ragland, D., Chan, C. *Weighting Integration by Block Heterogeneity to Evaluate Pedestrian Activity.* Transportation Research Board Annual Meeting 2013 Paper# 13-0579. 2013. 14p

24. Guler, S.I., Grembek, O., Ragland, D.R. *Using Time-Based Metrics to Compare Crash Risk Across Modes and Locations.* Transportation Research Board Annual Meeting 2013 Paper #13-0522. 2013. 15p

25. Li, Z., Wang, W., Liu, P., Bigham, J.M., Ragland, D.R. Using Geographically Weighted Poisson Regression for County-Level Crash Modeling in California. *Saf Sci.* 2013 10; 58: 89-97

26. Li, Z., Wang, W., Liu, P., Bigham, J., Ragland, D.R. Modeling Bicycle Passing Maneuvers on Multilane Separated Bicycle Paths. *J Transp Eng.* 2013 01; 139 (1): 57-64

27. Li, Z., Wang, W., Yang, C., Ragland, D.R. Bicycle Commuting Market Analysis Using Attitudinal Market Segmentation Approach. *Transportation Research Part A: Policy and Practice.* 2013 01; 47: 56-68

28. Ragland, D.R., Grembek, O., Orrick, P., Felschundneff, G. Roadway and Infrastructure Design and Its Relation to Pedestrian and Bicyclist Safety: Basic Principles, Applications, and Benefits. Transportation Research Board Annual Meeting 2013 Paper #13-4820. 2013. 15p

29. Schneider, R.J., Grembek, O., Braughton, M., Phyllis, O., Ragland, D.R. *Pedestrian and Bicycle Safety Strategies for UC Berkeley Campus and Periphery: Recommendations for Implementation.* UC Berkeley Safe Transportation Research and Education Center. 2013. 187p

30. Yan, H., Potu, R., Lu, H., Vezzoni de Almeida, V., Stewart, T., Ragland, D., et al. Dietary Fat Content and Fiber Type Modulate Hind Gut Microbial Community and Metabolic Markers in the Pig. *PLoS One.* 2013 8(4): e59581

31. Zhang, Y., Bigham, J., Li, Z., Ragland, D., Chen, X. Associations Between Road Network Connectivity and Pedestrian-Bicyclist Accidents. Transportation Research Board Annual Meeting 2013 Paper #13-4316. 2013. 17p

12

32. Cooper, D.L., Ragland, D.R. *Applying Safety Treatments to Rail-Highway At-Grade Crossings*. UC Berkeley Safe Transportation Research and Education Center. 2012. 61p

33. Cooper, J.F., Ragland, D.R., Ewald, K., Wasserman, L., Murphy, C.J. Observational Survey of Cell Phone Use and Texting by California Drivers, 2011. *Transp Res Rec.* 2012 (2321): 7-14

34. Grembek, O., Kim, K., Kwon, O.H., Lee, J., Liu, H., Park, M.J., et al. Experimental Evaluation of the Continuous Risk Profile (CRP) Approach to the Current Caltrans Methodology for High Collision Concentration Location Identification. UC Berkeley Safe Transportation Research and Education Center. 2012. 72p

35. Li, Z., Chung, K., Liu, P., Wang, W., Ragland, D.R. *Surrogate Safety Measure for Evaluating Rear-End Collision Risk Near Recurrent Bottlenecks.* Transportation Research Board Annual Meeting 2012 Paper #12-3037. 2012. 15p

36. Li, Z., Wang, W., Liu, P., Ragland, D.R. Physical Environments Influencing Bicyclists' Perception of Comfort on Separated and On-Street Bicycle Facilities. *Transportation Research Part D: Transport and Environment.* 2012 05; 17 (3): 256-261

37. Li, Z., Wang, W., Liu, P., Schneider, R., Ragland, D.R. Investigating Bicyclists' Perception of Comfort on Physically Separated Bicycle Paths in Nanjing, China. *Transp Res Rec.* 2012 (2317): 76-84

38. Li, Z., Wang, W., Zhang, Y., Lu, J., Ragland, D.R. *Exploring Factors Influencing Bicyclists' Perception of Comfort on Bicycle Facilities.* Transportation Research Board Annual Meeting 2012 Paper #12-2295. 2012. 17p

39. MacLeod, K.E., Griswold, J.B., Arnold, L.S., Ragland, D.R. Factors Associated With Hit-and-Run Pedestrian Fatalities and Driver Identification. *Accid Anal Prev.* 2012 Mar; 45: 366-72

40. Ragland, D.R. A Comparative Analysis of Pedestrian and Bicyclist Safety Around University Campuses. UC Berkeley Safe Transportation and Research Center. 2012

41. Sanders, R., Griffin, A., MacLeod, K.E., Cooper, J.F, Ragland, D.R. *Effects of Transportation Corridor Features on Driver and Pedestrian Behavior and on Community Vitality: Final Study Report.* UC Berkeley Safe Transportation Research and Education Center. 2012. 318p

42. Andrews, S., Madanat, S., Ragland, D., West, T. *Promoting Research Results and New Technologies: Making the Case for Accelerated Deployment.* California Center for Innovative Transportation. 2011. 63p

43. Do, M.T., Grembek, O., Ragland, D., Chan, C.Y. *Analyse du Deplacement des Pietons a l'Aide de Space Syntax: Exemple du Campus de l'Universite de Californie a Berkeley*. 3eme Colloque Francophone du Geri Copie (Comportement du Pieton dans son Environnement), Salon de Provence, 13-14 Octobre 2011. 2011 10/13: 6p

13

44. Griswold, J., Fishbain, B., Washington, S., Ragland, D.R. Visual Assessment of Pedestrian Crashes. *Accid Anal Prev.* 2011 Jan; 43 (1): 30106

45. Orrick, P., Frick, K., Ragland, D.R. Bicycle Infrastructure that Extends Beyond the Door: Examining Investments in Bicycle-Oriented Design Through a Qualitative Survey of Commercial Building Ownersand Tenants. Transportation Research Board Annual Meeting 2011. 11p

46. Ragland, D.R., Grembek, O., Orrick, P. *Strategies for Reducing Pedestrian and Bicyclist Injury at the Corridor Level.* UC Berkeley Safe Transportation Research and Education Center. 2011. 109p

47. Ragland, D.R., Orrick, P. Transportation and Health: Policy Interventions for Safer, Healthier People and Communities. Partnership for Prevention. 2011. 109p

48. Sanders, R., Macdonald, E., Anderson, A., Ragland, D.R., Cooper, J. *Performance Measures for Complete, Green Streets: Initial Findings for Pedestrian Safety Along a California Corridor.* Transportation Research Board Annual Meeting 2011. 21p

49. Arnold, L.S., Ragland, D.R., Yip, H., Cooper, D., MacLeod, K.E., Hennessey, D., et al. Evaluate the Causes of Pedestrian and Bicyclist Traffic Fatalities and Injuries, and Establish Appropriate Countermeasures for Use in California. California PATH. 2010. 236p

50. Attaset, V., Schneider, R.J., Arnold, L.S., Ragland, D.R. *Effects of Weather Variables on Pedestrian Volumes in Alameda County, California.* Transportation Research Board Annual Meeting 2010 Paper #10-2658. 2010. 18p

51. Babka, R.J., Cooper, J.F., Ragland, D.R. Removing Barriers for Seniors at Transit Stops and Stations and the Potential for Transit Ridership Growth. California PATH. 2010. 236p

52. Chan, C., Jin, E.J., Oh, S., Ragland, D.R. A Methodology of Quantifying Precipitation Exposure for Wet-Weather Collisions and Evaluating Effectiveness of Open-Graded Asphalt Concrete as a Countermeasure. Transportation Research Board Annual Meeting 2010 Paper #10-0287. 2010. 15p

53. Cooper, D.L., Duffy, S., Orrick, P., Ragland, D.R. *Develop Methods to Reduce or Prevent Backing Crashes.* California PATH. 2010. 59p

54. Greene-Roesel, R., Diogenes, M.C., Ragland, D.R. *Estimating Pedestrian Accident Exposure.* California PATH. 2010. 230p

55. Hua, J., Gutierrez, N., Banerjee, I., Markowitz, F., Ragland, D.R. San Francisco PedSafe II Project Outcomes and Lessons Learned. *Transp Res Rec.* 2010 (2198): 52-64

56. Jones, M.G., Ryan, S., Donlon, J., Ledbetter, L., Ragland, D.R., Arnold, L.S. Seamless Travel: Measuring Bicycle and Pedestrian Activity in San Diego County and its Relationship to Land Use, Transportation, Safety, and Facility Type. California PATH. 2010. 120p

14

57. MacLeod, K.E., Griswold, J., Arnold, L.S., Ragland, D.R. Factors Associated With Hit- and-Run Pedestrian Fatalities and Driver Identification. *Accid Anal Prev*. 2010 (45): 366-372

58. Oh, S.M., Ragland, D.R., Chan, C. Evaluation of Traffic and Environment Effects on Skid Resistance and Safety Performance of Rubberized Open-Grade Asphalt Concrete. California PATH. 2010. 36p

59. Oh, S., Madanat, S.M., Ragland, D.R., Chan, C. *Evaluation of Traffic and Environment Effects on Skid Resistance in California.* Transportation Research Board Annual Meeting 2010 Paper #10-2830. 2010. 10p

60. Oh, S., Ragland, D.R., Chan, C. *Safety Performance of Experimental Pavement Types in California Using Before-and-After Comparisons.* Transportation Research Board Annual Meeting 2010 Paper #10-2876. 2010. 11p

61. Schneider, R.J., Diogenes, M.C., Arnold, L.S., Attaset, V., Griswold, J., Ragland, D.R. Association Between Roadway Intersection Characteristics and Pedestrian Crash Risk in Alameda County, California. *Transp Res Rec.* 2010 (2198): 41-51

62. Babka, R.J., Cooper, J.F., Ragland, D.R. Evaluation of Urban Travel Training for Older Adults. *Transp Res Rec.* 2009 (2110): 149-154

63. Banerjee, I., Lee, J.H., Jang, K., Pande, S., Ragland, D.R. *Rest Areas–Reducing Accidents Involving Driver Fatigue.* California PATH. 2009. 318p

64. Bigham, J.M., Rice, T.M., Pande, S., Lee, J., Park, S.H., Gutierrez, N., Ragland, D.R. Geocoding Police Collision Report Data from California: A Comprehensive Approach. *Int J Health Geogr.* 2009 Dec 29; 8: 72,072X-8-72

65. Chung, K., Ragland, D.R., Madanat, S.M., Oh, S.M. The Continuous Risk Profile Approach for the Identification of High Collision Concentration Locations on Congested Highways. *Transportation and Traffic Theory 2009: Golden Jubilee 2009*: 463-480

66. Cooper, D.L., Ragland, D.R. Driver Behavior at Rail Crossings: Cost-Effective Improvements to Increase Driver Safety at Public At-Grade Rail-Highway Crossings in California. California PATH. 2009. 59p

67. Jang, K., Chung, K., Ragland, D.R., Chan, C. Safety Performance of High-Occupancy- Vehicle Facilities: Evaluation of HOV Lane Configurations in California. *Transp Res Rec.* 2009 (2099): 132-140

68. Jang, K., Ragland, D.R., Chan, C. A Comparative Safety Study of Limited Versus Continuous Access High Occupancy Vehicle (HOV) Facilities. California PATH. 2009. 46p

69. Lee, J.H., Chan, C., Ragland, D.R. Quantifying the Performance of Countermeasures for Collision Concentration Related to Ramp/Freeway Mainline Junctions. California PATH. 2009. 37p

15

70. Oh, S., Chung, K., Ragland, D.R., Chan, C. Analysis of Wet-Weather-Related Collision Concentration Locations: Empirical Assessment of Continuous Risk Profile. Transportation Research Board Annual Meeting 2009 Paper #09-0366. 13p

71. Ragland, D. 2009 California Highway Safety Improvement Program 5 Percent Report August 2009. University of California, Berkeley. 2009. 41p

72. Schneider, R.J., Arnold, L.S., Ragland, D.R. Methodology for Counting Pedestrians at Intersections: Use of automated Counters to Extrapolate Weekly Volumes from Short Manual Counts. *Transp Res Rec.* 2009 (2140): 1-12

73. Schneider, R.J., Arnold, L.S., Ragland, D.R. Pilot Model for Estimating Pedestrian Intersection Crossing Volumes. *Transp Res Rec.* 2009 (2140): 13-26

74. Sehl, M.E., Satariano, W.A., Ragland, D.R., Reuben, D.B., Naeim, A. Attribution of Functional Limitation to Cancer Decreases in the Year Following Breast Cancer
Diagnosis in Older Patients. *Crit Rev Oncol Hematol.* 2009 Jul; 71 (1): 62-9

16

DocuSign Envelope ID: B8C3F05F-940B-4DC4-981B-0F54BF86C01A

# Appendix B

17

Appendix B:  Deficiencies in Dallas DOT approach to pedestrian safety.
Summary from the Audit of Pedestrian Safety, City of Dallas, May 2022[3]

However, the Dallas Department of Transportation **does not** have performance measures and written procedures directly related to pedestrian safety.

The Dallas Department of Transportation **does not** have a documented process for effectively and efficiently reducing the risk of serious or fatal injuries at locations that experience multiple serious or fatal pedestrian crashes. The Federal Highway Administration recommends developing a Pedestrian Safety Action Plan to improve pedestrian safety.

The Dallas Department of Transportation **does** not service and maintain existing pedestrian safety countermeasures in accordance with best practices such as the Texas Manual on Uniform Traffic Control Devices and Federal Highway Administration's Guide for Maintaining Pedestrian Facilities for Enhanced Safety. In addition, the Dallas Department of Transportation is behind in meeting its maintenance goals.

The Dallas Department of Transportation **does not** have formal, written, specific, measurable, and time-focused goals and performance measures and associated written procedures and work instructions for strengthening pedestrian safety in Dallas. A comparison of departmental written procedures and unwritten practices to the critical pedestrian safety elements recommended by the United States Department of Transportation, Federal Highway Administration's (found in How to Develop a Pedestrian and Bicycle Safety Action Plan) demonstrates the following improvements could increase pedestrian safety:

The Dallas Department of Transportation **does not** have formal, written, specific, measurable, and time-focused goals and performance measures that specifically address pedestrian safety. The department does track the progress of crosswalk refreshment, replacement of aging signs, street striping, responsiveness to signal malfunctions, and signal cabinet inspections, and utilizes monthly crash reports, which provide the most recent statistics on traffic fatalities citywide, including pedestrian fatalities. The monthly crash reports detail factors such as incident locations and types (e.g., at a crosswalk, not at a crosswalk, or on the side of the roadway) but do not include severe injuries. Also, none of the procedures include setting and tracking:
• Explicit targets for reducing pedestrian fatalities, injuries, and/or crashes.
• Timeline for achieving these results.

As a result, the Dallas Department of Transportation **has not** focused Improvements to Pedestrian Countermeasures.  The Dallas Department of Transportation **does not** have: 1) an explicit pedestrian priority written into procedures and work instructions; 2) criteria for which pedestrian incidents it should investigate and when to conduct a traffic study or road safety audit to evaluate issues at sites with multiple pedestrian incidents and what safety improvements to implement; and, 3) procedures to evaluate the effectiveness of implemented pedestrian countermeasures.

The City's Complete Streets Manual, maintained by the Department of Public Works, **does not** detail an explicit pedestrian priority. Without a policy or objective statement which clarifies that

---

[3] The full audit is accessible at:
https://dallascityhall.com/departments/auditor/DCH%20Documents/Audit%20of%20Pedestrian%20Safety%205.23.22.pdf

DocuSign Envelope ID: B8C3F05F-940B-4DC4-981B-0F54BF86C01A

pedestrian safety should be prioritized, the Dallas Department of Transportation engineers lack direction on how to achieve this goal.

The Dallas Department of Transportation **does not** have procedures or criteria to prompt further investigation, traffic studies, or road safety audits at high injury pedestrian locations, and evaluate the effectiveness of the implemented countermeasures. Due to this, some high injury locations may not be addressed in a timely manner and may cause equity issues.

The Dallas Department of Transportation maintenance schedules for pedestrian countermeasures **do not** match Federal and State recommendations found in the Federal Highway Administration guidance and Texas Manual on Uniform Traffic Control Devices guidelines (see exhibit 2). As a result, the pedestrian countermeasures mentioned below may fail, exposing pedestrians to unnecessary risk.

However, the Dallas Department of Transportation **does not** have performance measures and written procedures directly related to pedestrian safety. Additionally, the Dallas Department of Transportation:

•Has a backlog of 1,500 crosswalks where thermoplastic markings have not been refreshed.
•Does not maintain pedestrian countermeasures as frequently as federal and state guidelines recommend

The Dallas Department of Transportation **does not** have a documented process for effectively and efficiently reducing the risk of serious or fatal injuries at locations that experience multiple serious or fatal pedestrian crashes. The Federal Highway Administration recommends developing a Pedestrian Safety Action Plan to improve pedestrian safety. (See Observation A).
2. Does the Dallas Department of Transportation service and maintain existing pedestrian safety countermeasures in accordance with best practices according to Texas Manual on Uniform Traffic Control Devices or other best practices?

The Dallas Department of Transportation **does not** service and maintain existing pedestrian safety countermeasures in accordance with best practices such as the Texas Manual on Uniform Traffic Control Devices and Federal Highway Administration's Guide for Maintaining Pedestrian Facilities for Enhanced Safety. In addition, the Dallas Department of Transportation is behind in meeting its maintenance goals.

# Exhibit S

**THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| Alton Waggoner et al.,       ) | |
|       ) | |
| Plaintiffs,       ) | |
|       ) | Case No. 3:22-cv-02776-E |
| v.       ) | Jury Trial Demanded |
|       ) | |
| The City of Dallas, Texas et al.,       ) | |
|       ) | |
| Defendants.       ) | |
|       ) | |

**<u>SECOND DECLARATION OF ALTON WAGGONER</u>**

I, ALTON WAGGONER, hereby declare and state:

1. I am over eighteen years of age and am of sound mind to make this declaration. The facts set forth in this declaration are based on my personal knowledge, unless otherwise indicated, and, if called as a witness, I could and would testify thereto.

2. I am a homeless veteran who resides in Dallas, Texas. This declaration supplements my previous declaration with facts acquired after filing the above-captioned lawsuit.

3. Since filing this case, the threat of enforcement in the area I live has intensified. The day before this lawsuit was filed, December 13, 2022, I saw people wearing City uniforms looking around the medians and street corners on which I frequently solicit donations. I was afraid to speak with them because I did not want to get a citation for being on the median, where they were. However, when I asked individuals who had spoken with the City representatives, they told me the City was evaluating where to place "No Panhandling" signs. "No Panhandling" signs the City posted in the past urged pedestrians to report panhandlers to law enforcement or the City's "3-11" line.

1

4.      I am worried that the signs will usher in waves of police and marshal enforcement of the Ordinance I challenged in this lawsuit, § 28-61.1 of the Dallas City Code. The signs will encourage people to call the police on me and others while we solicit donations. I already owe the city $459.80, money I am still trying to pay back and unable to afford. Another ticket would cripple any chance I have of paying that money back and getting my license unsuspended. Without a license, I will remain unable to get a job and continue to rely on panhandling for my survival.

5.      Because of the increased threat of enforcement, I have tried using medians of greater than six feet to panhandle. There are few medians less than six feet within walking distance of the area around where I live. Fewer pedestrians and drivers pass me by, and I make significantly less money. This means less money for food, medicine, and other necessities. Taking a bus or metro line where other medians may exist is similarly not possible because that requires spending the little money I do have on a fare while also spending valuable time traveling far away from where I live when I could be making money closer to home.

6.      The larger median is also not any safer. I have relied on panhandling for my survival virtually every day for the past two years and I have never been injured, nor ever seen someone injured, while panhandling from a median of less than six feet.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 4th day of January 2023, at Dallas, Texas.

_____
Alton Waggoner

2