### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **ALTON WAGGONER, LAFAYETTE "TERI" HEISHMAN, HANNA LEBOVITS, AND KAWANA SCOTT, PLAINTIFFS,** | § § § § § | |
| **V.** | § § | **CASE NO. 3:22-CV-2776-E-BK** |
| **THE CITY OF DALLAS, TEXAS, EDGARDO GARCIA, IN HIS OFFICIAL CAPACITY, AND DAVID PUGHES, IN HIS OFFICIAL CAPACITY, DEFENDANTS.** | § § § § § | |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b) and the district judge's *Order of Referral*, Doc. 28, Plaintiffs' *Motion for Preliminary Injunction*, Doc. 11, is now before the Court.  For the reasons stated here, the motion should be **DENIED**.

## I. BACKGROUND

This case involves a First Amendment challenge to an ordinance recently enacted by the City of Dallas, codified as § 28-61.1 of the Dallas City Code ("the Ordinance").  Plaintiffs are Alton Waggoner, a 68-year-old homeless veteran who solicits donations in the City; Lafayette "Teri" Heishman, a 67-year-old disabled veteran who has struggled with homelessness and currently resides in subsidized housing but solicits donations to make ends meet; Hannah Lebovits, a public affairs professor at the University of Texas at Arlington who uses areas affected by the Ordinance for research and as part of her personal commitment to helping homeless individuals; and Kawana Scott, a political activist who frequently uses areas affected

by the Ordinance as part of her advocacy.[1]  Doc. 1 at 4.  In addition to the City, Plaintiffs also have named as Defendants Dallas Chief of Police Edgardo Garcia and David Pughes, the Interim City Marshal of the Dallas City Marshal's office.  Doc. 1 at 4-5.

The Ordinance, enacted on October 26, 2022, prohibits any person from "stand[ing] or walk[ing] on a median that measures six feet or less, in areas where no median exists for roadways designated as divided roadways, or in an area designated as a clear zone."  Doc. 1 at 5; Doc. 1-3 at 3.  A "clear zone" is defined as

> the unobstructed, traversable area provided beyond the edge of the through travelled way for the recovery of errant vehicles.  On a curbed street, the clear zone is the area four feet from the face of the curb.  On an uncurbed street, the clear zone is 10 feet from the edge of the travel lane.  A clear zone includes shoulders, bicycle lanes, and auxiliary lanes, except auxiliary lanes that function like through lanes.  However, a clear zone does not include areas adjacent to the back of the curb where a paved sidewalk exists.

Doc. 1-3 at 3.  The Ordinance contains a variety of exceptions, including for individuals crossing the street in the most direct route possible, receiving or rendering aid in emergency situations, performing permitted road work, or with prior authorization from the City.  Doc. 1-3 at 4. Violating the Ordinance is punishable by a fine of up to $500.00, and the City has amended section 13-10 of the City Code to give Dallas City Marshals authority to enforce it.  Doc. 1-3 at 4, 7-8.

## II.  PROCEDURAL HISTORY

On December 14, 2022, Plaintiffs filed this action for declaratory and injunctive relief under 42 U.S.C. § 1983, asserting that the Ordinance—both facially and as applied—constitutes an invalid content-based restriction on free speech or, alternatively, an invalid time, place, and manner regulation on content-neutral speech.  Doc. 1 at 26-30.  The gist of the Complaint is that

---

[1] Scott got married and changed her name before the hearing was held on the instant motion, so she is referred to hereafter as Kawana Menchaca.  Doc. 47 at 5.

the Ordinance targets poor people who solicit donations—so-called "panhandlers" and those who assist them—but, in an effort to conceal the true purpose of the Ordinance, the City manufactured a "public safety rationale" to avoid the appearance that the Ordinance violates the First Amendment.  Doc. 1 at 2-3.  Shortly after they filed their Complaint, Plaintiffs filed the instant motion, and the Court conducted hearings on April 13 and April 27, 2023.  The parties filed post-hearing briefs, and Plaintiffs additionally submitted *Proposed Findings of Fact and Conclusions of Law*.  Doc. 55; Doc. 56; Doc. 57.

### III.  APPLICABLE LAW

#### A.  *42 U.S.C. § 1983*

"Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's 'rights, privileges, or immunities secured by the Constitution and laws' of the United States."  *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994).  To state a claim under section 1983, a plaintiff must allege facts showing he has been "deprived of a right 'secured by the Constitution and the laws' of the United States" and that the defendant was acting under color of state law.  *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

#### B.  *First Amendment*

The First Amendment to the United States Constitution protects an individual's right to freedom of expression through speech and public assembly.  *Virginia v. Black*, 538 U.S. 343, 358 (2003).  Laws that regulate such expression because of its message, idea, subject matter, or content. are "presumptively invalid" as the government has "no power to restrict expression" on those bases.  *United States v. Stevens*, 559 U.S. 460, 468 (2010) (citation omitted); *but see United States v. Alvarez*, 567 U.S. 709, 717 (2012) (noting that content-based restrictions on speech generally have been confined to a few "historic and traditional categories of expression

long familiar to the bar," including obscenity, defamation, speech integral to criminal conduct, so-called "fighting words," child pornography, fraud, true threats, and "speech presenting some grave and imminent threat the government has the power to prevent").

The government's ability to restrict expressive activity in a public forum is thus very limited. *Int'l Soc'y for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge*, 876 F.2d 494, 497 (5th Cir. 1989) (citation omitted). The Supreme Court has "identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Frisby v. Schultz*, 487 U.S. 474, 479-80 (1988) (citation omitted). Traditional public fora generally refer to places which "by long tradition or by government fiat have been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). "Traditional public forums include sidewalks, streets, and parks that the public since time immemorial has used for assembly and general communication." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010).

In evaluating a First Amendment challenge to a law, a court must first determine whether the targeted speech is protected and, if so, what level of judicial scrutiny applies. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011). "The appropriate level of scrutiny is initially tied to whether the statute distinguishes between prohibited and permitted speech on the basis of content." *City of Baton Rouge*, 876 F.2d at 497 (quoting *Frisby*, 487 U.S. at 481). If the law is content based, it is subject to strict scrutiny and, thus, "must be necessary to serve a compelling state interest and narrowly drawn to achieve that end." *Id*. Conversely, intermediate scrutiny applies to "content-neutral regulations of time, place, and manner of expression [which] are enforceable if they are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id*. (citation omitted).

4

Second, the court must assess whether the challenged law survives the appropriate level of scrutiny. *Id.* In a case involving a content-neutral regulation, while the law "must be narrowly tailored to serve the government's legitimate, content-neutral interests . . . it need not be the least restrictive or least intrusive means of doing so." *Doe I v. Landry*, 909 F.3d 99, 111 (5th Cir. 2018) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)). Rather, the "narrow tailored" requirement is satisfied "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest." *Ward*, 491 U.S. at 800. Thus, a "regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.*

### C. Standing

"[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011) (quoting *Davis v. FEC*, 554 U.S. 724, 733 (2008)). "To establish standing, a plaintiff must demonstrate (1) an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent'; (2) is fairly traceable to the defendant's actions; and (3) is likely to be redressed by a favorable decision." *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

In cases involving First Amendment pre-enforcement challenges, however, simply "chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Hous. Chron. Publ'g Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007) (citation omitted). A plaintiff thus need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson,* 415 U.S. 452, 459 (1974). Instead, the party may

demonstrate the requisite "injury in fact by showing that he (1) has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) his intended future conduct is arguably proscribed by the policy in question, and (3) the threat of future enforcement of the challenged policies is substantial." *Barilla*, 13 F.4th at 431-32 (internal quotations and citation omitted); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) (concluding that where "the State has not disavowed any intention of invoking" the challenged law, plaintiffs are "not without some reason in fearing prosecution").

### D.  Injunctive Relief

Four elements must be established to secure a preliminary injunction:

(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citation omitted).  The plaintiff bears the burden of establishing each element.  *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009).  Indeed, "the standard to be applied by the district court in deciding whether a plaintiff is entitled to a preliminary injunction is stringent."  *Janvey*, 647 F.3d at 591 (citation omitted).

In the First Amendment context, however, a court need not analyze the threat of irreparable injury and the public interest because these factors are presumed and weigh in favor of an injunction.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) ("Injunctions protecting First Amendment freedoms are always in the public interest.") (citation omitted).

Accordingly, the following analysis addresses only whether Plaintiffs have shown a likelihood of success on the merits and that the balance of hardships is in their favor.[2]

## IV. PARTIES' ARGUMENTS AND ANALYSIS

### A. Standing

Initially, Defendants assert that Plaintiffs' challenge to the Ordinance fails for lack of standing because the Ordinance regulates non-expressive conduct, not speech. Doc. 20 at 13-14; Doc. 56 at 7-8, 11-12. Defendants relatedly argue Plaintiffs have not established that medians measuring less than six feet wide are traditional public forums because they are not designed or intended to be used for that purpose. Doc. 56 at 9-11. Plaintiffs, however, maintain that they stand and/or walk in public areas affected by the Ordinance while engaging in constitutionally protected expressive speech such as soliciting and receiving donations, offering help to those in need, staging protests, and similar activities. Doc. 55 at 11-14.

The Court agrees with Plaintiffs on this point. "Prior authorities . . . clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests–communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980); *see also Reynolds v. Middleton*, 779 F.3d 222, 225 (4th Cir. 2015) ("There is no question that panhandling and

---

[2] Defendants argue that Plaintiffs' two-month delay in moving for injunctive relief after the Ordinance took effect suggests that "no degree of harm necessitating such extraordinary relief exists . . . [and] the relative positions of the parties is [sic] maintained by the denial of a preliminary injunction." Doc. 20 at 12-13. The Court declines to so find, especially given the then-forthcoming seasonal holidays and the relatively short period at issue. *Cf. Texas v. United States*, 328 F. Supp. 3d 662, 738-40 (S.D. Tex. 2018) (collecting cases and holding that the plaintiffs could not demonstrate irreparable injury where they did not file suit until nearly six years after the challenged statute was enacted).

solicitation of charitable contributions are protected speech."); *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999) ("Like other charitable solicitation, begging is speech entitled to First Amendment protection.") (citing *Loper v. N.Y.C. Police Dept.*, 999 F.2d 699, 704 (2d Cir. 1993)).  It is also not subject to dispute that organizing protests and engaging with members of the community are similarly protected constitutional rights.  *See* U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

Moreover, the medians and clear zones, as defined by the Ordinance, are traditional public fora.  *See City of Baton Rouge*, 876 F.2d at 496 ("Public sidewalks, streets, and parks have been recognized as traditional public fora which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'") (citations omitted); *Frisby*, 487 U.S. at 481 ("[A]ll public streets are held in the public trust and are properly considered traditional public fora."); *World Wide St. Preachers Fellowship v. Town of Columbia*, 245 F. App'x 336, 347 (5th Cir. 2007) ("Restrictions on demonstrations on the paved shoulder are thus subject to analysis under the strict or intermediate scrutiny standards, depending on whether the restriction was content-based or content-neutral."); *Acorn v. City of New Orleans*, 606 F. Supp. 16, 19, 24 & n.6 (E.D. La. 1984) (holding unconstitutional an ordinance which prohibited solicitation in a roadway or on "neutral ground," defined as "the median area in a divided street which separates traffic flowing in opposite directions.").

The City next argues Plaintiffs have not established a "credible threat of prosecution" sufficient to mount a pre-enforcement challenge to the Ordinance and, in fact, testified that they

8

continue to engage in the acts they claim the Ordinance criminalizes.  Doc. 20 at 14-15; Doc. 56 at 7-9.  Plaintiffs respond that they have long engaged in activities now prohibited by the Ordinance and plan to continue doing so such that they thus have a credible, imminent fear of prosecution sufficient to confer standing.  Doc. 25 at 15-16; Doc. 55 at 6-8.

Upon consideration, the Court finds Plaintiffs have established that they continue to engage in activities now prohibited by the Ordinance and thus have a credible, imminent fear of prosecution.  *Barilla*, 13 F.4th at 431-32.  First, Waggoner testified at the evidentiary hearing that he panhandles for his survival on corners and medians alongside various heavily trafficked City throughways holding a sign that identifies himself as a disabled veteran and requests money.  Doc. 47 at 40-41.  Waggoner also has previously been cited and fined by a City police officer for panhandling although not under the Ordinance.  Doc. 47 at 44-45, 47.

Menchaca testified that she helps organize demonstrations approximately every other weekend, she uses City medians to connect with drivers and pedestrians and, during larger gatherings, organizers use the medians as a vantage point to safely guide traffic and pedestrians. Doc. 47 at 63-64.  Menchaca further testified that participants in "moving events" like marches utilize the clear zone.  Doc. 47 at 65, 69-70.  Menchaca averred that while she had not been arrested for such, she had seen some of her co-demonstrators be arrested for obstructing the roadway (although not under the Ordinance).  Doc. 47 at 71-72, 79-80.  Menchaca additionally testified that she had participated in several marches since the Ordinance was enacted and, most recently, marched with approximately 40 people through City streets and on sidewalks.  Doc. 47 at 76-78.  She worries that the Ordinance would impede people's ability to participate in protests, disrupt the flow of events, and lower the efficacy of the organizers' efforts.  Doc. 47 at 80-81. While Plaintiffs Heishman and Lebovitz did not testify at the evidentiary hearing, their

Declarations indicate that they engage in activities similar to Waggoner and Menchaca, respectively.  *See* Pl. Ex. 13 (Lebovitz averring that she stands on City medians to engage with homeless individuals, which is fundamental to her academic research, and fears being fined for violating the Ordinance and the affect it would have on her work); Pl. Ex. 15 (Heishman averring that she has been cited for panhandling, continues to do so out of necessity, and fears police harassment and enforcement of the Ordinance).  They thus have standing as well.  *Barilla*, 13 F.4th at 431-32.

### B.  Applicable Level of Scrutiny

The Supreme Court has set forth two separate tests to determine whether a government's restriction on speech violates the First Amendment—strict scrutiny and intermediate scrutiny. The key to deciding which test applies is whether the restriction is content-based, in which case strict scrutiny applies, or content-neutral, in which case intermediate scrutiny applies.  For a content-based regulation to survive strict scrutiny, the government "must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."  *Serv. Emps. Int'l. Union, Loc. 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010) (citation omitted).  Conversely, "content-neutral regulations of 'time, place, and manner' of expression' in a public forum" will withstand intermediate scrutiny if "they are 'narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'"  *Id.* (citation omitted).

"A regulation of speech is facially content-based . . . if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'"  *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) ("*Reagan I*") (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163

10

(2015)).  A regulation that facially "examine[s] . . . speech only in the service of drawing neutral, location-based lines" and "is agnostic as to content" is content-neutral and does not warrant the application of strict scrutiny.  *Id.*  Thus, for example, "restrictions on solicitation are not content based and do not inherently present 'the potential for becoming a means of suppressing a particular point of view,' so long as they do not discriminate based on topic, subject matter, or viewpoint."  *Id.* at 1473 (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981)).

Here, the Ordinance is content-neutral in that it prohibits all persons, with some narrowly drawn, non-discriminatory exceptions, from standing or walking on designated medians and clear zones.  *See Reed*, 576 U.S. at 171 ("[A] speech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message expressed.").  Plaintiffs presented evidence that the Ordinance would affect such varied individuals and groups as journalists, Chinese Communist Party protesters, Q-Anon activists, and neighborhood advocacy groups as well as panhandlers.  *See* Doc. 11-1 at 123-27.  Plaintiffs speculate that enforcement of the Ordinance will discriminate against them, while the City has stated it will not enforce the Ordinance against firefighters and religious organizations.  Doc. 11 at 24.  Plaintiffs' factual basis in support of this argument is flawed, however.  When counsel from the City Attorney's Office was asked whether these groups would be exempt from the Ordinance, he simply said they could apply for the City's permission to engage in such activities.  *See* https://dallastx.swagit.com/play/04182022-541 at 2:19:45.  Moreover, the Court declines to speculate about the types of activities, which would otherwise violate the Ordinance, the City might permit in the future.

Nevertheless, "[e]ven if not content-based, to survive a First Amendment challenge, the ordinance must not have an improper purpose." *Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*, 64 F.4th 287, 292-93 (5th Cir. 2023) ("*Reagan II*"). Thus, "[i]f there is evidence that an impermissible purpose or justification underpins a facially content-neutral restriction . . . , that restriction may be content based." *Reagan I*, 142 S. Ct. at 1475 (citation omitted). Because Plaintiffs assert that an "impermissible purpose or justification underpins" the Ordinance, Doc. 55 at 15-18, the Court considers whether the evidence supports their argument. *Id*. at 1475.

### C. Whether the Ordinance Has a Content-Based Purpose or Justification

The genesis of the Ordinance was the City's "Vision Zero Traffic Safety Strategy," ("Vision Zero") which the City began to consider in or around September 2019.[3] Doc. 47 at 133 (Khankarli Test.). Then-City Transportation Director, Michael Rogers, briefed the Dallas City Council (the "Council") regarding Vision Zero on October 2, 2019.[4] Doc. 21-2 at 94; Doc. 47 at 134 (Khankarli Test.). The evidence presented demonstrated that Dallas has the fifth highest traffic and pedestrian fatality rates of the 25 largest cities in the country and, between 2013 and 2017, several hundred pedestrians had been involved in fatal or severe crashes in the City. Doc. 21-2 at 99-102. Rogers also noted that the City had developed a "high injury network" ("HIN"), which identified areas where severe and fatal traffic accidents most frequently occurred, and determined that 50 percent of fatal and severe injury crashes occurred on eight percent of the City's streets. Doc. 21-2 at 108-09; *see also* Doc. 21-1 at 13 (Khankarli Decl.) (averring that the

---

[3] Vision Zero is an "internationally recognized strategy to eliminate traffic fatalities and severe injuries relating to automobile users, pedestrians, and bicyclists" based on the tenet that "no loss of life is acceptable and that all traffic fatalities and severe injuries are preventable." Doc. 21-2 at 96; Doc. 47 at 134 (Khankarli Test.).

[4] The current Director of the City's Department of Transportation (the "City DOT"), Gus Khankarli, joined the department as an assistant director in September 2019 and was appointed Director in May 2021 after serving as interim director. Doc. 47 at 128-29.

pedestrian HIN data indicated that 59 percent of severe crashes involving a pedestrian occurred on four percent of the City's streets).  Finally, crash data from the Texas Department of Transportation showed that 27 percent of severe or fatal traffic crashes involved pedestrians and 86 percent of crashes occurred at or near intersections.  Doc. 21-2 at 114-15.

On December 11, 2019, the Council adopted a resolution (the "Vision Zero Resolution"), directing the City Manager to form a task force to develop a Vision Zero plan ("the Plan") by December 2021 with the goal to eliminate fatal accidents and reduce by half the number of severe injuries by 2030.  Deft. Ex. 3 at 3; Doc. 47 at 136 (Khankarli Test.).  The Council further directed the City Manager and key City departments to collaborate in developing, implementing, and evaluating the Plan.  Deft. Ex. 3 at 3.  The Vision Zero Resolution noted that (1) the Federal Highway Administration had designated the City a Pedestrian Safety Focus City due to the high pedestrian fatality rate; (2) the cities of Austin, San Antonio, and Laredo had implemented Vision Zero plans; and (3) there was no City-wide action plan that addressed traffic safety for all road users.  Deft. Ex. 3 at 3.

The Council's Transportation and Infrastructure Committee (the "TI Committee") received briefing on the progress of the Plan on February 19, June 8, and November 15, 2021, and two community surveys were conducted the same year.  Deft. Ex. 5 at 3, 6, 36-38.  On January 25, 2022, the Council was briefed on a draft of the Plan and "provided feedback," and the City Manager subsequently responded in writing to various councilmembers' questions about the data underlying the HIN, enforcement of the Plan, and the number of traffic-related fatalities in the City.  Deft. Ex. 5 at 3, 6, 36-38; Deft. Ex. 20.

In May 2022, the City Auditor released his final report on pedestrian safety following a two-year study.  Doc. 21-1 at 26-44; Doc. 47 at 226 (Khankarli Test.).  The audit determined that

the City DOT did not have sufficient pedestrian safety goals and performance measures and recommended the implementation of (1) such measures to improve pedestrian safety; (2) written operating procedures for collecting and utilizing pedestrian accident data to improve safety at high injury locations; and (3) written criteria and instructions for decision-making related to (a) pedestrian incident investigations, traffic studies, and road safety audits, (b) appropriate pedestrian countermeasures, and (c) the re-design of high injury locations. Doc. 21-1 at 30-33. The audit also recommended that the City DOT Director prioritize pedestrian traffic over other modes of transportation as recommended by the Federal Highway Administration. Doc. 21-1 at 33.

The City Manager responded to the auditor's findings on May 20, 2022, stating that while the City DOT agreed to implement most of the recommendations, it declined to prioritize pedestrian traffic but noted that the City's Vision Zero initiative would "play a significant role in addressing the risk identified . . . and providing a safer roadway system for all users, including pedestrians." Doc. 21-1 at 40-41. On June 8, 2022, the Council unanimously adopted the Plan, which pledged that "the safety of the people on public roads is a top priority and we will work to eliminate traffic deaths and severe injuries caused by preventable crashes."[5] Deft. Ex. 5 at 7.

Meanwhile, on February 3, 2021, the City Attorney made a presentation to the Council entitled Overview of Panhandling, Solicitation, and Available Strategies, during which he discussed various City initiatives and proposals to address panhandling being coordinated

---

[5] The Council consisted of (1) Chad West; (2) Jesse Moreno; (3) Casey Thomas; (4) Carolyn King Arnold; (5) Jaime Resendez; (6) Omar Narvaez; (7) Adam Bazaldua; (8) Tennell Atkins; (9) Paula Blackmon; (10) Adam McGough; (11) Jaynie Schultz; (12) Cara Mendelsohn; (13) Gay Donnell Willis; and (14) Paul E. Ridley. Deft. Ex. 5 at 7. Thus, while Plaintiffs reference certain remarks by then-Councilmember Larry Kleinman regarding the preparation of "an ordinance criminally punishing panhandling," Doc. 11 at 10, Kleinman was not a councilmember when either the Plan was adopted or the Ordinance was passed.

14

through a variety of City departments, including the Dallas Police Department, the City

Marshal's Office, the Office of Community Care, and the Office of Homeless Solutions.  Pl. Ex.

3.  The City Attorney and other City employees discussed, *inter alia*, the implementation of a

variety of supportive solutions as well as modification and/or adoption of new ordinances and

potential constitutional challenges to the latter.  Pl. Ex. 3 at 8-9.

On October 25, 2021, the City's Government Performance and Financial Management

Committee convened to discuss and ultimately approved a six-month pilot panhandling

deflection program which proposed a holistic solution to include social services, public

education, and law enforcement options with "traditional law enforcement" being a "last resort."

Doc. 11-1 at 36, 38.  The City's proposal included a 311-based street outreach team, a database

to map and identify high volume panhandling locations, a public education campaign, and the

coordination of efforts among faith-based organizations, homeless services providers, and street

charity event organizers.  Doc. 11-1 at 35, 40, 45.  Additional discussion centered on (1) the City

Marshal's Office partnering with mobile crisis intervention caseworkers to assess the behavioral

and physical health and needs of individuals identified as illegally soliciting money, and (2) the

implementation of mobile community courts to resolve cases involving individuals who were

uncooperative and resistant to accepting assistance and ultimately cited for illegal solicitation.

Doc. 11-1 at 41-43.  In response to one councilmember's question, the City's managing attorney

noted that constitutionally implementing the Ordinance would require evidence which supported

the City's public safety concerns.  https://dallastx.new.swagit.com/videos/202662 at 3:12-3:13.

In April 2022, a representative of the City Attorney's Office briefed the TI Committee on

the Ordinance, stating at the outset that its purpose was pedestrian safety, not panhandling, and

the law would apply to all individuals.  https://dallastx.new.swagit.com/videos/04182022-541 at

2:18.  Several of the councilmembers present repeatedly referred to the Ordinance as a public safety measure not designed to target panhandlers or criminalize soliciting.  *Id.*, *passim*. Pursuant to one councilmember's request for information supporting the Ordinance's six-foot-median restriction, in September 2022, the Assistant City Manager referred the TI Committee to (1) a standard developed by the American Association of State Highway and Transportation Officials which provided that medians in urban areas that were intended to serve as pedestrian refuges should be at least six feet wide, (2) resources from the U.S. Department of Transportation and the National Association of City Transportation Officials, and (3) the City's 2019 Street Design Manual, which contained the six-foot standard.  Doc. 21-2 at 124-25.

On October 26, 2022, the Council convened to address, *inter alia*, the Ordinance.  Prior to voting, Councilmember Narvaez introduced a measure that would require annual review of the Ordinance, which passed with opposing votes only from Mayor Eric L. Johnson and Councilmembers Moreno, Willis, and Ridley.  Deft. Ex. 1 at 2.  The Ordinance then passed with only Councilmember Bazaldua voting in opposition.  *Id*. at 3.  Notably, the Ordinance contains a number of introductory statements, which explained the rationale for its enactment, including: (1) a study of pedestrian fatalities in the City had found that "the vast majority of pedestrian fatalities occur when the pedestrian enters the roadway at a point that is not designated for crossing or standing"; (2) traffic studies showed that "medians under six feet in width, areas with no medians, or areas designated as clear zones are not safe pedestrian refuges";[6] (3) the U.S. Department of Transportation, transportation organizations, and the City's 2019 Street Design Manual recommended that medians used as pedestrian refuges be at least six feet wide; (4)

---

[6] The Pedestrian HIN data reflected that most severe crashes occurred on major arterial roadways and/or in areas where land use changes had increased traffic flow, and a pedestrian was close to a roadway.  Doc. 21-1 at 13 (Khankarli Decl.).

prohibiting pedestrians from standing in restricted areas would protect the health and safety of both pedestrians and motorists and was in the best interest of public health and safety.  Doc. 11-1 at 3-4.

Khankarli averred that the City DOT supported adoption of the Ordinance because it (1) proactively worked to prevent fatalities; (2) preserved the purpose of the affected medians, which is to regulate traffic; (3) prevented pedestrians from entering roads where access was not limited by barriers; (4) ensured that bicycle lanes and shoulders would be free of pedestrian traffic; and (5) established a safe distance between an arterial roadway and a pedestrian.[7]  Doc. 21-1 at 14 (Khankarli Decl.).  This type of testimony was held sufficient to support the content-neutral regulation in *City of Baton Rouge*, 876 F.2d at 496, 498 (considering the testimony of a traffic engineering expert and legal counsel for the police department regarding the purpose of the anti-solicitation ordinance).

Plaintiffs' evidence that the Ordinance actually was enacted for an improper purpose is thin at best.  First, they point to the alleged lack of data supporting the City's claim that pedestrians in areas affected by the Ordinance, particularly medians, faced safety risks from traffic.  Doc. 55 at 19-21.  But that overlooks Vision Zero's *proactive* approach to traffic safety and the data the Council did rely on as discussed *supra*.  Plaintiffs additionally point to Council discussions about drafting and enacting the Ordinance, which began more than a year after the City adopted the Vision Zero Resolution.  *See* Doc. 55 at 17-20.  But the stated aim of the Plan was to address traffic safety for *all* road users.  In context, the Ordinance logically followed from

---

[7] Khankarli testified that arterial roadways are heavily trafficked, essentially connect freeways, and function to get people "from Point A to Point B at the fastest time possible," citing as examples Dallas Tollway/Spring Valley, Botham Jean/I-30 ramp, and Lovers Lane/Greenville.  Doc. 47 at 151, 183, 228.

that goal since ensuring pedestrian safety necessarily entails restricting pedestrian access to areas deemed to be unsafe.  The fact that the data the City relies on was perhaps not as specific as Plaintiffs would have liked does not lead to a different result.  *See City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 50 (1986) (rejecting argument that a city's justification for an ordinance was "conclusory and speculative" because the ordinance was enacted despite the lack of studies specifically relating to the city's "particular problems or needs.").

     In short, the Court finds there is insufficient evidence that the City had "an impermissible purpose or justification" for enacting the Ordinance, and intermediate scrutiny thus applies.  *Reagan I*, 142 S. Ct. at 1475.  The fact that the Ordinance may impact Plaintiffs more than other road users does not require a different result.  *See Ward*, 491 U.S. at 791 (holding that "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."); *J & B Entm't, Inc. v. City of Jackson*, 152 F.3d 362, 377 (5th Cir. 1998) (holding that an ordinance prohibiting public nudity, with some exceptions, was content neutral even though it may have placed a greater burden on nude dancing establishments than on others).  Accordingly, the Court assesses the Ordinance through the lens of intermediate scrutiny.

### D.  Intermediate Scrutiny Analysis

     Indisputably, public safety qualifies as a significant government interest.  *See Hous. Chron. Publ'g Co.*, 488 F.3d at 622.  The parties' main debate focuses on whether the Ordinance is narrowly tailored to serve that interest and leaves open ample alternative channels of communication.[8]

---

[8] Plaintiffs have mounted both "as applied" and facial constitutional challenges to the Ordinance. The Court need not address them separately because Plaintiffs' facial challenge fails; thus, their as-applied challenge, based on essentially the same arguments, must as well.  *See In re Cao*, 619

### 1. Narrowly Tailored

As the Supreme Court explained in *Heffron*, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." 452 U.S. at 647. "In the context of intermediate scrutiny, narrow tailoring does not require that the least restrictive means be used. As long as the restriction promotes a substantial governmental interest that would be achieved less effectively without the restriction, it is sufficiently narrowly tailored." *Serv. Emps. Int'l Union*, 595 F.3d at 596 (citations omitted). Nevertheless, the regulation must not "burden substantially more speech than is necessary to achieve the government's legitimate interests." *Ward*, 491 U.S. at 799.

Plaintiffs contend the Ordinance is not sufficiently tailored as it effectively prohibits panhandling "on virtually any median because the driver is typically the audience," and the width of the median is irrelevant because a pedestrian must always stand at least four feet from the roadway. Doc. 55 at 22-24. Conversely, Plaintiffs argue that the Ordinance is also underinclusive as it does not apply to people who are sitting down or to individuals crossing the road at unmarked intersections or in the middle of the block even though the City's data revealed that pedestrian failure to yield the right of way to vehicles is the fourth leading cause of severe crashes. Doc. 55 at 25-26. Finally, Plaintiffs maintain that the Ordinance does not serve the City's "proactive" traffic safety strategy because it is based on speculation that the Plan could help in the future. Doc. 55 at 26.

---

F.3d 410, 430 (5th Cir. 2010) ("[I]t is well-established that the facial upholding of a law does not prevent future as-applied challenges[,]" but a plaintiff cannot succeed on an as-applied challenge to a statute based on the same factual and legal arguments the court considered in rejecting the facial challenge).

Here, the City "bears the burden of producing evidence in support of its proffered justification for the [Ordinance], including objective evidence showing that the [Ordinance] serves [the City's] interest in public safety." *Watkins v. City of Arlington*, 123 F. Supp. 3d 856, 868 (N.D. Tex. 2015) (citing *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 183 (1999)).  Ordinances similar to the one at hand have withstood intermediate scrutiny. In one such case, the Court of Appeals for the Fifth Circuit upheld the constitutionality of an ordinance which provided:

> No person shall be upon or go upon any street or roadway or shall be upon or go upon any shoulder of any street or roadway nor shall any such person be upon or go upon any neutral ground of any street or roadway for the purpose of soliciting employment, business, or charitable contributions of any kind from the occupant of any vehicle.

*City of Baton Rouge*, 876 F.2d at 495-96.  The court noted that the city's witnesses attested to the need for the ordinance following a fatal injury involving a news vendor and in light of the basic purpose of streets, highways, and roads which is to allow people and goods to move safely and efficiently.  *Id.* at 496.  Additionally, the appellate court relied on the preamble to the ordinance which identified the safety risks associated with such activities.  *Id.* at 498.  Granted, the ordinance in question did not "restrict oral advocacy, distribution of literature, or other forms of communication and expression," *id.*, but even ordinances that do pose such restrictions have passed constitutional muster.

One such ordinance prohibited the solicitation, sale, or distribution of any material to the occupant of a vehicle stopped at a traffic light on a public roadway, but permitted such activities if the person "remains on the surrounding sidewalks and unpaved shoulders, and not in or on the roadway itself, including the medians and islands."  *Hous. Chron. Publ'g Co.*, 488 F.3d at 616. The appellate court held that the law was sufficiently narrow because there was evidence that

such intersections were generally the most heavily trafficked and, therefore, the most dangerous. *Id.* at 622. Accordingly, the ordinance passed constitutional muster because it "serve[d] a compelling interest at the heart of government's function: public safety." *Id.* (also rejecting the appellants' under-inclusiveness challenge).

A similarly analogous case addressed a City ordinance that prohibited solicitation of vehicle occupants from public property adjacent to a roadway. *Gbalazeh v. City of Dallas*, No. 3:18-CV-0076-N, 2019 WL 1569345, at *1 (N.D. Tex. Apr. 11, 2019) (Godbey, J.). The applicable law defined solicitation as, "either orally or in writing, (1) asking for a ride, employment, goods, services, financial aid, monetary gifts, or any article representing monetary value, for any purpose; or (2) offering to sell something; or (3) giving away goods, services or publications; or (4) asking for signatures on a petition." *Id.* The court applied strict scrutiny, finding that the ordinance in question was content based, but nevertheless held the City had a compelling interest in traffic safety which justified the law's scope. *Id.* at *2 (citing *City of Baton Rouge*, 876 F.2d at 498).

"Whenever government draws a line, there will be cases close to the mark. One can always claim that a small change could have accommodated more conduct, at a little sacrifice in the government's objective. Choosing how much to accommodate at what sacrifice in other objectives is precisely the business of government . . . ." *Chi. Observer, Inc. v. City of Chicago*, 929 F.2d 325, 329 (7th Cir. 1991). But the validity of the Ordinance "depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Ward*, 491 U.S. at 801. To be sure, the Ordinance is not a model of legislative drafting—oddly, it does not prohibit sitting or lying down in the affected medians, for example. But that does not alter the analysis nor does the fact

that Plaintiffs believe the effectiveness of the Ordinance is "speculative."  First, as noted above, the data the City relied on need not be the data Plaintiffs might prefer as long as it "is reasonably believed to be relevant to the problem" the City is attempting to address.  *See City of Renton*, 475 U.S. at 50-52.  "[T]he least restrictive regulation is not required."  *Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 748 (5th Cir. 2009).

Further, the City "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems."  *SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1275 (5th Cir. 1988) (quoting *City of Renton*, 475 U.S. at 52).  In sum, the effectiveness of the Ordinance must be judged by considering all the varied groups that use the roadways impacted thereby and is valid if the City could reasonably have determined that its interest in public safety would be served less effectively without the Ordinance than with it.  *Ward*, 491 U.S. at 801; *Moore v. Brown*, 868 F.3d 398, 404 (5th Cir. 2017) (holding that challenged regulations "must be evaluated in terms of their *general* effect" not how they impact particular individuals) (emphasis in original).  Based on the evidence before the Court discussed *supra*, the City makes that showing here.

### 2.  *Ample Alternative Means of Communication*

Having determined that the Ordinance is narrowly tailored, the next question is whether it leaves open ample alternatives for communication.  "While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate."  *Int'l Women's Day March Plan. Comm. v. City of San Antonio*, 619 F.3d 346, 371 (5th Cir. 2010) (quoting *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984)).  Alternative means of reaching an audience may be adequate

"even when there is 'a reduction in the potential audience' for speech in the alternative venue." *Id.* at 372 (quotation omitted) (holding that an ordinance that imposed fees on march organizers allowed sufficient alternatives for expression where there existed other procession routes where large groups could march for free).  Here, the City correctly points out that the Ordinance leaves open a number of alternative areas where members of the public may engage in all manner of speech such as sidewalks, public parks, and medians wider than six feet.  Doc. 20 at 23; s*ee City of Baton Rouge*, 876 F.2d at 498 (holding that prohibiting solicitation of vehicle occupants allowed ample alternative avenues of communication in the form of solicitation of pedestrians, via telephone, and door-to-door canvassing).  Plaintiffs do not seriously contend otherwise. The Court finds that the Ordinance thereby passes constitutional muster.

## V.  CONCLUSION

For the reasons stated, it is recommended that Plaintiff's *Motion for Preliminary Injunction*, Doc. 11, be **DENIED**.

**SO RECOMMENDED** on July 20, 2023.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation will be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). An objection must identify the finding or recommendation to which objection is made, state the basis for the objection, and indicate where in the magistrate judge's report and recommendation the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).